Jessica Molligan, OSB #001823
Jessica Molligan, Attorney at Law
P.O. Box 16893
Portland, OR  97292
(971) 350-7347
jessicamolligan@comcast.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | | |
|---|---|---|
| **CONNER SLEVIN,** | * | |
| **an individual,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| **v.** | * | **Case No. 3:23-CV-01404-YY** |
| | * | |
| **AB HOLLYWOOD, LLC,** | * | RESPONSE TO DEFENDANT'S RULE |
| **a limited liability company,** | * | 11 MOTION FOR SANCTIONS |
| | * | |
| **DEFENDANT.** | * | |
| | * | |

---

### PLAINTIFF'S FORMER ATTORNEY'S RESPONSE TO DEFENDNAT'S MOTION FOR RULE 11 SANCTIONS

---

This Court should deny Defendant's Rule 11 Motion for Sanctions ("Motion").

Defendant's Motion for Sanctions is premised on the idea that a) Plaintiff made frivolous claims,

i.e., that there were no ADA violations at Defendant's property; b) Plaintiff's former counsel

filed a Stipulated Dismissal after Defense counsel had "withdrawn its consent to stipulate to that

dismissal", and c) that Plaintiff's former counsel "appears to have violated ethical rules."

This Court has already orally denied a motion to dismiss under similar grounds on or

about January 24, 2024.  Accordingly, it is self-evident that this case is not frivolous.

I.    **Courts across the country have recognized the salutary effects of private actions being brought to enforce the ADA.**

While Defendant personally attacks Plaintiff and his former counsel in its Motion, it is apparent courts across the country have a different opinion regarding the enforcement of the ADA.  "There can be no question that the Americans With Disabilities Act, passed in 1990, established as law the nation's interest in eradicating the bigotry and barriers faced by individuals with disabilities. 42 U.S.C. § 12102 et. seq. (hereafter "ADA")."  "The benefits of such changes clearly redound not only to the plaintiffs themselves, but to similarly situated disabled persons, and the entire society at large."  "*See also Bruce v. City Of Gainesville, Ga.*, 177 F.3d 949, 951 (11th Cir. 1999) (discussing ADA plaintiffs as private attorneys general); *Rosenberg v. Merrill Lynch, Pierce, Fenner Smith, Inc*., 170 F.3d 1, 11 (1st Cir. 1999); For example, successful ADA plaintiffs confer a tremendous benefit upon our society at large, in addition to the attainment of redress for their personal individual injuries, successful ADA plaintiffs, like plaintiffs under Title VII, are entitled to 42 U.S.C. § 1988's fee shifting provision." *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d 1135 (N.D. Cal. 2000).

Further illustrating the purpose of the enactment of the ADA, included below is an excerpt from President George Bush's speech over 30 years ago following his signing of the act:

"I know there have been concerns that the ADA may be vague or costly, or may lead endlessly to litigation. But I want to reassure you right now that my administration and the United States Congress have carefully crafted this Act. We've all been determined to ensure that it gives flexibility, particularly in terms of the timetable of implementation, and we've been committed to containing the costs that may be incurred.

…

And now I sign legislation which takes a sledgehammer to another wall, one which has for too many generations separated Americans with disabilities from the freedom they could glimpse,

but not grasp. Once again, we rejoice as this barrier falls for claiming together we will not accept, we will not excuse, we will not tolerate discrimination in America."[1]

Recently, a US District Judge for the Western District of Tennessee with 32 years of experience who has presided over at least 27 individual ADA cases elaborated on the salutary effects of private causes of action to uphold the standards set forth in the ADA, specifically categorizing a plaintiff and his counsel's efforts as a "public service." The District Judge continued to reiterate Plaintiff's counsel is entitled to reasonable fees for providing this service. *Grey v. Salameh*, Case 2:24-cv-02363-JPM-cgc (Attached and marked as "Exhibit 1"). Additionally, this District Court Judge stated, "testers" are allowed partly because the government itself doesn't have or doesn't attempt to have the resources to handle [these cases], and so they do provide for someone like [the plaintiff]." *Id*. at 12. This Judge's sentiments echo the law in this circuit and others.

In the 9th Circuit in *Langer v. Kise,* the Court recently held "[*In Civil Rights Education and Enforcement Center v. Hospitality Properties Trust ("CREEC ")*, 867 F.3d 1093 (9th Cir. 2017)], [w]e also held for the first time, that a plaintiff suing under Title III of the ADA can establish standing through being a tester plaintiff. Id. at 1101. We concluded that a plaintiff's motivation for visiting a place of public accommodation is "irrelevant to the question of standing." Id. Drawing upon the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), in which it recognized tester standing under the Fair Housing Act, we noted that Congress used the same "any person" language in Title III of the ADA as it did in the Fair Housing Act. Id. at 1101–02. This broad language, allowing "any person" to bring a claim under Title III of the ADA, indicated to us that Title III

---

[1] https://archive.ada.gov/ghw_bush_ada_remarks.html

did not contain a "bona fide" customer requirement for standing. Id.; see also 42 U.S.C. §

12188(a)(1)." *Langer v. Kiser*, 57 F.4th 1085 (9th Cir. 2023).

## II.    Plaintiff's complaint is not frivolous, and Defendant makes its assertions with no support in the record before the Court.

Defendant fails to offer any proof that Plaintiff brought frivolous claims in the case at

bar. In fact, Defendant moved for a dismissal of this case, in part using that same argument.

ECF Doc. No. 5. After a hearing on January 24, 2024 (ECF Doc. No. 12), this Court denied that

motion and granted Plaintiff's request to have the property subject to further investigation as to

the alleged ADA violations. This Court has already acknowledged that Plaintiff sufficiently

plead claims for which relief can be granted. There was nothing then, and nothing now, in the

record before the Court to decide as to the factual merits of the case. Defendant simply states

Plaintiff's claims are frivolous without offering any admissible support.

The Ninth Circuit has acknowledged that complaints that initiate actions are not filed for

an improper purpose if they are non-frivolous. *Townsend v. Holman Consulting Corp.*, 929 F.2d

1358, 1362 (9th Cir. 1990) (en banc). (discussing *Zaldivar v. City of Los Angeles*, 780 F.2d 823,

829 (9th Cir. 1986). The purpose of the filing of this case was to require Defendant to get into

compliance with the ADA. Defendant's statement that "[d]uring discovery in this matter,

defendant received photos taken by plaintiff which appeared to directly contradict the allegations

made in the complaint" is false, and again, the only support Defendant appears to rely upon are

pictures submitted in support of its motion for summary judgment. These pictures were not

produced in accordance with Rule 26, and prior to conducting Plaintiff's own expert inspection

of the property[2], the case was closed.

---

[2] Plaintiff's Former Counsel did not seek to inspect the property, because she believed the matter had been resolved. See *Declaration Supporting Response to Defendant's Rule 11 Motion for Sanctions.*

The ADA is a highly technical act, requiring an expert in the field to make measurements to determine compliance. Defendant has designated no such expert along with the production of these photographs. Further, Plaintiff's former counsel disputes that these photographs depict ADA compliance. Additionally, the Court cannot simply take these photographs as proof that ADA violations never existed, as it is clear from the pictures that recent modifications have been done that altered the condition of the property from the time Plaintiff originally visited the property to now. Defendant is now asking the Court to make a factual determination when Plaintiff has no way of rebutting Defendant's claims at this point. It is worth noting, that even if the property had been fully brought into compliance since the initiation of this suit, this would be an issue of mootness, not frivolity.

Former Plaintiff's counsel stands by her position that the violations at the property existed and may still exist; the claims of such were never frivolous.

### III.    Similarly constructed complaints do not mean that a litigant is vexatious or the claims brought are frivolous.

Contrary to Defendant's claim that this Complaint is "near identical" to other ADA enforcement complaints, the actual observed ADA violations are quite specific to Defendant's property. Still, simply filing similar complaints does not establish a presumption that the complaints are frivolous. The Court in *Wilson v. Pier 1 Imports (US), Inc.,* held, "Plaintiff does not dispute that he has filed a large number of cases but notes that "mere litigiousness is insufficient." *De Long*, 912 F.2d at 1147. The court "must examine the content of the filings." *Id.* The court has examined plaintiff's filings, including in the instant case, and finds that plaintiff's ADA claims are not frivolous." *Wilson v. Pier 1 Imports(US), Inc.*, 411 F. Supp. 2d 1196 (E.D. Cal. 2006). Like the case at bar, this Court has already determined that Plaintiff's complaint states a cause for which relief can be granted by denying Defendant's motion to dismiss.

The Court in *Wilson* continues, stating, "Defendants argue that [the plaintiff]'s conduct is "egregious and vexatious," in part because he files "boilerplate violations of the ADA and state law."  Indeed, it appears that earlier instances of Hubbard's complaints are virtually identical. It is unclear to this court, however, why uniform instances of misconduct do not justify uniform pleadings." *Id*. at 1201.  This holding is consistent with the pleadings in the case at bar as it relates to ADA claims and any other area of law, for that matter.  Certainly, it is an illogical and inefficient proposition to require a lawyer prosecuting a car wreck case to completely reinvent a complaint every time a similar accident occurs.  The same applies under the ADA when similar claims are present at different businesses.

Defendant refers to the hearing on the Motion to Compel, during which counsel for Plaintiff realized that there was an error in the filed Complaint, citing an ADA violation that was not listed in her case research.  She apologized to the Court and agreed to file an Amended Complaint.  Defendant's representation that this meant that there were no ADA violations at the property is untrue.

## IV.  Plaintiff's Former Counsel had authority to negotiate and execute all settlements regarding Plaintiff's prosecution of ADA claims.

Defendant appears to make the erroneous argument that, despite Plaintiff giving his former counsel authorization to settle ADA complaints on his behalf, Plaintiff's formal counsel had no such authority.  Plaintiff's agreement with Former Plaintiff's Counsel clearly delegated settlement authorization to his counsel.  The pertinent excerpts from the agreement is attached and marked "Exhibit 2."

Interpreting Oregon RPC 1.2, Oregon Formal Ethics Opinion No. 2019-195 states, in pertinent part,

"It is important to emphasize that this opinion only addresses a client's blanket delegation of settlement authority to his or her lawyer. A blanket delegation of settlement authority means the client has placed no restrictions whatsoever on the settlement terms the lawyer may accept on the client's behalf. The same ethical considerations are not necessarily implicated when the client and lawyer discuss settlement beforehand and the client agrees to give the lawyer authority to settle a claim within pre- agreed parameters—even broad parameters that confer significant discretion to the lawyer.

Nothing prevents a client from providing a lawyer with advance authorization to agree to a settlement within pre-agreed parameters as long as that client places some outer limit on the lawyer's discretion and the client has sufficient information available at the time to make an informed decision about providing such authorization under Oregon RPC 1.4…"

In the case at bar, Former Plaintiff's Counsel's authorization from the client was simple: require the defendant to make the repairs requested and seek a reasonable attorney fee to compensate Plaintiff's Former Counsel for her time.  That is precisely what the proposed settlement agreement would have accomplished.

## V.     Defendant consented to the filing of a stipulation of dismissal in this matter, and never moved to set the stipulation of dismissal aside before it became a final judgment.

Sanctions are not warranted because Defendant thinks that Plaintiff's prior counsel wrongfully filed the Stipulated Dismissal.  This Court has a statement from Jessica Molligan that although Defense counsel sent an email to her earlier in time than her filing of the Stipulated Dismissal, she was unaware of that contact and absolutely did not intentionally file it knowing that the consent to dismissal had been withdrawn.  (ECF Doc. No. 37).  Furthermore, Ms. Molligan responded to Defense counsel's email upon viewing it, advising that she had already filed the Dismissal.  Ms. Molligan then waited to see if Defense counsel wanted her to contact the Court to advise, but Defense never did.  In fact, Defense counsel did nothing until weeks after the judgment became final, leaving Ms. Molligan to conclude that Defendant had again changed its mind and decided to simply let the Dismissal stand.

In pertinent part, FRCP 11(c)(2) states, "The motion [for sanctions] must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.  While Plaintiff's former counsel strongly stands by the veracity of the allegations in the underlying complaint in this cause, Plaintiff's former counsel has already offered to dismiss the suit with prejudice, to which Defendant's counsel originally agreed as stated above.  Essentially, Defendant already accepted the relief that it is now seeking in this motion, and its motion for summary judgment, indicating a potentially improper purpose for the filing of the Rule 11 motion.

Again, citing to *Wilson*, the Court in that case held "based on the evidence presented, defendants have not shown that [the plaintiff] is a vexatious litigant. Indeed, they have left the court with the distinct fear that the motion [to declare him as such] is frivolous." *Wilson v. Pier 1 Imports(US), Inc*., 411 F. Supp. 2d 1196 at 1201.   Based on the record in this case, Plaintiff's former counsel contends the underlying Rule 11 motion is frivolous as well.

### VI.    Counsel for Plaintiff has not violated any ethical rules in her representation of Plaintiff.

Sanctions are not warranted because of Defendant's assertion that "it appears" that Ms. Molligan violated ethical rules.  It is unclear how Defendant expects this Court to make a conclusion as to whether or not there was an ethical violation and whether or not that in any way creates the right to seek Rule 11 Sanctions.  While Ms. Molligan's position is that Plaintiff gave authority to settle all ADA matter, on an informed basis, i.e., that the ADA violations would be addressed, and that Defendant would pay for the attorney fees and costs, this issue does not create a Rule 11 violation.

Sanctions are not warranted because of Defendant's assertion that Plaintiff was paid to be a Plaintiff to create standing. This Court has heard testimony in another ADA enforcement case handled by Ms. Molligan, *Burley-Beavers v. Nguyen and Le,* Case No. 3:23-CV-01890-YY, that the Plaintiff therein was not paid by anyone to be a Plaintiff; he was compensated for estimated expenses involved with visiting Defendant's property. The same applies here to this case. Mr. Slevin was compensated for reasonably calculated probable expenses incurred while visiting Defendant's property. Your Honor previously entered an order effectively "ending the inquiry on this matter." (ECF Doc. No. 21) Further, Defendant offers no proof or substantiation that expense reimbursements in any way affect "standing."

Plaintiff always had standing to bring this case against Defendant. Discrimination has long been recognized in our Courts as a basis for lawsuits. Plaintiff is disabled and encountered physical barriers; he has Article III standing to sue under the ADA. *Sierra v. City of Hallandale Beach, Fla.,* 996 F. 3d 1110, 1114-15 (11th Cir. 2021); *Mielo v. Steak 'n Shake Operations, Inc.,* 897 F. 3d 467, 480 (3rd Cir. 2018); *Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.,* 566 F. Supp. 3d 383, 394 (D. Md. 2021). Furthermore, he actually did not even need to attempt to access a physically inaccessible structure, or to ask for service and be refused, in order to have standing. *International Brotherhood Of Teamsters v. United States,* 431 U.S. 324, 366 (1977); 42 USC Sec. 12188(a)(1).

## VII.   There is no evidence that Plaintiff's demand for attorney's fees was unreasonable.

While it may be true that Defendant expended significant time and money defending itself from this lawsuit, that certainly is by no fault of Plaintiff or Plaintiff's prior counsel. At the very onset, Defendant could have avoided the lawsuit entirely by agreeing to make the repairs and modifications requested in Plaintiff's initial demand letter and by paying for reasonable attorney

fees. Importantly, the ADA does not only require businesses to get into compliance once they are sued; rather, it requires all businesses operating places of public accommodation to be in compliance when such compliance is readily achievable.

While Plaintiff's initial demand for attorney fees may have been $8,000, it is normal negotiating strategy to lower that amount in an effort to avoid unnecessary fees and expenses. There is no adequate record at this point to determine what are reasonable attorney fees for this case, but for reference, attached to this brief are three (3) orders from a US District Court in Eastern Missouri, granting a Plaintiff and her attorney judgments for fees in the amounts of $7,087.50, $7722.00, and $7925.63, respectively, in ADA cases where default judgments were taken. (collectively, "Exhibit 3"). Certainly, more work was involved on the instant case than in the defaulted cases, as negotiations took place between the parties and significant time was spent during that process.

Defendant elected to pursue this matter on its own, even to this point beyond the case dismissal, and continues to incur unnecessary attorney fees without ever once proving that there were in compliance with the ADA or that, if so, it was for some unarticulated reason exempting its compliance with the ADA.

Additionally, Defendant invokes Tennessee rulings by pointing to the matter in *Jordan v. Joe B. Beasley & Associates*, L.P., No. 3:23-cv-00496. Defendant neglects to inform the Court that this case is under appeal, and, given the statements made above in the Western District of Tennessee, it is at minimum possible that such appeal will be successful.

Despite there being no factual record to support any of the allegations toward the plaintiff and the plaintiff's counsel in that case, the dicta from that case cited by Defendant included discussion of the court's order in *In re Tristan W. Gillespie*, No 1:21-mc-14 (D. Md. June 30,

2023), suspending an attorney under circumstances that, in the district court's view, were tangential to those argued by Plaintiff and Plaintiff's former counsel. Significantly, and overlooked by the district court and Counsel for Defendant in the case at bar, the Fourth Circuit vacated the suspension order in Gillespie on November 14, 2023, some two months earlier. *See In re Gillespie*, 2023 WL 7548181 (6th Cir. Nov. 14, 2023), *see also Fox v. County of Saginaw*, 2023 WL 697858 (E.D. Mich. Oct. 23, 2023) (effect of circuit court order vacating district court order is invalidation of district court order).

**VIII.    Conclusion.**

For the reasons stated above, Plaintiff's former counsel respectfully requests a denial of Defendant's Rule 11 Motion for Sanctions.

Dated this October 10, 2024                    /s/ Jessica Molligan

                                                            Jessica Molligan, OSB #001823

**Certificate of Service**

I hereby certify that on October 10, 2024, I caused to be served the foregoing on the following listed e-service contacts:

Nicky Blumm,

Iann M.R. Armstrong,

Michael Fuller, michael@underdoglawyer.com

/s/ Jessica Molligan

**EXHIBIT 1**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                     WESTERN DIVISION

 3   _____
                                   |
 4   JEREMY GREY,                  |
                                   |
 5           Plaintiff,            |
                                   |
 6   vs.                           |   NO. 24-CV-02363
                                   |
 7   IBRAHIM SALAMEH, IHSAN        |
     AWAD,                         |
 8                                 |
             Defendants.           |
 9   _____|

10

11

12

13      TRANSCRIPT OF THE TELEPHONIC SCHEDULING CONFERENCE

14                      BEFORE THE

15              HONORABLE JON P. MCCALLA

16

17

18                      WEDNESDAY

19                 SEPTEMBER 11, 2024

20

21

22

23              TINA DuBOSE GIBSON, RPR, RCR
24                  OFFICIAL REPORTER
            FOURTH FLOOR FEDERAL BUILDING
25             MEMPHIS, TENNESSEE 38103
```

UNREDACTED TRANSCRIPT

2

1                    A P P E A R A N C E S

2

3          Appearing on behalf of the Plaintiff:

4               DAVIS A. STEPHENSON
                Wampler, Carrol, Wilson & Sanderson, PLLC
5               208 Adams Avenue
                Memphis, Tennessee 38103
6               (901) 523-1844
                alex@wcwslaw.com
7

8          Appearing Pro Se:

9               SALAMEH IBRAHIM
                1720 Winchester Road
10              Memphis, Tennessee 38116
                (901) 230-3535
11              salameh1979@yahoo.com

12              IHSAN AWAD
                1720 Winchester Road
13              Memphis, Tennessee 38116
                (901) 299-3925
14              ihsanawad5030@gmail.com

15

16

17

18

19

20

21

22

23

24

25

1          WEDNESDAY

2          SEPTEMBER 11, 2024

3          - - - - - - - - - - - - - - - - - - - - - -

4

5          **THE COURT:**  This is Judge McCalla, and we're

6     obviously on the telephone.  I need to go through three rules

7     to keep in mind.  The first thing is when a person speaks,

8     they need to state their name.  Obviously, we cannot see you,

9     and we need your name to have an accurate record.

10          The second thing is that if the court reporter

11    cannot hear you or understand you, or me, or anybody else,

12    the court reporter will say, I could not hear you or

13    understand you.  Then just repeat more clearly and perhaps a

14    little more loudly the statement that you were making.

15          The third thing is that if there's some

16    overspeaking, and that can happen just because we're distant

17    and we can't see each other, then she will say, I can only

18    take one at a time.  Sometimes I do need to interrupt just a

19    little to keep things moving along.

20          But let me check and see who we have on the line

21    for Mr. Grey.

22          **MR. STEPHENSON:**  Alex Stephenson, counsel for

23    Mr. Grey, present.

24          **THE COURT:**  Okay.  And who do we have for the

25    individual defendants?  I think we may have both of them.  I

1  don't know.  Who do we have for the individual defendants?

2         **MR. IBRAHIM:**  You have Salameh Ibrahim.

3         **MR. AWAD:**  And Ihsan Awad.

4         **THE COURT:**  Okay.  All right.  I'm going to ask

5  just at the beginning, Mr. Ibrahim and Mr. Awad, are these

6  properties part of a corporate operation?  In other words, is

7  there a -- is any of this incorporated, or is this all

8  individually owned?

9         And I'll just start with Mr. Ibrahim, if that's

10  all right, because he's first on my list.  So what's the

11  situation in that regard?

12         **MR. IBRAHIM:**  Yes.  No.  It's basically

13  individual.

14         **THE COURT:**  Individual?

15         **MR. IBRAHIM:**  Yes.  We just accessed the property

16  about two years ago, something like that.

17         **THE COURT:**  Okay.  And you purchased -- you

18  acquired the properties about two years ago.  Is that

19  correct?  Is my understanding correct?

20         **MR. IBRAHIM:**  Yeah.  About two or three years

21  ago, yes.

22         **THE COURT:**  No problem.  And how many -- it says

23  shopping centers, so I don't know how many entities are in

24  the shopping center.  Is this leased property with multiple

25  shops?  What's our situation, Mr. Ibrahim?

1      **MR. IBRAHIM:**  It's basically one big store

2  divided into three where you can go through each store

3  without, you know, going outside.

4      **THE COURT:**  Okay.  And do you operate the store,

5  or does someone else operate the store?

6      **MR. IBRAHIM:**  Ihsan operates the store, and I'm

7  not ever there basically.  Ihsan is the one who is over there

8  sometimes, usually.

9      **THE COURT:**  Okay.  And what kind of business is

10  that?  I'll just switch to your colleague.  What's our

11  situation in terms of the business?

12      **MR. AWAD:**  The business is like a cell phone

13  store, okay, and a clothing store.  It was a vape store, but

14  they did clothing too.

15      **THE COURT:**  Okay.

16      **MR. AWAD:**  They did clothing for like two years.

17      **THE COURT:**  Okay.

18      **MR. AWAD:**  Probably one years and a half,

19  something like that.

20      **THE COURT:**  Okay.  I understand.  All right.  I

21  think that was just a little background so that we could have

22  a better understanding.

23      Let's go back to Mr. Stephenson.  Usually, you

24  engaged in some discussions with defendants and Americans

25  with disability cases.  Have you done that in this case?

6

1    You're not exactly required to, but you almost always do.

2           **MR. STEPHENSON:**  Alex Stephenson speaking.  Yes,

3    Your Honor, I have engaged the defendants with regard to

4    potential resolution of these issues, and that's what I'll

5    say on that at this point in time.  I have presented an

6    offer.  There have been multiple offers presented to them at

7    this time.

8           **THE COURT:**  Okay.  And, of course, the Court

9    doesn't really deal extensively at all in the settlement

10   process, but I know that you usually try to work on that.

11          Do I have the pictures here?  I think they're up

12   here, so let me take a look at them, of the facility.  So

13   exactly what is the -- I know we have -- I tell what you,

14   let's go to Mr. Stephenson.

15          Would you list the most difficult access problems

16   that you've encountered, or your client, Mr. Grey, has

17   encountered, in connection with the property.

18          **MR. STEPHENSON:**  Yes, Your Honor.  Alex

19   Stephenson speaking again.  The defendants have made what

20   appear to be some remediations, attempted remediations to the

21   property.  However --

22          **THE COURT:**  I'm sorry.  I did see that they had

23   and they filed, in essence, an answer and they have -- it

24   appears they have made some -- probably have made some

25   efforts at remediation.

1          Go ahead now.  I'm sorry.

2          **MR. STEPHENSON:**  Correct, Your Honor.  And so at

3    this time, based on -- and I've been out to the property

4    personally.  I went at the end of August.  So unless there

5    have been changes since that time, the main issues that I --

6    that we are noticing is the fact that there is a transition

7    from the access aisle up to the route to entry, and there is

8    no curb ramp.  And so there's about a one half -- there's a

9    wooden board that goes across right behind the parking stops,

10   the bollards out front.

11         And so there's a transition.  There needs to be a

12   ramp of some kind or a level portion where someone on a

13   wheelchair can arrive and access that without having to put

14   in extra force or find a way to jump that transition.

15         There also -- it appears that the access aisles

16   are too narrow on the spaces that are accompanying the

17   accessible spaces, and we are also requesting that there be a

18   van accessible space.  It does not appear that either of the

19   spaces that have been added are designated as a van

20   accessible space, and it does not look like either of those

21   spaces meet the minimum requirements to satisfy the

22   guidelines for a van accessible space.

23         **THE COURT:**  Right.  We have pictures of the

24   automobile accessible space, but your point is that there's

25   not -- you don't believe there's a van accessible space; is

8

1    that correct?

2         **MR. STEPHENSON:**  That is correct, Your Honor.

3    And there's a couple of other issues, and I'll just go ahead

4    and run through those briefly.  Nothing can protrude into an

5    access aisle and/or space.  It appears that at least in one

6    of the access aisles, and potentially both, there's a parking

7    bollard that projects into or is located within the access

8    aisle, and that is not allowed.  So that's another issue.

9         But, mainly, it's the fact of the missing van

10   accessible parking space, the transition from the parking

11   facility up to the route to entry, and the fact that it does

12   not appear that either of the spaces satisfy what would make

13   a van accessible space.  Even if they were just to add

14   signage, it would need to be re-striped from what I'm seeing.

15        **THE COURT:**  Okay.  All right.  Well, let me hear

16   from, perhaps, Mr. Ibrahim because -- what's our situation,

17   then?  I know you made some remedial efforts.  And, actually,

18   looking at the photographs, the property looks pretty neat

19   and clean and nice.  How is it going in terms of working with

20   Mr. Stephenson to get these things resolved?

21        **MR. IBRAHIM:**  Salameh Ibrahim speaking.  We did

22   do the required, I guess, modification that needed to be

23   done.  We only have, like, what, eight parking spaces over

24   there or nine parking spaces, and we do have even two

25   handicap spaces.  We only have to have one.

9

1     The handicap goes straight to the door.  I think
2     he's talking about where you can go from one door to the
3     other from the outside.  From the outside, it is a little
4     small, but you can go from one door -- from the handicap to
5     the door, you can go inside of it.  And the first handicap
6     space, I mean, we measured it.  It looked like it was
7     required, in other words, you know, I guess the measurements
8     that needed to be measured.
9     But I invited Mr. Stephenson and his client to
10    meet me over there two or three times if they would like and
11    so we can go -- so we can go to the -- you know, exactly what
12    needs to be fixed.  In my -- the way I see that we fixed
13    everything that I guess I thought needed to be fixed.  But
14    like I said, if there's anything we have to do, re-striping
15    or anything, we have no problem.  It's under a $200 job.  We
16    have no problem paying anybody to, you know, anybody to
17    re-stripe.
18            **THE COURT**:  Sure.  Right.  Let me check with your
19    colleague.  Tell me what your relationship is.  I want to get
20    the names right.  I've just been using the names as they
21    appear here, but it may be that -- Mr. Awad; is that right?
22            **MR. AWAD**:  Yes, sir.  Yes, Awad.
23            **THE COURT**:  Sometimes they -- I hate to say this.
24    Sometimes they mix up first names and last names because I'm
25    never quite sure the order in which they appear on my page.

1          **MR. AWAD:**  First name is Ihsan.  Last name is

2     Awad.

3          **THE COURT:**  We're good, Mr. Awad.

4          What's your observation, about what we need to

5     get done here?  We usually set a schedule.  We will set a

6     schedule, but tell me what your observation is.

7          **MR. AWAD:**  I mean, I'm sorry because my English

8     is not very well.  I've not been in the USA for a long time.

9          **THE COURT:**  You sound really good.  I want to --

10    you sound quite good, but if you would prefer your colleague

11    to speak, that's okay too, but . . .

12         **MR. AWAD:**  Yes, because I'm not speaking very

13    well English actually.

14         **THE COURT:**  Well, a lot better than -- now,

15    what's your native language, then?

16         **MR. AWAD:**  I speak Arabic.

17         **THE COURT:**  Arabic.  All right.  Well, I have a

18    Farsi speaker here, but I don't have an Arabic speaker.  I

19    had one not long ago.

20         **MR. AWAD:**  I mean, Salameh can translate for me.

21    If you want to ask me something, he can translate.  I can

22    understand a couple of things, but not everything.  Like what

23    you asked right now, I don't understand.

24         **THE COURT:**  No problem.  We're going to go

25    back -- I just didn't want to leave you out.  That's

1    important because you're part of the case.  And so --

2              MR. AWAD:  Yes, sir.

3              THE COURT:  Is it Mr. Salameh, that's close, I

4    hope.  How do you pronounce your last name?

5              MR. IBRAHIM:  Yes, sir.  (Inaudible.)

6              THE COURT:  Okay.  Yes, sir.  So what do you

7    propose in terms of how we proceed?  I'm going to come back

8    to plaintiff's counsel.  I will tell you that usually

9    plaintiff's counsel, on these cases, they're properly

10   brought.  There's not a problem with that.  It may seem a

11   little frustrating sometimes.  But I will tell you that

12   Mr. Stephenson is usually pretty reasonable.

13             Aren't you, Mr. Stephenson?

14             MR. STEPHENSON:  Your Honor, I try to be.  I try

15   to be.  And if I may respond just briefly to some of the

16   comments made by the defendants.  You know, we have -- I

17   proposed meeting the defendants out at the property.  You

18   know, we have not -- there hasn't been a time scheduled at

19   this point, but I'm happy to go out there and go over that

20   with them and review these issues that my client has

21   complained of and that we still believe are currently in

22   violation of the ADA.  And so we're willing to work with the

23   defendants.

24             They -- as I said, we presented offers.  The

25   defendants have, at least as far as Mr. Ibrahim, has told me

12

1    that the defendants have, you know, some issue with the fact

2    that my client is bringing this case and has brought so many

3    cases.  And so I do appreciate you bringing that up.  I tried

4    to explain to them that there's nothing other than the fact

5    that we're trying to get this property into compliance so we

6    can get this resolved, and so I do appreciate you making that

7    point.

8          **THE COURT**:  Well, it is confusing the first time

9    someone is confronted with ADA compliance because it looks

10    like, well, what's going on here, how come this individual is

11    going around doing this?  But testers in this area are

12    allowed.  It's -- and that's to ensure the enforcement of the

13    statute.  It's really partly because the Government itself

14    doesn't have or doesn't attempt to have the resources to

15    handle this, and so they do provide for someone like

16    Mr. Grey.

17          My impression, because we've had a good many of

18    these, is that Mr. Grey clearly has a real disability.  This

19    is not some -- did you see him, Mr. Salameh?  Did you see

20    Mr. Grey?  He's usually in a van.  Is he still in a van?

21          Let me just check back with Mr. Stephenson.  He

22    had a van.  He's usually in a wheelchair.  Right.

23          **MR. STEPHENSON**:  Yes, Judge.  He's generally in a

24    van.  There's also a Nissan Xterra he has with accessible

25    features that he will drive from time to time.

1              THE COURT:  Okay.

2              MR. AWAD:  Excuse me.  I'm sorry, sir.

3              THE COURT:  Sure.  Go right ahead.

4              MR. AWAD:  I just want to ask something.

5              THE COURT:  Sure.

6              MR. AWAD:  He spoke about the guy, the tester.

7              MR. IBRAHIM:  Basically, he's talking about the

8     handicap guy.  He comes in with a van.

9              MR. AWAD:  Yes.  I think I remember this guy,

10    okay, so -- because I'm working always there.  Okay.

11             THE COURT:  Sure.

12             MR. AWAD:  I think he always come in there, and

13    honestly, he -- if I'm not mistake what you guys talking

14    about, okay, I always -- he gives me the beep.  (Speaking

15    Arabic.)

16             THE COURT:  I'm sorry.  We missed that.  I'm

17    going to ask you to say that again.  The court reporter just

18    said we need to re-speak.

19             MR. IBRAHIM:  He said he remembers the guy.  He

20    thinks it's the guy.  He usually beeps when he comes.

21             MR. AWAD:  Yes.  (Speaking Arabic.)

22             I'm sorry.  I'm just speaking Arabic so he can

23    translate for you guys.

24             THE COURT:  Okay.  I'm sorry.  Go ahead.  But

25    they asked you to slow down just a little bit.

1           **MR. AWAD:**  Okay.  Salameh, can you hear me?

2           **THE COURT:**  Yes, yes.  Just speak a little more

3    slowly.

4           **MR. AWAD:**  I'm going to tell him in Arabic.

5           **MR. IBRAHIM:**  He's trying to speak in Arabic so I

6    can translate for him.

7           **THE COURT:**  Oh, no, that's perfectly fine.

8    That's no problem at all.  We're glad to do that.

9           **MR. AWAD:**  (Speaking Arabic.)

10          **MR. IBRAHIM:**  I don't know if it's the same guy

11   he's talking about.  He's saying there's a guy that comes in

12   there.  He beeps his horn, and they go out.  When he beeps

13   his horn, they go out to his car and help him out, give him

14   whatever he wants and just go back to the store so he won't

15   have to get out.  I don't know if maybe he's confused with

16   another guy.

17          **MR. AWAD:**  If I'm not mistaken.  He's my

18   customer.  He's a very good customer.  Okay.  And he always

19   come in there.  Even when we have the handicap, he's coming,

20   he beep the horn, and we go help him.

21          **THE COURT:**  I think that's all -- it reminds me

22   of when I was in France, actually.  That's a really good

23   thing to do, and that's not a problem.  In fact, I'm sure

24   that Mr. Stephenson would agree that that's certainly a way

25   to approach the issue.  I think that what I am hearing is

1    that you would all three like to meet and also -- I think it
2    is another person that is -- that you're dealing with, but
3    that's still a very favorable thing.
4              So, Mr. Stephenson, when do you suggest that you
5    try to get together with these two gentlemen?
6              **MR. STEPHENSON:**  I can gladly get out there in
7    the next 30 days with them.  The property is here in town,
8    Your Honor.  It's about 15 to 20 minutes from my office.  If
9    we can find some time in the next 30 days, I would gladly
10   meet Mr. Awad and Mr. Ibrahim out at the property and go over
11   the issues that my client is still complaining of.
12             **THE COURT:**  I think that's a good idea.  Is that
13   okay for the --
14             **MR. IBRAHIM:**  Like I said, he is out of town the
15   next, I think, week.  So after one week, I can get with
16   Mr. Stephenson and we can just meet out there and hopefully
17   we can solve this without any further -- anything further.
18             But going back to Mr. Stephenson, about him --
19   about his client going around.  Honestly, I do believe
20   that -- I'm sorry.  Mr. Stephenson told me that his client
21   doesn't go around and get money out of this.  He can't get
22   money out of this.  He doesn't get paid.  It's against the
23   law.  And, honestly, I'm sorry, I just don't believe his
24   client is just going around to 20, 25 stores just to -- just
25   to, you know -- just to, you know, basically just pay off

1   lawyers and waste his time like that.

2           The reason I have a problem with it is because
3   Mr. Grey never came inside the store and told us, look, I do
4   have a problem with the handicap space.  Can y'all please fix
5   it?  I do have a problem with this showcase being high.  Can
6   y'all please fix it?  It's not like he's coming in there and,
7   you know, asking us and we didn't do it.

8           THE COURT:  I understand.  And I think that the
9   answer to this is for the three of -- the four of you to meet
10  and try to get it resolved.  So I was going to try to set a
11  date or a close -- something that's pretty close to a date
12  for you to meet.  It sounds like that should be -- what will
13  work for the defendants?  What's a good day for you?  And I
14  think that plaintiff's counsel is saying he will try to work
15  with that.  What day would work for you?

16          MR. IBRAHIM:  Ihsan, when do you come back in
17  town?

18          MR. AWAD:  I'll be in Memphis on the 27th.  So
19  any day after that, I will be okay with it.

20          THE COURT:  Any day after September 27.  Of
21  course, September 27 is a Friday.  So you're talking about
22  either the 30th or maybe later in the week.  Maybe October
23  the 2nd would be a Wednesday.  Would that work?

24          MR. AWAD:  Yes.

25          THE COURT:  Okay.  Wednesday, October 2nd.

1          **MR. AWAD:** Yes.

2          **THE COURT:** Let me ask Mr. Stephenson: Is that

3  going to work for you?

4          **MR. STEPHENSON:** Let me check my calendar, Your

5  Honor. I'm looking right as we speak. October 2nd appears

6  to be a good date for me, Your Honor.

7          **THE COURT:** Okay. What time do you want to meet

8  at the business, at 1722 Winchester?

9          **MR. STEPHENSON:** Anything between nine and four

10  o'clock works for plaintiff's counsel, Your Honor.

11          **THE COURT:** By that time of year, it will be

12  fairly comfortable during the day, so why don't we say 11 a.m.

13          **MR. AWAD:** That works.

14          **THE COURT:** Would that work for the defendants?

15          **MR. IBRAHIM:** You said October 2nd, 11 a.m.

16          **THE COURT:** Wednesday, October 2nd, at 11 a.m.

17          **MR. IBRAHIM:** That works.

18          **MR. AWAD:** That works for me.

19          **MR. IBRAHIM:** Yes, that works for me too.

20          **THE COURT:** Looks like everybody is on board on

21  this.

22          **MR. IBRAHIM:** I did want to ask something, Judge.

23          **THE COURT:** Sure.

24          **MR. IBRAHIM:** We did receive the notice from --

25  on, I think, around -- I'm sorry, on the 4th of June. We did

1    receive that 21 days where you have to fix everything, and I

2    did submit the ticket that Ihsan was out of town from the 2nd

3    to the 29th, and that's why we didn't do the 21 days on time

4    because he was out of town, and I submitted those tickets to

5    Mr. Stephenson and his client but they still, I guess -- I

6    explained to them this is why we didn't do it, 21 days on

7    time.

8            THE COURT:  Sure.  I think Mr. Stephenson has

9    agreed that that's not going to be raised as a problem in the

10   case.  Is that right, Mr. Stephenson?

11           MR. STEPHENSON:  Correct, Your Honor.

12           THE COURT:  Thank you for bringing that up,

13   though.  That does take care of that.

14           What we're going to do is we're going to reflect

15   in the scheduling order that the parties will meet on

16   Wednesday, October 22nd (*sic*), at 11 a.m., at the business in

17   an attempt to resolve the matter.  And we will also reflect,

18   because I can see the photographs and so forth, that the

19   business has taken steps to remediate a portion of the

20   complaints and will attempt to resolve the rest in the

21   meeting.

22           Now, I have to set a couple of other things.  I'm

23   going to tell you about a few things, but don't get too -- we

24   can work through this.  In the business -- in the federal

25   court, there's a requirement that the parties exchange

1  information, and it is a serious requirement, very much

2  enforced, and that means that, for example -- and I think

3  that the -- I think defendant has done some of this already.

4  You know, things that you would rely on in defense of your

5  case, you have to show Mr. Stephenson.

6         Now, he has to show you what he would rely on in

7  his case.

8         So, Mr. Stephenson, if you have photographs taken

9  by Mr. Grey, which you usually do, have you disclosed those

10  at this time?

11         **MR. STEPHENSON:**  I have not, Your Honor.  But

12  the -- I believe we've agreed that the initial disclosures

13  will be served on each other by the 23rd of this month.  I

14  can gladly include any photos the plaintiff has along with

15  those disclosures.

16         **THE COURT:**  And so you have agreed on that.  Both

17  sides do have to disclose.

18         The second thing is that you also have to

19  identify people who would be witnesses to what's been done.

20  Now, for example, if someone has changed the striping on the

21  parking lot or put up a -- changed matters as to the handicap

22  access, that person, who might well be a workman or a

23  craftsman, name would be disclosed also to show that the

24  defense had done that.

25         That's important.  It's very favorable to you to

1    show that.  So you would want to identify the company and/or

2    the workman who had made those changes, and you have made

3    some changes.  So I would -- you have to show those.  It's a

4    list, not very complicated:  an address, a phone number of

5    those two or three or four or five people.  And, of course,

6    you put both of your names on there because you're very

7    familiar with the property and also the businesses.  You

8    also -- the -- in this case, there's not a damage claim.

9           So I want to make it clear, Mr. Stephenson,

10   you're not seeking money damages from -- you're not seeking

11   money damages from the defendants, right?

12          **MR. STEPHENSON:**  That is correct, Your Honor.

13          **THE COURT:**  Right.  So we have to show that that

14   there's no request -- otherwise, they would be to specify

15   what they were.  And that's important, obviously.

16          Now, I realize there's some issues about maybe

17   attorney's fees and so forth, but we're not going to try to

18   address those now.  So that's what's due on September the

19   23rd of this year.

20          If a party, either side, does not disclose that

21   information, which is pretty simple to disclose, then they

22   lose the ability to use that information later on in a

23   determination of the merits of the claim.  So very important.

24   Not very hard to do.

25          If you're not quite sure what to do, my staff

1  cannot tell you what to do because we're not allowed to do

2  that.  We can't help people.  But I think Mr. Stephenson is

3  the kind of guy who will tell you what is needed because he's

4  not doing this to get rich.

5        Right, Mr. Stephenson?  You're doing this because

6  it's an important part of helping people have access.  And if

7  you're doing it to get rich, you're doing it the wrong way,

8  right.

9        **MR. STEPHENSON:**  Absolutely, Your Honor.

10       **THE COURT:**  So this is more of a public service,

11  and I do appreciate what he's doing.  I think we need to

12  understand that.

13       I checked initially to see whether we needed to

14  have any new parties, whether there was somebody else that

15  might have responsibility.  Is there anybody else from the

16  defense point of view that we might need to have who would be

17  responsible for making any changes, or do we have everybody

18  correctly?

19       Mr. Salameh, what about that?

20       **MR. IBRAHIM:**  You said we need to disclose

21  whoever does the parking lot.  Is that something that I send

22  to the Court?

23       **THE COURT:**  No.  It's something you send to

24  Mr. Stephenson.  Now, you theoretically could send it to us,

25  but we don't receive that normally.  That's an exchange of

1    information to help get the case resolved.  And it's

2    important.  Mr. Stephenson, I think, is going to be helpful.

3    He's not your lawyer.  He can't give you real advice --

4             **MR. IBRAHIM:**  Yes.

5             **THE COURT:**  -- but he will not be --

6             **MR. IBRAHIM:**  No, he's been helpful.

7             **THE COURT:**  He seems like he's a good guy on

8    this.

9             **MR. IBRAHIM:**  Yes.

10            You did say something that I think I

11   misunderstood.  You said the thing was October 22nd.  I think

12   you meant to say October 2nd.

13            **THE COURT:**  I'm sorry.  October 2nd.  If I say

14   22nd, it's just because I've got something else I've got to

15   do on that day, which I do, actually.

16            **MR. IBRAHIM:**  So one more question, if I may ask.

17   You did say something about Mr. Grey and his lawyer, they're

18   not doing this to get rich and stuff, but they are acquiring

19   royalties and stuff.

20            Now, can the judge -- can you know how much those

21   royalties are? because when we tried to settle the case, I

22   thought the lawyer fees was way more expensive than the

23   normal fees.  Would the Court set the lower fees for this

24   case or --

25            **THE COURT:**  Let me explain one thing about --

1    good question, and the Court can, if there's not an agreement

2    on that, then there can be -- if it's determined -- and it

3    appears that it might be determined -- that some remediation

4    needed to occur, then the Court can set a reasonable fee that

5    will be paid by the defense.  We usually don't end up doing

6    that in these types of cases.

7              Now, we do it in lots of cases, but this is not

8    the type of a case.  And this is not like in state court

9    where you're talking about a fee that sounds like a couple of

10   hundred dollars.  I know in state court, there can be fairly

11   low fees.  They're really fees that go to the court.

12             These are fees that are for the purpose of making

13   sure that counsel, who are willing to pursue these cases, are

14   adequately compensated for their work.  We're not trying --

15   but when I said about not -- just as a practical observation

16   from many, many cases, I was not kidding when I said to

17   Mr. Stephenson, I don't think you're getting rich on these

18   cases, because these -- he's -- these are not usually high

19   fees.

20             I will give you a terrible example of fees.  I

21   have cases where people get -- this is a different situation

22   completely.  In Delaware, people may get $7 million in fees.

23   That's not the kind of case at all.  That's a patent case or

24   trade secret case.

25             So we have -- we do have the ability to set fees.

1    It's better if people can work them out, but we can if the

2    parties don't work them out.  A party is entitled to an

3    application for fees, and we set them in accordance with the

4    law that exists in the Sixth Circuit.  So it's a little

5    complicated, and I think you'll -- I'm going to let y'all

6    work that out if you can.  If you can't, then I'll take care

7    of it at the appropriate time.

8              MR. IBRAHIM:  Okay.  The lawyer's fees -- now,

9    for example, Mr. Stephenson, not that he would do this.  He

10   can basically try to drag this out for two years and say,

11   okay, this is two years' worth of royalties.

12             THE COURT:  I don't think that -- Mr. Stephenson,

13   your fees --

14             MR. IBRAHIM:  Not that he would do that.  I'm not

15   a lawyer.  I'm sorry.  I'm just trying to --

16             THE COURT:  Right.  You have the same healthy

17   skepticism that most of Americans do about paying lawyers.

18   There's nothing wrong with that.  That's not a problem.

19             MR. IBRAHIM:  Yeah, yeah, because, honestly, this

20   case is kind of -- this case is kind of -- I don't want to

21   say ridiculous and stuff, but, I mean, we could have resolved

22   this case from the beginning where Mr. Grey -- you're saying

23   Mr. Stephenson is not out there to get rich.  I mean, he's

24   trying to do his job to get some money.  It's not that.

25             If Mr. Grey wanted us to fix this stuff, he could

1  have just came inside the store and said, can y'all please

2  fix this, and the case would be over.  But yet, we're going

3  to do all this stuff, and he's going to 30 locations.  I

4  don't know how many locations.  I don't want to say.  He goes

5  to every single location just snapping pictures and doing

6  this stuff.

7            I know you're looking at it a different way, but

8  I'm sorry, I'm looking at it a completely different way than

9  you are, Judge.  I'm looking at it as they're going around

10  snapping pictures instead of going inside the store and just

11  asking, can y'all --

12            Now, if Mr. Grey, came over here and said, hey,

13  can y'all fix this, and I ignored it, I can understand that.

14  But he did not come to me and say, fix this.  We fixed this

15  stuff right when we received the paper, and yet we're going

16  through all this that requires more and more and more lawyer

17  money.

18            That's why I think, honestly, this lawsuit is

19  something that has to do -- a hundred percent in my mind has

20  to do with money because Mr. Grey never came up to me and

21  said, can y'all fix this.  He didn't give me a chance.

22            **THE COURT**:  Your point is a good one in terms of

23  a suggestion for Mr. Grey in the future.  I've seen him,

24  obviously, in other matters, and he's not a bad guy.  But I

25  understand exactly what you're saying.  I think it's a really

1    good suggestion.  We are kind of where we are.  I can't

2    really change that right now.

3              **MR. IBRAHIM:**  He's doing it by the law.  I know

4    he's doing it by the law.

5              **THE COURT:**  Right.

6              **MR. IBRAHIM:**  But this is all over the United

7    States and Florida, and California.  This stuff has happened

8    all over the United States, and I'm surprised that -- you

9    know, I know he's doing it by the law and I see that, but I'm

10   surprised that the courts haven't did something where, you

11   know, this person has to come in and give the person a chance

12   of, you know, trying to fix things instead of just going

13   straight to court and trying to get some money out of these.

14             **THE COURT:**  Right.

15             **MR. STEPHENSON:**  Your Honor, if I may just

16   respond briefly.

17             **THE COURT:**  Sure, go ahead.  But we're going to

18   try to get the schedule and wrap things up pretty quickly.

19             **MR. STEPHENSON:**  Absolutely.  This will be very

20   quick.  Just to clarify, plaintiff's counsel, I sent this

21   out, personally sent out a letter prior to the lawsuit being

22   filed in an attempt to resolve these issues.  There were

23   conversations prior to a lawsuit being filed.  Nothing was

24   able to get worked out.  That is why we're here.  That's all

25   I have to say, Your Honor.

UNREDACTED TRANSCRIPT

1          THE COURT:  No, I understand.

2          MR. IBRAHIM:  He was out of town.  I showed you

3     the tickets that he was out of town.

4          THE COURT:  Right.  Let me go ahead.  We've got

5     that information, and we understand that.

6          MR. IBRAHIM:  Okay.

7          THE COURT:  This is really a good case in terms

8     of what -- the way that the defendants have responded.  You

9     know, sometimes they don't try to fix things.  Sometimes it's

10    a really big issue, and you kind of wonder, well, why are

11    they not fixing this, they need to get things taken care of.

12    So I think everybody is trying to get to the right place

13    here.

14          Now, I don't think we need to join parties.

15    That's what I understand, so I'll make a note of that, but

16    we've got a deadline for that.

17          Motions to amend pleadings, I think the pleadings

18    are adequate.  And we refer back to the conference today and

19    the photographs submitted and so forth as supplementing what

20    has been submitted in the case.  And we understand, of

21    course, you will be exchanging material by -- on or about

22    September 23rd.

23          Motions to dismiss, this is really not a motion

24    to dismiss case.  These cases have an ability to be heard by

25    the Court, and they do state a claim.

1          Completing all discovery, they've got April 1.

2     That's interesting, April 1, of 2025.  I think this case will

3     get resolved, and we will leave that date in there.

4          And also there's a deposition deadline.  Requests

5     for admissions deadline and so forth.  We will leave those in

6     the proposed material.

7          Experts, this is actually so that everybody

8     understands, particularly the defendants, this is a case

9     where -- the type of case where there are individuals who are

10    engineers who do assessments as to compliance with the ADA.

11         And they will come in, and of course, they charge

12    a fee too, but they will come in.  They don't work for the

13    Court.  They work independently.  And they will actually do

14    measurements and check everything and say exactly what needs

15    to be fixed and what does not need to be fixed.

16         There's a gentleman out of Alabama that does this

17    regularly, but there are different people.  I think there's

18    someone in the city of Memphis who does it, so there could be

19    an expert if we were going to go to trial.  I understand the

20    plaintiff would probably have one who would do measurements,

21    and the defense might want one just to go through and make

22    sure that you've shown it.

23         That's an expense we hope you don't have to

24    incur, but that's something that is a possibility.

25         Then there are depositions that would be set for

1  those, and there's disclosure under Rule 26(e)(1), which is a

2  supplement to the materials that were exchanged in September.

3           Now, I'm going to give you a trial date. This is

4  actually listed as a -- let me make sure.

5           Mr. Stephenson, did you ask for a jury on this?

6           **MR. STEPHENSON:** No, Your Honor.

7           **THE COURT:** Right. So it's a nonjury as far as I

8  can tell right now. But there's been no answer -- there has

9  been an answer but no jury demand. So we're going to reflect

10 it as a nonjury, judge only case. That could change. If the

11 defense decides you want a jury and you file it with an

12 answer with the demand, you will have one.

13          We're going to give you a date for that. That

14 would be quite short. The jury trial would be probably a

15 day, maybe two at the most.

16          **CASE MANAGER:** Okay.

17          **THE COURT:** And we're going to give them a date.

18          **CASE MANAGER:** What month are you looking for,

19 Judge?

20          **THE COURT:** We can do this in June.

21          **MR. IBRAHIM:** Your Honor, can I request a jury?

22          **THE COURT:** You can. You can request a jury, and

23 that's fine if you want a jury. Juries add a lot of time to

24 the case. I don't mind. I'm glad to have a jury. I like to

25 have a jury because that means that I don't have to resolve

1   factual issues and the jury would.

2            **MR. IBRAHIM:**  I would like a jury.

3            **THE COURT:**  That's perfectly fine.  And so that

4   will make it a two-day case or two and a half.  When will we

5   have that?

6            **CASE MANAGER:**  We will do that on Monday,

7   June 16th.

8            **THE COURT:**  Monday, June 16.  That's, of course,

9   next year, 2025.  We start at 9:30 in federal district court,

10  a courtroom to be designated.

11           Pretrial conference would be on which day?

12           **CASE MANAGER:**  Friday, June 6th at 10:45.

13           **THE COURT:**  June 6 at 10:45.

14           And pretrial order?

15           **CASE MANAGER:**  May 30.

16           **THE COURT:**  May 30, 2025.  I think those are

17  dates, and if there's anybody that's got a problem -- this is

18  so far away, I can't imagine anybody has an issue on that.

19           Okay.  We'll enter the schedule.  What I need you

20  to do, though, is this -- obviously, I would require you to

21  meet in this case, and then if you do get the case resolved,

22  it is important that you notify us promptly, and that's set

23  out in the local rule.

24           Usually, you notify us immediately by phone to

25  say the case is resolved, and then you notify us -- and then

1   you're required to file an order of dismissal that basically

2   indicates the resolution of the case within a specified

3   period of time, which is about 28 days at the most, and we

4   would be -- if we didn't get that, then we would follow up

5   and see what had happened.

6           So, Mr. Stephenson, you're familiar with the

7   notice requirement in connection with any resolution of the

8   matter?

9           **MR. STEPHENSON:**  Correct, Your Honor.

10          **THE COURT:**  All right.  And I wanted to actually

11  tell everybody else.

12          I think we've covered it.  I do understand the

13  frustration of the defendant on this.  It's not -- it's fully

14  understandable.  Our objective is to get this resolved as

15  efficiently and as inexpensively as we can, but I -- you

16  know, I can't -- that's really up to the parties, but that's

17  what we try to do.

18          All right.  Anything else, then, from the

19  defendants?  Mr. Salameh, anything else that I need to know

20  from you?  I do appreciate -- obviously, you've worked on it.

21  I appreciate it.  I appreciate both of you working on the

22  matter.  Anything else that I need to know from the defense?

23          **MR. IBRAHIM:**  There is one thing that, you know,

24  that I haven't brought up yet.  The -- a media did call me.

25  Media called me about doing some ADA cases on the news and

UNREDACTED TRANSCRIPT

1   stuff.  It wouldn't be a problem if I did one of those on the

2   media on that, would it?

3          THE COURT:  Are they asking about a story, a news

4   story, or is there something else?

5          MR. IBRAHIM:  Yes, a story about ADA cases.  I

6   just want to make sure --

7          THE COURT:  If you -- that's entirely up to you.

8   If -- you know, we can't give advice.  There's no prohibition

9   about having a news story on it.  But often --

10         MR. IBRAHIM:  I just wanted to make sure I didn't

11  create a problem.

12         THE COURT:  You're not creating a problem there.

13  I would suggest that often things resolved between the

14  parties calmly are better than things that are put on the TV.

15         MR. IBRAHIM:  I think everybody would.

16         THE COURT:  Most people would think that, but

17  it's up to you.  It's up to you.

18         Okay.  Anything else, Mr. Stephenson, from you?

19         MR. STEPHENSON:  Nothing from the plaintiff, Your

20  Honor.

21         THE COURT:  Good deal.  We will get that order

22  entered, and thank you all very much.  Thank you.

23         MR. IBRAHIM:  Okay.  Thank you.

24         MR. STEPHENSON:  Thank you, Your Honor.

25         (Adjournment.)

```
 1              C E R T I F I C A T E

 2

 3

 4              I, TINA DuBOSE GIBSON, do hereby certify that the

 5    foregoing 32 pages are, to the best of my knowledge, skill

 6    and abilities, a true and accurate transcript from my

 7    stenotype notes of the TELEPHONIC SCHEDULING CONFERENCE

 8    hearing held on the 11th day of September, 2024, in the

 9    matter of:

10

11    JEREMY GREY

12    vs.

13    IBRAHIM SALAMEH, IHSAN AWAD

14

15

16    Dated this 18th day of September, 2024.

17

18

19

20                        S/Tina DuBose Gibson
                          _____
21                        TINA DuBOSE GIBSON, RPR, RCR
                          Official Court Reporter
22                        United States District Court
                          Western District of Tennessee
23

24

25
```

UNREDACTED TRANSCRIPT

# EXHIBIT 2

Client and Attorneys agree as follows:

I. PURPOSE OF REPRESENTATION

1.1 The Attorneys' Legal Services. Attorneys will file lawsuits in the U.S. District Court on Client's behalf involving claims for discrimination as a result of the conduct of defendants subject to Title III of the Americans with Disabilities Act where attorneys find the cases to have merit.

II. THE DUTIES OF THE ATTORNEYS

2.1 Prosecution of your Cases. Client and Attorneys agree that, if warranted upon an evaluation of the merits and likelihood of success of each case by Attorneys, Client's cases will be prosecuted to the extent possible under Title III of the ADA. Client agrees to accept notifications and transmission of documents from the regarding case(s) via electronic mail of text (SMS).

IV. CONDUCT OF THE LITIGATION 4.1 Power of Attorney. Attorneys are granted a Power of Attorney as related to these cases so that they have full authority to prepare, sign, and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to commence, conduct, and conclude their representation, including reducing to possession any and all things of value due Client under these claims should the Courts choose to make such award(s), as fully as Client could do in person. Attorneys are authorized and empowered to act as a negotiator in any and all settlement negotiations.

**EXHIBIT 3**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JULIE BURGESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22-CV-1324 RLW |
| | ) | |
| AANASER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED JUDGMENT

In accordance with the Court's order of May 9, 2023 (ECF No. 10) and the Memorandum and Order of this date, both incorporated herein,

**IT IS HEREBY ORDERED, ADJUDGED, and DECREED** that judgment is entered in favor of Plaintiff Julie Burgess and against Defendant AANASER, Inc.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant AANASER, Inc. shall bring its real property into compliance with the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, as delineated in Plaintiff's Complaint.

**IT IS FINALLY ORDERED** that Plaintiff's counsel is awarded Seven Thousand Eighty-Seven Dollars and Fifty Cents ($7,087.50) in attorney's fees and Four Hundred Seventy-Seven Dollars ($477.00) in litigation expenses.

*Ronnie L. White*

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 10th day of July, 2023.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE STEGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:23-cv-00549-MTS |
| | ) | |
| CLAYTON CAPITAL ASSETS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## JUDGMENT BY DEFAULT

In accordance with the Order entered this same date granting Plaintiff's Motion for Default Judgment,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment by Default is entered in favor of Plaintiff Michelle Steger and against Defendant Clayton Capital Assets LLC in the amount of seven thousand, seven hundred twenty-two dollars ($7,722.00).

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, within twelve (12) months of the date of this Judgment by Default, Defendant Clayton Capital Assets LLC shall perform the following six (6) actions at its real property located at 7329 Saint Charles Rock Road, St. Louis, Missouri to bring the property into compliance with the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* and its implementing regulations, the ADA's Accessibility Guidelines, 28 C.F.R. Part 36:

1. Add a van-accessible parking space that is at least one hundred thirty-six (136) inches wide.

2.    Add an access aisle adjacent to the newly created van-accessible parking space that is at least sixty (60) inches wide.

3.    Add signage denoting the newly created space as accessible.  This signage must be mounted at least sixty (60) inches above the finished ground of the parking space.

4.    Add signage denoting the newly created space as van-accessible.

5.    Restripe the newly created van-accessible space so that the lines delineating the space are clearly visible.

6.    Add a new curb ramp that has a slope less than 8.33% leading from the parking facility to the entrance of the store located at the property.

*   *   *

So **ORDERED, ADJUDGED, AND DECREED** this 8th day of December 2023.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TIM BURGESS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:22CV1044 HEA** |
| | ) | |
| **SHREYAS REAL ESTATE, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT BY DEFAULT

This matter is before the Court on Plaintiffs Tim Burgess's Motion for Default Judgment [Doc. No. 10] against Defendant Shreyas Real Estate LLC, pursuant to Rule 55 of the Federal Rules of Civil Procedure. The Court will grant Plaintiff's Motion.

On September 29, 2022, Plaintiff filed this case against Defendant for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act (ADA). The Complaint alleges Defendant failed to remove physical barriers to allow access Defendant's property, which is located within and does business within this district. The record reflects service of summons upon Defendant was executed on October 13, 2022 [Doc. No. 3].

Defendant has failed to answer or otherwise defend as to Plaintiff's Complaint or serve a copy of any answer or other defense upon Plaintiff's attorneys of record or

upon Plaintiff as provided by the Federal Rules of Civil Procedure.

On January 3, 2023, Plaintiff filed his Motion for Entry of Clerk's Default against Defendant. On January 6, 2023, the Clerk of Court entered an order of default against Defendant [Doc. No. 5]. Plaintiff filed the instant motion, an affidavit by counsel outlining attorney's fees and costs and requested judgment be entered in his favor in the amount of Seven Thousand, Nine Hundred, Twenty-Five Dollars and Sixty-Three cents ($7925.63). Further, Plaintiff requests injunctive relief requested in Count 1 at the expense of Defendant.

The Court, having fully considered the allegations in the Complaint, and Plaintiff's evidence submitted in support thereof, will grant Plaintiff's Motion pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure.

Accordingly,

**IT IS ORDERED, ADJUDGED and DECREED** that Plaintiff's Motion for Default Judgment [Doc. No. 10] is **GRANTED.**

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that Judgment by Default is hereby entered against Defendant, and in favor of Plaintiff, in the amount of Seven Thousand, Nine Hundred, Twenty-Five Dollars and Sixty-Three cents ($7925.63).

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that

injunctive relief is **GRANTED** at the expense of the Defendant, and Defendant has

twelve (12) months to bring the property into compliance with ADA standards.

Dated this 15th day of May, 2023.


HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE