UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CONNOR SLEVIN, an individual,

        Plaintiff,

   v.

AB HOLLYWOOD, LLC, a limited liability company,

        Defendant.

Case No. 3:23-cv-01404-YY

OPINION AND ORDER

YOU, Magistrate Judge.

On a November evening in 2022, plaintiff Connor Slevin visited a strip mall in southeast Portland owned by defendant AB Hollywood, LLC. At the time, two business were operating there—a teriyaki restaurant that is still open and a cannabis dispensary that has since closed. The storefront where the cannabis dispensary was operating is currently vacant. Plaintiff, who uses a wheelchair for mobility, entered each business and made a purchase. Approximately nine months later, plaintiff's then-counsel Jessica Molligan sent a letter to defendant that demanded a number of repairs be made to the property's parking lot and curb ramps to bring the property into purported compliance with the Americans With Disabilities Act. The letter also demanded $13,000 in attorney fees. After defendant refused Molligan's settlement demands, she filed this law suit on plaintiff's behalf in September of 2023.

Eventually Molligan, purportedly acting on plaintiff's behalf, voluntarily dismissed the case in July of 2024. The circumstances leading up to and surrounding how and why the case was brought and later dismissed, Molligan's role in the now-uncovered scheme, and her conduct in litigating the case and in representing plaintiff are the subject of defendant's pending Rule 11 Motion for Sanctions (ECF 38), as well as an order this court issued directing Molligan to show cause why she should not be sanctioned under the court's inherent power. *See* Order (Dec. 19, 2024), ECF 56.

As explained more fully below, defendant's motion for Rule 11 sanctions is denied because the case had already been dismissed, albeit under suspicious circumstances, before defendant brought the motion and therefore Rule 11 sanctions are not available. The evidence, however, clearly shows that Molligan acted in bad faith by bringing a lawsuit based on a misrepresentation of facts for the improper purpose of extracting an attorney fee settlement from defendant, using plaintiff's visit to the property as a pretext. All the while, Molligan was relying on her purported authority under an unethical representation agreement to settle cases on plaintiff's behalf and without, it appears, ever consulting plaintiff about the case and how it was proceeding. This conduct permeated the entire case from the very beginning, and therefore Molligan conduct is sanctionable under the court's inherent power, and defendant is entitled to recover the entire amount of attorney fees it spent in defending this case.[1]

---

[1] The law in the Ninth Circuit is clear that magistrate judges may decide whether to impose Rule 11 sanctions when they are nondispositive of a claim or defense of a party. *U.S. v. Rivera-Guerrero*, 377 F.3d 1064, 1067 (9th Cir. 2004) (quoting *Maisonville v. F2 America, Inc.*, 902 F.2d 746, 747 (9th Cir. 1990)); *see also* Fed. R. Civ. P. 72(a), (b) (distinguishing nondispositive from dispositive matters); 28 U.S.C. § 636(b)(1)(A), (B) (setting out a magistrate judge's jurisdiction over eight categories of dispositive pretrial motions); *Gomez v. U.S.*, 490 U.S. 858, 873-74 (1989) (indicating that the list of eight categories of dispositive pretrial motions in § 636(b)(1)(A) is not exhaustive). Here, as in *Maisonville*, the imposition of sanctions is not

## I.    Background

This suit was among the first in what became a flurry of ADA actions brought in this district between 2023 and 2024. Eventually, 52 such cases were filed. The majority of the cases were handled by Molligan—4 on behalf of plaintiff Slevin, and another 36 cases on behalf of two other disabled individuals. *See, e.g., Burley-Beavers v. Nguyen*, No. 3:23-cv-01890-YY; *Roberts v. Randy L L Corp.*, No. 3:24-cv-00523-HZ. Although it was not clear at the time the case was filed, developments have revealed that this case appears to be part of a larger coordinated effort, and it seems to be roughly representative of the way Molligan brought and litigated other similar cases. The analysis that follows is based on Molligan's conduct in this particular case. The existence of a broader scheme and Molligan's alleged role in such a scheme are the subject of a recently-filed putative class action lawsuit by a group of business owners against Molligan and the Tennessee-based law firm Wampler, Carroll, Wilson & Sanderson (hereinafter "Wampler") that Molligan and plaintiff, among others, are alleged to have worked with in bringing cases against them. *See Baek Family Partnership, LLC v. Wampler, Carroll, Wilson & Sanderson, P.L.L.C.*, No. 3:25-cv-00584-AN. Details about that wider effort, to the

---

dispositive of a claim or defense of a party because the action has already been dismissed, and the motion for sanctions is all that remains for the court to decide. 902 F.2d at 747 ("[T]he Rule 11 sanctions imposed here were not dispositive of a claim or defense of a party. In fact, the parties had already settled the case prior to Dombroski's filing his motion for reconsideration. Thus, under Rule 72(a), the Rule 11 sanctions imposed in this case are properly characterized as non-dispositive.").

Sanctions imposed under the court's inherent power may similarly be non-dispositive, as they are here. The Ninth Circuit has analogized sanctions under the court's inherent power to sanctions under Rule 11 and Rule 37. *See Stanley v. Woodford*, 449 F.3d 1060, 1064 (9th Cir. 2006) ("the policies undergirding Rule 37(a) sanctions are not relevantly different from those justifying sanctions under § 1927 or a court's inherent powers"); *Grimes v. City and County of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991) ("we see no material distinctions between Rule 11 sanctions and Rule 37 [discovery] sanctions") (quoting *Maisonville*, 902 F.2d at 748) (alteration in *Grimes*).

extent they are supported by the record in this case, are presented to place Molligan's specific

actions in this case in context and to help explain, in part, how this case unfolded and eventually

unraveled the way it did.

Plaintiff was recruited by attorney B.J. Wade, a Tennessee attorney, to act as a paid

"tester" to "start the process" of bringing lawsuits under the ADA against businesses in this

district.[2] Plaintiff entered into a Representation Agreement dated July 26, 2023, with Molligan,

Wade Law, LLC, and Wampler attorney, J. Luke Sanderson, that authorized Molligan and her

co-counsel to "file lawsuits in the U.S. District Court on [plaintiff's] behalf involving claims for

discrimination . . . [under] Title III of the Americans with Disabilities Act."[3] The Representation

Agreement also included what could be fairly described as a "blanket" Power of Attorney, giving

the attorneys "full authority to prepare, sign, and file all legal instruments, pleadings, drafts,

authorizations, and papers as shall be reasonably necessary to commence, conduct, and conclude

their representation" and specifically authorizing the attorneys to "act as a negotiator in any and

---

[2] *See* Mehrens Decl., Text Message, ECF 68 at 29; Blumm Decl. ¶ 13, ECF 39; Pl. Resp. Mot. Sanctions 6–7, ECF 42. The Wampler firm also has filed a "high number" of cases in the Middle Division of Tennessee, Nashville Division. *Jordan v. Joe B. Beasley & Assoc., L.P.*, No. 3:23-CV-00496, 2024 WL 150584, at *8 (M.D. Tenn. Jan. 12, 2024), *aff'd sub nom. Jordan v. Joe B. Beasley & Assocs., L.P.*, No. 24-5122, 2024 WL 4710157 (6th Cir. Nov. 7, 2024). In one case, a district judge observed that the "attorneys and testers follow a suspect playbook" and their "conduct raises serious ethical issues under the Tennessee Rules of Professional Conduct and the intention of the ADA's civil suit provision." *Id*. The district judge noted that "[c]ourts across the country have condemned this shakedown-like behavior," and "advise[d] that counsel proceed with caution." *Id.*

[3] Def. Hearing Exhibits, Ex. 3 at 1–2, ECF 49-2 ("Representation Agreement"). The Representation Agreement has a signature line for "Wade Law, LLC." *See id.* at 4. Although the version of the agreement in the record does not have a signature on that line, Wade represented to plaintiff that he was "co-counsel" with the Wampler firm and seemed to be, at least from the evidence in the record, plaintiff's main point of contact regarding the ADA cases. Mehrens Decl., Text Message, ECF 68 at 29, 31. It was Wade who initially communicated with plaintiff about joining the "project," explained how plaintiff would complete the "assignments," and verified the visits plaintiff made each month to facilitate plaintiff's payment. *Id.* at 31–39.

4 – OPINION AND ORDER

all settlement negotiations."[4] In other words, Molligan had complete control over plaintiff's

cases and was authorized to settle them without consulting plaintiff or getting his express

approval.[5]

Wampler operated a so-called "portal," on which both Molligan and plaintiff relied

heavily.[6] Molligan described the portal as a "case management system" to which documents and

other materials, including settlement agreements, were "uploaded" and where she and plaintiff

could "log in" and "see what stage [the case was] at."[7] Through either the portal or some other

"system," plaintiff was offered or assigned to visit properties around the Portland area and paid a

flat $200 for visiting each site.[8] It appears as though the properties, including defendant's here,

were identified by an unnamed "ADA expert" or "inspector" who prepared an "initial inspection

report" purporting to identify portions of the property that did not comply with the ADA.[9] After

the "expert" identified the targeted properties, plaintiff was offered site visits through the

"system" or email.[10]

Molligan denies paying plaintiff directly, but she admits knowing that plaintiff was being

paid for visiting the properties and insists the payments were a "reimbursement" based on a

---

[4] Representation Agreement at 3, ECF 49-2.

[5] Hearing (Nov. 12, 2024) Transcript ("Sanctions Hearing Tr.") 14:21-22, ECF 53 (wherein
Molligan stated she was "authorized to do settlements").

[6] Id. at 41:19–42:19.

[7] Id.

[8] Mehrens Decl., Text Message Ex. at 37 ("We've implemented something you will like. It's a
way for you to easily upload your documents, rather than sending emails . . . Equally as
important, our new system will allow us to email you new locations on the 9th of the month,
giving you another week in order to visit."); see Sanctions Hearing Tr. 14:3–8, ECF 53 (wherein
Molligan states that plaintiff was no longer "being assigned . . . places to go" in "early May" of
2024); id. at 38:1-16.

[9] Sanctions Hearing Tr. 20:13–22:2, ECF 53; see also Molligan Surreply 1, ECF 48 (describing
receiving "expert information"); Molligan Resp. Order to Show Cause 4, ECF 58 (wherein
Molligan represents she "used" the "initial inspection report" to draft the complaint).

[10] Mehrens Decl., Text Message Ex. at 32–38, ECF 68.

"reasonable estimate of costs associated with visiting the property[.]"[11] But a reimbursement is a "repayment for an expense or loss incurred,"[12] and plaintiff "never spent . . . close to $200 at any location [he] visited."[13] That Molligan was complicit in paying plaintiff $200 to visit locations for the purpose of gathering information to file lawsuits raises the separate question of whether she violated Oregon Rule of Professional Conduct 1.8(e) by "provid[ing] financial assistance to a client in connection with pending or contemplated litigation."

According to text messages between plaintiff and Wade, plaintiff visited approximately two to five sites per month between July of 2022 and May of 2023.[14] Plaintiff visited defendant's property for the first and only time in November of 2022; he went into both the restaurant and the dispensary and made a purchase at each business.[15] This visit, according to Molligan, would "start the process."[16]

After plaintiff visited a property, the next step in "the process" was for Molligan to send a demand letter to the property owner listing repairs that allegedly needed to be made to bring the property into ADA compliance. In this case, Molligan wrote to defendant on August 29, 2023:

> Concerning repairs at the property, my client is requesting the following:
>
> 1. The designated van accessible [parking space] is too narrow and needs to be widened to meet ADA guidelines.
> 2. The designated accessible spaces present need to be dispersed evenly throughout the parking facility.
> 3. The designated accessible handicap space needs to be made level to meet ADA guidelines.

---

[11] Molligan Surreply 5, ECF 63; Molligan Resp. Order to Show Cause 5, ECF 58.
[12] https://www.dictionary.com/ browse/reimbursement.
[13] Sanctions Hearing Tr. 38:1–2, ECF 53.
[14] Mehrens Decl., Text Message Ex. 31–39, ECF 68.
[15] Sanctions Hearing Tr. 25:5–7, ECF 53.
[16] *Id.* 38:16–18; *see also* Molligan Surreply 3, ECF 48 (referring to "payments for 'starting the process'").

    4.   The accessible aisle needs to be made level to meet ADA guidelines.

    5.   The curb ramp needs to be rebuilt to not be projecting into the access aisle.

    6.   The curb ramp needs to not have flared sides that do not follow the ADA guidelines.[17]

Molligan also demanded that defendant pay "$13,000 in attorney fees and costs associated with this case."[18] About a month later, presumably after defendant had rejected plaintiff's initial settlement demands, Molligan filed this suit on plaintiff's behalf in September of 2023.[19] The original complaint mirrored the repairs requested in Molligan's demand letter, and also alleged that defendant had "a practice of failing to maintain the accessible features of the facility[.]"[20]

At the end of November 2023, defendant moved to dismiss the complaint for failure to state a claim.[21] Even at this early stage, there were irregularities in how Molligan drafted the complaint and attempted to explain the allegations, though of course it is only with the benefit of hindsight that the problems with the case and Molligan's conduct can now be understood with more certainty. Defendant noted that the complaint was "identical to that which [p]laintiff has used in at least three active ADA case in the District of Oregon," and characterized the complaint as essentially "boilerplate" without any significant factual allegations showing that defendant's property either violated the ADA or that any of the potential repairs were "readily achievable."[22] In response, Molligan filed an amended complaint on December 13, 2023, adding allegations that the "visible upright signage" in defendant's parking lot was "faded and unintelligible," the paint in the parking lot was not adequately maintained, and the curb ramp had "abrupt changes in

---

[17] Armstrong Decl., Ex. B at 1, ECF 60-2 ("Demand Letter").
[18] *Id.* at 1–2.
[19] *See* Compl., ECF 1 (filed September 26, 2023).
[20] *See id.* ¶¶ 27(a)–(i); Demand Letter at 1–2, ECF 60-2.
[21] Mot. Dismiss 1, ECF 5.
[22] *Id.* at 4–6.

level at the bottom transition," plus several essentially legal conclusions regarding plaintiff's rights under the ADA.[23]

At a hearing on defendant's motion to dismiss in January of 2024, Molligan withdrew the allegations regarding parking space distribution after defense counsel asserted that the parking lot had four spots total, one of which was an accessible spot "set off with clear markings."[24] Defense counsel also represented that the parking lot was painted, and "there is a sign, and I believe that it's clear," and generally denied that any known ADA compliance issues existed and characterized the property as "well-maintained."[25] Defense counsel, however, recognized that at the motion to dismiss stage, evidence regarding the property's current condition was not typically going to carry the day.[26] Still, there were enough questions about the condition of the property as alleged in the complaint and how it in fact appeared, that the court reserved ruling on defendant's motion and instead ordered the parties to "confer further regarding plaintiff's allegations and . . . file a joint status report" in two-weeks' time.[27]

Molligan filed a Second Amended Complaint that dropped the allegations regarding the parking spot distribution but was in all other relevant aspects identical to the previous version.[28] According to a Joint Status Report filed on February 23, 2024, defendant had already served discovery requests, and the responses were due that same day.[29] Molligan had not yet sought any discovery on plaintiff's behalf but suggested that such requests were forthcoming.[30] About two

---

[23] Am. Compl. ¶¶ 18–21, 27(g)–(i), ECF 8.
[24] Hearing (Jan. 24, 2024) Transcript 5:4–9, ECF 65 ("Motion Hearing Tr.").
[25] *Id.* at 6:1–5.
[26] *Id.* at 15:4–16.
[27] Order (Jan. 24, 2024), ECF 12.
[28] *See* Second Am. Compl., ECF 13.
[29] Joint Status Report 2, ECF 15.
[30] *Id.*

weeks later, defendant filed a motion for summary judgment.[31] In support of the motion, defendant filed several photographs appearing to show that the designated parking spot was adequately wide and level, the transition from the parking lot to the sidewalk was also level, and the parking lot's signage and marking paint were clear and well-maintained.[32]

In response to the motion, Molligan requested a hearing during which she moved for an order allowing her to conduct a physical inspection of defendant's property under Federal Rule of Civil Procedure 34. At the April 2, 2024 hearing (hereafter "Inspection Hearing"), Molligan sought to conduct an inspection of both the exterior and the interior of the property. Defense counsel objected to any inspection of the interior because the allegations in the complaint were solely directed to "the status of the exterior of the property, specifically the parking lot and whether the parking, the parking spaces, and the access points from the parking lot to the property . . . were ADA compliant[.]"[33] Defense counsel also noted that, when plaintiff responded to defendant's interrogatories "asking for a specific description of the physical impediments and ADA violations that plaintiff actually experienced and what measurements, photos, any evidence that they were there or how they affected him[,] . . . not a single one touched on the interior of the property."[34] Moreover, defendant had produced the first photographs of the property in the record, and they seemed to support defendant's representations that the property's parking lot was well-maintained and ADA compliant.[35]

Molligan countered that the complaint did not contain an "exhaustive list" of ADA violations, and that the list of violations alleged in the complaint "includes, but is not limited to .

---

[31] Mot. Summ. J., ECF 16.
[32] *See* Blumm Decl., Exs. A–F, ECF 17-1–17-6.
[33] Hearing (Apr. 2, 2024) Transcript 5:7–6:12, ECF 76 ("Inspection Hearing Tr.").
[34] Inspection Hearing Tr. 9:11–16, ECF 76.
[35] *See* Blumm Decl., Exs. A–F, ECF 17-1–17-6.

. . what my client was able to observe at the time."[36] She acknowledged that the pictures showed that defendant "did . . . quite a bit of work to that parking lot" but she "need[ed] to know if it was done, you know, after the complaint was filed."[37] Molligan suggested that other ADA violations might exist inside, and represented, "you can't tell from the photos that defendant included in the motion for summary judgment, but that entrance to [the dispensary] is, like, two -- maybe two feet wide."[38] Molligan claimed that, one time, she was "going by the property" and saw a "tremendous amounts of graffiti covering the accessibility sign" and a "car parked right in the access lane."[39] The dispensary space was for lease, and Molligan insisted that "tomorrow someone else in a wheelchair would have the same exact problem trying to get into that property."[40]

Notably, while Molligan was "reviewing the file" during the April 2, 2024 hearing, she discovered for the first time that plaintiff "did have three pictures of his visit" in November of 2022.[41] Molligan represented that the photos "really don't show a lot," but said she would gather the photos and produce them to defense counsel later that day.[42] As described in more detail below, the photos actually show a great deal, though their significance was not immediately apparent to the court and opposing counsel—who had not yet seen the photos—or, so it seems, to Molligan.

On May 7, 2024, relying on the allegations in the complaint and Molligan's representations at the Inspection Hearing, the court granted in part plaintiff's motion and

---

[36] Inspection Hearing Tr. 6:22–7:3, ECF 76.
[37] *Id.* at 13:9–13.
[38] *Id.* at 7:11–14.
[39] *Id.* at 15:13–15.
[40] *Id.* at 15:22–24.
[41] *Id.* at 12:2–7.
[42] *Id.*

authorized an inspection of "any barriers related to plaintiff's disability that plaintiff is reasonably likely to encounter as a patron," except for the vacant retail space and any employee-only restricted areas.[43]

On May 16, 2024, a local media outlet aired and published an online report headlined: "Portland businesses hit with ADA complaints, demands for thousands in attorney's fees."[44] Plaintiff "had seen the news and gotten very concerned about the allegations that [the reporter was bringing,"[45] and on May 22, 2024, he emailed Wampler stating, "No thanks I quit."[46] By May 29, 2024, word had reached B.J. Wade that plaintiff wanted out, and Wade wrote to plaintiff that he "understood that you don't want to visit any new places."[47] Wade wanted to talk with plaintiff, though, about "one case in suit," which happened to be this one against defendant AB Hollywood. Wade wrote that the property was "[h]orribly non compliant" and stated, "This is not a mom and pop operation. They bought the property for 1 million with $750k down and a

---

[43] Order (May 7, 2024) 5, 7, ECF 23.

[44] Kyle Iboshi, *Portland Businesses Hit With ADA Complaints, Demands for Thousands in Attorney Fees*, KGW.COM (May 16, 2024, at 4:33 p.m.), https://www.kgw.com/article/news/investigations/portland-businesses-ada-demand-letter-violations-lawsuit/283-b597f6cd-b087-4e48-b0a9-e464d711f7fe. A series of other news articles and videos reports from several different local outlets about the "uptick in ADA cases" and the legal developments in several of the cases pending in this district were reported in July and August of 2024. *See* Kyle Iboshi, *Asian-Owned Business Feel Targeted by Portland Lawyers Who Filed Dozens of ADA Lawsuits*, KGW.COM (July 3, 2024, at 1:59 p.m.), https://www.kgw.com/article/news/investigations/asian-owned-businesses-feel-targeted-portland-lawyers-ada-lawsuits/283-77e2c0a2-ebc7-437e-b5db-a75740333f10; Maxine Bernstein, *Lawyer Alleges Widespread Scheme to 'Extort' Money from Portland Businesses Over Disability Access*, THE OREGONIAN/OREGONLIVE (Aug. 2, 2024, at 8:29 a.m.), https://www.oregonlive.com/crime/2024/08/more-than-40-portland-area-businesses-got-demand-letters-to-make-ada-updates-pay-thousands-in-lawyers-fees-in-shakedown-like-scam.html.

[45] Sanctions Hearing Tr. 14:14-16, ECF 53.

[46] Molligan Supp. Exs. at 9, ECF 69.

[47] Mehrens Decl., Text Message Ex. at 40, ECF 68; *see also* Sanctions Hearing Tr. 14:3–17, ECF 53 (wherein Molligan states what she later learned about plaintiff's desire to end his association with the lawyers and his cases).

250k loan."[48] Plaintiff was clear: "Sorry BJ but talking would be a waste of time. I want to make changes for accessibility in my community but I do not agree with the way that your firm handles this business and I do not want to be associated."[49] Wade responded:

> Conner, you are entitled to your opinions but you are not entitled to your "facts." Here are the facts. You have bought into a slanted news article that was generated by attorneys for property owners to deter people like you from pursuing cases. It's your prerogative to quit and we will certainly honor that. The facts are that we have pursued over 4000 of these cases across the country and in 90% of cases, we have been successful in requiring the property owners to get in compliance with the ADA, despite them being non-compliant for decades and hiring attorneys to fight us.[50]

Notably, Molligan was nowhere to be found. She did not know anything about plaintiff's unequivocal statement to Wampler that he "quit" or plaintiff's statement to Wade that he no longer wanted to "be associated" with the lawyers or this case any longer. Despite being plaintiff's sole counsel of record in this case, Molligan inexplicably only "learned . . . after the fact . . . that [plaintiff] didn't want any new cases" and that plaintiff had signaled to Wampler that he wanted to end the attorney-client relationship as early as May 22, 2024.[51] Nor is there any evidence in the record that Molligan made even preliminary arrangements to conduct the inspection of defendant's property that she had asked the court to authorize. On April 2, 2024, Molligan produced to defense counsel the photos of plaintiff's initial visit to the property that she had discovered during the Inspection Hearing,[52] but apart from that, it is not clear what work Molligan did on the case in the meantime or if she ever consulted with plaintiff about the status of the case or to clarify how he wished to proceed with it.

---

[48] Mehrens Decl., Text Message Exhibit at 40, ECF 68 (as written).
[49] *Id.*
[50] *Id.* at 40–41.
[51] Sanctions Hearing Tr. 13:14–15:8. ECF 68.
[52] Molligan Supp. Exs. 6, ECF 69.

As for the photos of plaintiff's initial visit that had just come to light, defense counsel observed that the photos at least in part "appeared to directly contradict the allegations made in the complaint."[53] On May 29, 2024, defense counsel served requests for admission asking plaintiff (and by extension, Molligan) to admit that the pictures show a clear and visible sign designating an accessible parking space, and show plaintiff was able to use the parking lot and curb ramp and thus was "able to access and assess all areas of the property which were open to the public when he visited the property" in November of 2022, in contradiction to what was alleged in the complaint.[54]

Despite having a court order authorizing an inspection of defendant's property, Molligan suddenly became very eager to settle the case. Although it is not entirely clear from the record when the settlement discussions began to heat up, by about 6 p.m. on Thursday, May 30, 2024 (just over 24 hours since the requests for admission were served), Molligan wrote to defense counsel that she "was really hoping to hear back from one of you by now" and asked for an estimate of when she could expect a response.[55] The lawyers scheduled a call for the next morning, on Friday, May 31, 2024, at which time defense counsel made an offer to settle the case for $1,000, and Molligan immediately accepted.[56] On Tuesday, June 4, 2024, defense counsel emailed Molligan and asked her to "send us [the] settlement offer" that the lawyers had discussed on Friday morning.[57] Molligan responded that her understanding was that the parties

---

[53] Def. Mot. Sanctions 8, ECF 38.
[54] Blumm Decl., Ex. C at 3–5, ECF 39-3; *see also* Def. Supp. Ex. 3 at 1, ECF 73.
[55] Blumm Decl., Ex. A at 16, ECF 39-1.
[56] *Id.* ¶ 2, ECF 39 ("As soon as I said the dollar figure, plaintiff's counsel interrupted me and told me we could settle at that value.").
[57] *Id.*, Ex. A at 14, ECF 39-1.

"agreed to settle this matter for $1000 in attorney fees" and "[i]f you mean the Settlement Agreement, I should have that over to you today."[58]

Molligan sent the first written draft of the settlement agreement later that day, and defense counsel responded on June 12, 2024, with a revised agreement that was "more specific as to the obligations for [defendant]."[59] Molligan's only proposed revision thereafter was the removal of the language "as to form" that defense counsel had appended to Molligan's signature line.[60] A final version was exchanged on June 13, 2024.[61] Molligan then returned the "signature page" to defense counsel on June 18, 2024, after signing the agreement in her own name as "Power of Attorney" for plaintiff.[62] The terms of the settlement were simple: defendant would pay $1,000 to Molligan and plaintiff would dismiss the case and release all claims.[63] There was no mention of any repairs or modifications at all, and Molligan had not even attempted to conduct the court-authorized inspection of the property's interior within the 30-day window that expired on June 7, 2024.[64] Two days later, defense counsel wrote back requesting plaintiff's signature rather than Molligan's, and when Molligan did not respond, defense counsel followed up about 10 days later, on July 1, 2024, asking again for plaintiff's signature on the agreement.[65] Molligan responded that they were instead "dismissing the case" and that she would "send over a Stipulated Dismissal shortly."[66]

---

[58] *Id.* at 13.
[59] *Id.* at 8, 10–11.
[60] *Id.* at 9.
[61] *Id*. at 8.
[62] *Id.* at 7–8; *see also* Armstrong Decl., Ex. A at 9, ECF 44-1 ("Settlement Agreement").
[63] Settlement Agreement at 1, ECF 44-1
[64] *See id.* at 1–6; *see also* Order (May 7, 2024) 7, ECF 23.
[65] Blumm Decl., Ex. A at 5–7, ECF 39-1.
[66] *Id.* at 5.

By July 3, 2024, defense counsel had signed the Stipulated Dismissal and given Molligan consent to file it.[67] Molligan, though, did not file the dismissal right away. Molligan still had not filed the Stipulated Dismissal on July 8, 2024, at 5:42 p.m., when defense counsel emailed Molligan: "We see from Pacer that that you have not yet filed the stipulated dismissal. Our client has had second thoughts and has withdrawn his permission to agree to stipulate to a dismissal at this time. Accordingly, please do not file the dismissal."[68] Molligan then filed the Stipulated Dismissal at 5:53 p.m., and at 5:54 p.m., emailed defense counsel stating, "I filed it today."[69] Based on the Stipulated Dismissal, the court directed the Clerk of the Court to close the case on July 10, 2024 (of course, without knowing any of preceding facts about how the settlement and dismissal came to be), and the matter seemed to be at an end.[70]

On August 1, 2024, at a hearing in another one of plaintiff's cases in which Molligan was acting as his attorney, plaintiff represented he had learned "through the media" about how Molligan, and by extension the Wampler firm, had been handling his cases and he "want[ed] to be completely done with these attorneys."[71] He "[did] not agree with" the way Molligan and the other attorneys had represented him, and he "[did] not want to be associated with them any further."[72] Following that hearing, the court directed plaintiff to confirm "whether he wishes for Ms. Molligan to represent him in this case, and if he does not, Ms. Molligan shall file a

---

[67] *Id.* at 2.
[68] Blumm Decl., Ex. A at 1, ECF 39-1.
[69] *Id.*; *see also* Not. Voluntary Dismissal (July 8, 2024), ECF 24.
[70] Order (July 10, 2024), ECF 25; *see also* Def. Mot. Sanction 5, ECF 38 (stating there was "no subsequent communication between the parties" after the dismissal).
[71] *Slevin v. Baek Family Partnership LLC*, No. 3:23-cv-01487-HZ, Hearing (Aug. 1, 2024) Tr. 12:22–13:9, ECF 15.
[72] *Id.* at 13:9-11.

withdrawal notice."[73] Molligan filed a motion to withdraw the next day, and plaintiff obtained new counsel.[74]

Molligan's rush to settlement without seeking any inspection or further repairs, the suspicious timing between defense counsel's email withdrawing consent to file the Stipulated Dismissal and Molligan's filing of it, and plaintiff's representations about his role in the *Baek Family* case precipitated defendant's first motion for sanctions in August of 2024.[75] Although defendant voluntarily withdrew that motion because it did not comply with Rule 11's procedural requirements, the court under its inherent authority ordered Molligan to explain the circumstances surrounding the dismissal.[76] Defendant then re-filed its now-pending motion for sanctions against Molligan, and a Sanctions Hearing was held on November 12, 2024, at which Molligan appeared to explain her conduct, and plaintiff appeared with new counsel.[77] After the hearing, defendant filed, at the court's request, the "photographs taken by plaintiff at defendant's property and plaintiff's fee agreement with Wampler, Carroll, Wilson & Sanderson, P.C."[78]

The court subsequently ordered Molligan to "show cause in writing by January 17, 2025, why based on the conduct alleged in defendant's motion for sanctions, she should not be sanctioned under the court's inherent authority," notwithstanding whether defendant could successfully seek sanctions under Rule 11.[79] Molligan responded to the court's order to show cause and also filed several other pieces of supplementary material in response to defendant's

---

[73] Order (Aug. 14, 2014) 1, ECF 29.
[74] *See* Mot. Withdraw 1, ECF 32.
[75] Mot. Sanctions I, ECF 26.
[76] Order (Sept. 9, 2024), ECF 35.
[77] *See* Mot. Sanctions II, ECF 38; Minutes of Proceedings (Nov. 12, 2024), ECF 50.
[78] Minutes of Proceedings (Nov. 12, 2024), ECF 50.
[79] Order (Dec. 19, 2024), ECF 56.

motion for sanctions. [80] The court further ordered the parties to provide the following supplementary materials: "[d]ocumentation showing the date on which Molligan produced to defense counsel the photographs contained in defendant's Exhibits re Hearing, ECF 52"; "[d]ocumentation showing what date defendant served its Request for Admission (dated May 29, 2024) on Molligan;" and "[t]ext messages and other communications between plaintiff and individuals from the Wampler, Carroll, Wilson & Sanderson firm in May and June of 2024 that are referenced in the Oregonian article dated August 7, 2024."[81]

The matter—whether Molligan should be sanctioned under either Rule 11 or the court's inherent power—is now ripe for decision.[82]

## II.  Defendant's Motion for Rule 11 Sanctions

As mentioned above, defendant's second motion for sanctions under Rule 11 suffers from an incurable procedural defect because of the case's posture and the timing of the motion. "Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.' " *Islamic Shura Council of S. California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393 (1990)). Rule 11 sanctions are not available, however, "unless there is strict compliance with [the Rule's] safe harbor provision." *Id.* "That provision provides that any motion for sanctions must be served on

---

[80] *See* Supplement, ECF 57; Resp. Mot. Sanctions, ECF 58; Molligan Surreply, ECF 63.
[81] Order (Apr. 18, 2025) 1–2, ECF 67; *see also* Maxine Bernstein, *Lawyer Alleges Widespread Scheme to 'Extort' Money from Portland Businesses Over Disability Access*, THE OREGONIAN/OREGONLIVE (Aug. 2, 2024, at 8:29 a.m.), https://www.oregonlive.com/crime/2024/08/more-than-40-portland-area-businesses-got-demand-letters-to-make-ada-updates-pay-thousands-in-lawyers-fees-in-shakedown-like-scam.html.
[82] Defendant's Rule 11 motion seeks sanctions against "plaintiff and/or plaintiff's counsel." Mot. Sanctions 38, ECF 38. Rule 11 sanctions are not available against either plaintiff or Molligan for the reasons discussed below.

the offending party at least 21 days before the motion is filed with the court," and the "safe harbor provision further dictates that the motion may not be filed if the offending party timely 'withdraw[s] or appropriately correct[s]' the challenged contention during the safe harbor period." *Id.* at 872–73 (citing and quoting Fed. R. Civ. P. 11(c)(2)).

A Rule 11 sanction motion "cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing . . . because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy." *Islamic Shura Council*, 757 F.3d at 873; *see also United States ex rel. MC2 Sabtech Holdings, Inc. v. Get Eng'g Corp.*, No. 3:19-cv-01249-RSH-MSB, 2025 WL 1043547, at *2 (S.D. Cal. Apr. 8, 2025) (collecting cases and explaining that "[o]ther circuits are in agreement" that "the service and filing of a motion for sanctions must occur prior to final judgment or judicial rejection of the offending motion") (quoting *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008)).

The analysis is straightforward here. The case was dismissed after Molligan filed the Stipulated Dismissal in July of 2024.[83] Molligan's dubious explanation of the circumstances surrounding the dismissal—that although five days had elapsed since defendant gave consent to file the stipulated dismissal, she *just happened* to be filing it at the precise moment she received (but claims not to have read) an email from defense counsel withdrawing consent[84]—and the other facts that have come to light about her conduct notwithstanding, defendant did not serve or file its motion for sanctions under Rule 11 until after the complaint had been dismissed. Plaintiff and Molligan therefore did not have the opportunity to use Rule 11's "safe harbor" and withdraw

---

[83] Not. Voluntary Dismissal (July 8, 2024), ECF 24; Order (July 10, 2024), ECF 25; *See* Fed. R. Civ. P. 41(a)(1)(A)(ii).
[84] *See* Molligan Decl. ¶¶ 1–3, ECF 37.

the allegedly offending complaint after being served with defendant's second motion.
Accordingly, that motion, which sought sanctions against "plaintiff and/or" Molligan,
necessarily fails. *See Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*, 339 F.3d
1146, 1150 (9th Cir. 2003) (explaining that a Rule 11 "motion served after the complaint had
been dismissed does not give the offending party" the opportunity to "withdraw the offending
pleading and thereby escape sanctions") (simplified). However, that does not end the inquiry
with respect to Molligan's conduct.

## III.    Inherent Power to Sanction

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to
manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' "
*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R.
Co.,* 370 U.S. 626, 630–31 (1962)). "That authority includes 'the ability to fashion an appropriate
sanction for conduct which abuses the judicial process.' " *Id.* (quoting *Chambers v. NASCO, Inc.,*
501 U.S. 32, 44–45 (1991)). This power includes the ability to sanction "conduct before the court
as well as actions beyond the court's confines, regardless of whether that conduct interfered with
courtroom proceedings." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021)
(citing *Chambers*, 501 U.S. at 44). "The power of a court over members of its bar is at least as
great as its authority over litigants." *Id.* (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766
(1980)) (simplified).

"Although it is preferable that courts use—and first consider—the range of federal rules
and statutes dealing with misconduct and abuse of the judicial system, 'courts may rely upon
their inherent powers to sanction bad-faith conduct even where such statutes and rules are in
place.' " *Id.* (quoting *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128,

1136–37 (9th Cir. 2001)); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct

in the course of litigation that could be adequately sanctioned under the Rules, the court

ordinarily should rely on the Rules rather than the inherent power. But if in the informed

discretion of the court, neither the statute nor the Rules are up to the task, the court may safely

rely on its inherent power.").

"Because of their very potency, inherent powers must be exercised with restraint and

discretion," and part of that discretion is "fashion[ing] an appropriate sanction for conduct which

abuses the judicial process." *Chambers*, 501 U.S. at 44–45. "A district court may, among other

things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys'

fees, or assess fines." *Am. Unites*, 985 F.3d at 1088. "When a court is considering using its

inherent authority to impose sanctions, the first step is to determine whether the potential

sanctions that may be imposed are compensatory, punitive, or both" because the "procedural

requirements and the substantive limitations that apply" vary depending on the type of sanction

imposed. *Id.* at 1089.

Compensatory or remedial sanctions "may go no further than to redress the wronged

party for losses sustained and may not impose any additional consequence as punishment for the

sanctioned party's misbehavior." *Id.* at 1089 (simplified). The sanction must be "calibrated to the

damages caused by the sanctionable conduct," and the misconduct must be a "but-for" cause of

the harm. *Id.*; *see also Meyer v. Mittal*, No. 3:21-cv-00621-HZ, 2023 WL 3004761, at *22 (D.

Or. Apr. 17, 2023). The "but-for" causation standard "generally demands that a district court

assess and allocate specific litigation expenses—yet still allows it to exercise discretion and

judgment," with the "essential goal" being "to do rough justice, not to achieve auditing

perfection." *Goodyear*, 581 U.S. at 109 (simplified).  In exceptional cases, for example where a

plaintiff initiates a case in bad faith, the but-for standard "permits a trial court to shift all of a party's fees" or "make a blanket award." *Id.* at 110.

The sanctions sought here are compensatory because they are based on the attorney fees and costs defendant incurred in defending against this action, and therefore civil procedural rules apply. *See* Def. Mot. Sanctions 3, ECF 38 ("[D]efendant seeks the costs and fees which defendant has incurred to defend from plaintiff's bad faith claims."); *see also RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 511 (C.D. Cal. 2022) (explaining that a "court must . . . provide adequate notice and an opportunity to be heard before imposing civil sanctions"); *Meyer*, 2023 WL 3004761 at *22 ("Civil procedures apply to sanctions that are remedial or compensatory, while criminal procedures apply to punitive sanctions.").

"When acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *Am. Unites*, 985 F.3d at 1090; *see also Lu v. United States*, 921 F.3d 850, 859 (9th Cir. 2019) (explaining that among the available sanctions under court's inherent power is the "assessment of attorneys' fees against 'a party that has acted in bad faith' ") (quoting *Goodyear*, 581 U.S. at 107). Bad faith, the only relevant option here, includes "conduct done vexatiously, wantonly, or for oppressive reasons," and "requires proof of bad intent or improper purpose." *Id.* Recklessness alone is not sufficient to find bad faith; rather it must be combined with "an additional factor such as frivolousness, harassment, or an improper purpose" to warrant sanctions under the court's inherent power. *Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001); *see also Harris v. JFC Int'l Inc.*, No. 2:21-cv-01536-LK, 2023 WL 3818463, at *9 (W.D. Wash. June 5, 2023) (citing *Fink*, 739 F.3d at 993–94; *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002). At the same time, a bad-faith finding "does not require that the legal and factual basis

for the action prove totally frivolous," and sanctions can be "justified when a party acts for an improper purpose—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Fink*, 239 F.3d at 992 (emphasis omitted).

The decision to impose sanctions based on the court's inherent power must be based on "an explicit finding that the sanctioned party's conduct constituted or was tantamount to bad faith." *Am. Unites*, 985 F.3d at 1090 (simplified). The Ninth Circuit has not established a specific standard of proof for imposing sanctions under the court's inherent power, but it "it is clear that a bad faith finding supported by clear and convincing evidence will suffice." *Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670, 677 (W.D. Wash. 2014) (citing *Lahiri v. Universal Music & Video Distrib. Corp.,* 606 F.3d 1216, 1219 (9th Cir. 2010)) (additional citations omitted).

The evidence in the record, which includes representations made by Molligan, plaintiff, and defense counsel in open court, shows that Molligan acted in bad faith in bringing this suit and in the manner she litigated it. As explained more fully below, Molligan entered into a financial arrangement with plaintiff to bring this suit, and empowered by the broad authority purportedly given to her via the Representation Agreement, she essentially conducted the case and attempted to settle it without consulting with plaintiff and without obtaining his consent for the actions she was purportedly taking on his behalf. The demand letter and complaint contained allegations that were simply not true and were not based on plaintiff's actual experience at defendant's property. When presented with evidence that defendant had made significant improvements to the parking lot, Molligan refused to drop the case and instead sought (and secured) a court-ordered inspection of defendant's property by relying on misleading representations about what she knew about the property and plaintiff's visit there in November of 2022. When the photos of plaintiff's initial visit were disclosed and appeared to show that the

complaint were not factually supported, Molligan immediately agreed to settle the case for $1,000 in attorney fees, without ever consulting with plaintiff about how he wanted to proceed. All of this indicates that Molligan brought this action for the improper purpose of extracting an attorney fee settlement. Molligan's initial demand for $13,000 in attorney fees grossly overestimated the amount of work she had done, or claimed she would do on the case "short of litigation,"[85] and it appears she requested the repairs without ever discussing with plaintiff what he experienced at the property or what changes he thought were needed. And when the factual foundation of the case began to crumble, so did the façade; Molligan abandoned any attempt to conduct the court-ordered inspection of defendant's property or secure additional repairs and instead did what she could to line her own pocket.

Although there are many facets of Molligan's conduct here that may warrant sanctions, any discussion must begin with one of this case's most fundamental aspects—the relationship between Molligan and plaintiff, her now-former client. As described above, the Representation Agreement gave Molligan advanced blanket authority to litigate and, most importantly, settle claims without consulting plaintiff. Such an agreement violates the Oregon Rules of Professional Conduct, including Rule 1.2(a), which provides that "a decision to settle must be made by the client, not the lawyer," and Rule 1.4, which obligates the attorney to "keep a client reasonably informed about the status of a matter" and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Oregon State Bar Formal Opinion No. 2019-195, though not binding,[86] is persuasive here in explaining why "[a]n

---

[85] Demand Letter, Ex. B, ECF 60-2.
[86] *See Evraz Inc., N.A. v. Cont'l Ins. Co.*, No. 3:08-cv-00447-AC, 2013 WL 6174839, at *4 (D. Or. Nov. 21, 2013) (explaining that Oregon legal ethics opinions are "advisory" and not controlling).

attorney may not ethically obtain from a client an advance blanket authorization over all settlement decisions," based on the requirements of Rules 1.2 and 1.4. OSB Formal Op. No. 2019-195 at 2. Such an arrangement runs afoul of both Rule 1.2 and 1.4 as it is "virtually impossible for a client to provide *informed* consent to [settle a case] at the outset of a representation" because "the facts and circumstances of a case are not fully developed, and the terms and conditions of a settlement will likely not have been fully explored or determined." *Id.* (emphasis in original). Other state bodies regulating the conduct of lawyers have essentially reached identical conclusions. *See* Ariz. Ethics. Op. 06-07 (2006) (concluding that an attorney could not ethically use a fee agreement that gave the attorney "blanket authority to decide whether to settle the client's case and then execute – as the client's attorney in fact – any drafts or releases necessary to accomplish the settlement" because, among other things, a client's informed consent is necessary to settle a case); *Matter of Lewis*, 266 Ga. 61, 63 (1995) (finding that an attorney "violated his duty to consult with his client prior to accepting the [defendant's] settlement offer," purportedly via a representation agreement that stated the attorney "shall have full power and authority to settle, compromise, or take such action as he might deem proper for the best interest of the client").

This case is a paradigm example of why Rules 1.2 and 1.4 exist and some of the problems these rules are designed prevent. For one thing, with the broad authority purportedly provided by the power of attorney, Molligan seems to have litigated the case with little, if any, communication with her client. As the case developed, it became clear that the allegations in the complaint were not based on plaintiff's actual experience, and it appears that Molligan drafted and filed the complaint without ever consulting plaintiff about what he observed during his visit to defendant's property in November of 2022, or whether he ever intended to return there. The

initial complaint alleged that plaintiff tried but was "unable to access and assess all areas of the [defendant's] premises due to the architectural barriers encountered."[87] The complaint also alleged that plaintiff "intend[ed] on revisiting" the property within six months of filing the complaint or sooner, depending on when the alleged "barriers" were removed.[88] In the Second Amended Complaint filed in February of 2024, Molligan wrote that plaintiff "attempted to, and has to the extent possible, accessed the Subject Property in his capacity as a patron . . . but could not fully do so because of his disabilities resulting from the physical barriers to access, dangerous conditions and ADA violations."[89] Further, the Second Amended Complaint repeated the allegation, first raised by Molligan in the Amended Complaint filed in December of 2023, that the "visible upright signage (displaying the International Symbol of Accessibility) designating any parking space as accessible is faded and unintelligible[.]"[90]

Many of these allegations turned out to be false. In her briefing regarding defendant's second motion for sanctions, Molligan represented that she knew, or at the very least later found out, that plaintiff actually "did enter the property and make a purchase."[91] Photos taken during plaintiff's only visit to defendant's property in November of 2022 show a blue and white sign designating an accessible parking space that was plainly legible and not, as the complaint alleged, "faded and unintelligible" on the day that plaintiff visited the property.[92] As for plaintiff's "intent to return" to the property, Molligan stated that she did not even ask plaintiff about that, even though she understood that intent to return was a key part of the claim she was

---

[87] Compl. ¶ 28, ECF 1.
[88] *Id.* ¶¶ 15–16.
[89] Second Am. Compl. ¶ 27, ECF 13.
[90] *Id.* ¶ 31(h); *see also* Am. Compl. ¶ 31(i), ECF 8.
[91] Molligan Surreply 3, ECF 48; Sanctions Hearing Tr. 24:2–25:12, ECF 53.
[92] *See* Def. Hearing Exhibits, Ex. 2 at 1, ECF 49.

asserting on plaintiff's behalf.[93] Plaintiff said he did not understand that returning to the property was part of the arrangement.[94] Without the intent to return, plaintiff did not have standing to bring an ADA claim. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011) ("[A]n ADA plaintiff can establish standing to sue for injunctive relief either by demonstrating deterrence, or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility.").

There are other facts too that further call into question the extent to which Molligan ever communicated with plaintiff before sending the demand letter and subsequently filing the complaint. Molligan said that she relied on an "initial inspection report that was used in the drafting of the complaint" and her own visit to the property sometime before the complaint was filed in September of 2023.[95] The details about this "initial inspection" are sparse; Molligan represented that a so-called "ADA expert" was the "initial person looking at the property."[96] Molligan has not produced even the name of this "expert," much less the "inspection report" this expert allegedly prepared, and could not specifically identify the date on which this "initial inspection" of defendant's property occurred.[97] Molligan also represented that she visited defendant's property in August 2023 before the complaint was filed and observed there was "graffiti all over the sign."[98] Even if that is true, but Molligan does not explain the discrepancy between the picture of the signage during plaintiff's actual visit to the site in November of 2022 and the allegations in the complaint that are purportedly based on the "ADA violations . . .

---

[93] Sanctions Hearing Tr. 33:8–17, ECF 53.
[94] *Id.* at 34:17–35:10.
[95] Molligan Resp. Order Show Cause 4, ECF 58.
[96] Sanctions Hearing Tr. 20:13–21, ECF 53.
[97] *Id.* at 21:24–22:2.
[98] *Id.* at 21:8–16.

Plaintiff experienced and/or observed[.]"[99] Molligan said that the photos, to her, meant that "somewhere between the time that the initial person looking at the property looked at it and the time of [plaintiff's] visit, [defendant] put up a new sign."[100] Whether Molligan was intentionally misleading in describing the timeline or hopelessly ill-informed about the allegations she was asserting in the amended complaints is not clear. It is clear, however, that Molligan added the allegations about the sign to two amended complaints after the case had already begun, an action necessarily representing to the court and defendant that she had learned something about plaintiff's visit after filing the initial complaint and thus had some factual basis for adding the allegation about the sign. But the initial "inspection report" for the property had been completed long before Molligan *added* the allegation regarding the signs to the amended complaint filed in December of 2023,[101] and Molligan should have discovered and resolved any lingering confusion between the initial report and what plaintiff actually saw at the property in November of 2022 before expanding the allegations in the operative complaint. That she failed to do so indicates that Molligan did not ever talk to plaintiff about his visit; had she done so, she would have (or at least should have) discovered the photos and confirmed with plaintiff what he actually saw at defendant's property and not asserted baseless, boilerplate allegations regarding defendant's signage.

In sum, Molligan did not know the details about plaintiff's visit or that photos of the visit existed, and did not ask plaintiff a key question that was needed to establish his standing to sue. She instead relied on an "expert" report and her own observations of the property, and many of the allegations in the demand letter and the complaint did not match what plaintiff experienced.

---

[99] Second Am. Compl. ¶ 31, ECF 13.
[100] Sanctions Hearing Tr. 20:13–16, ECF 53.
[101] Am. Compl. ¶ 27(i), ECF 8.

Molligan used the blanket power of attorney to run the case without any input from or, seemingly any meaningful communication at all with, her client, and she did not conduct a reasonable investigation into the property before initiating this action. Molligan appears to have regarded plaintiff as little more than a case generator for her, and apart from allegedly visiting the site, plaintiff had essentially no connection with the case or apparently any idea what was going on with it.

The problems wrought by Molligan's failure to communicate with her client and her reliance on the purported power over plaintiff's case without his consent affected not only this matter's beginning, but also its middle and end. As mentioned above, the court relied on plaintiff's supposed "intent to return" and Molligan's representations about plaintiff's visit to the property—which gave the unmistakable impression that Molligan actually knew what plaintiff had experienced—to authorize an invasive inspection of defendant's property.[102] That inspection order, in turn, was "a material factor in Defendant's decision to offer a nominal settlement amount in June 2024,"[103] even though the evidence that had been produced to that point strongly suggested that at least several allegations in the complaint were not based on the true condition of defendant's property.

Plaintiff was largely in the dark about his case until he first learned through the media in May of 2023 about how Molligan was running the cases. Shortly thereafter, as described above, plaintiff told Wampler on May 22, 2023, that he "quit," and on May 29, 2023, plaintiff specifically rejected Wade's request for assistance with defendant's property, stating that he "[did] not agree with the way that your firm handles this business" and "[did] not want to be

---

[102] *See* Order (May 7, 2024) 2–7, ECF 23.
[103] Def. Reply 10, ECF 59.

associated" with it.[104] This all occurred at the same time Molligan was eagerly trying to settle the

case with defendant on May 30, 2024, though Molligan did not know, or at the very least was

unsure about, what plaintiff wanted to do, and her attempted explanations about what was

happening in the attorney-client relationship as the case was ending are bizarre and

contradictory. When Molligan was asked when she first had indications that plaintiff did not

want to proceed with the case, she responded "it was in early May that . . . he wasn't being

assigned places to go. He was – you know, okay, he's not doing this anymore[.]"[105] But because

Molligan was not part of the conversations between plaintiff and Wampler or Wade,[106] and was

apparently not in regular (if any) contact with plaintiff herself, she did not learn until "after the

fact" that plaintiff "[didn't] want any new cases."[107] Even then, Molligan did not seem to

understand what plaintiff wanted and, more importantly, she did not seek further clarification.

Molligan stated she knew plaintiff "didn't want any new cases," but she "did not understand that

he was not agreeing to settlements" because that "was not made clear to [her]."[108] Again,

empowered by the blanket power of attorney, Molligan forged ahead without bothering to

consult with plaintiff and attempted to settle the case because she "was authorized to do

settlements . . . and assumed that he would want to extricate himself as quickly and easily as

possible," which to Molligan meant via settlement.[109]

---

[104] Mehrens Decl., Text Message Ex. at 40, ECF 68.
[105] Sanctions Hearing Tr. 14:1–7, ECF 53.
[106] *Id.* at 13:14–15 (wherein Molligan describes that plaintiff "was having communications not with me but with B.J. Wade primarily, I think primarily").
[107] *Id.* at 15:3–7.
[108] *Id.* at 15:3–8.
[109] *Id.* at 14:21–23 (Molligan: "I didn't understand that what he meant was that he wouldn't sign it. In other words, because I was authorized to do settlements, I assumed that he would want to extricate himself as quickly and as easily as possible and -- Well, that's what I thought.").

As described above, Molligan subsequently agreed to settle the case for $1,000 in attorney fees without securing any future right to inspect defendant's property or insisting on any future repairs. Given plaintiff's overt and clear direction on May 29, 2024, that he no longer "wanted to be associated" with the lawyers and this specific case, there is an obvious question whether Molligan had authority to take any action on the case at all after that point, much less to settle it without plaintiff's consent on terms that solely benefitted herself, and then to voluntarily dismiss plaintiff's suit once the problem with plaintiff's signature arose (this latter step of course being significant because it affected both plaintiff's and defendant's legal rights, obligations, and potential remedies). Molligan said it only "became clear" to her that plaintiff wanted to end the representation when he "refus[ed] to sign" the Settlement Agreement after defense counsel's insistence, though the details of when and by whom plaintiff was actually shown the agreement and then asked to sign it before he refused are not clear.[110] To muddy the waters even further, Molligan produced a supplemental exhibit that appears to show that plaintiff *did in fact* sign the Settlement Agreement on July 2, 2024,[111] one day after Molligan had told defense counsel that plaintiff was "dismissing this case" and had begun working to secure the Stipulated Dismissal that defense counsel returned to Molligan on July 3, 2024.[112] Molligan apparently never knew about the signed agreement until the court ordered her to produce supplementary materials in the sanctions phase of the case nearly a year later[113]; a phone call or an email to plaintiff might have revealed it, or at least provided clarity on plaintiff's wishes, sooner.

---

[110] *Id.* at 13:13–19.
[111] Molligan Supp. Record 8, ECF 72.
[112] Blumm Decl., Ex. A at 5, ECF 39-1.
[113] *See* Molligan Mot. Supp. 1, ECF 70 (wherein Molligan explains that "[i]n the course of responding to this Court's Order dated April 18, 2025," she learned that plaintiff "did in fact sign the Settlement Agreement between the parties in this matter on July 2, 2024").

Coming to some conclusion about precisely when Molligan no longer had authority to act on plaintiff's behalf, or whether plaintiff actually signed the Settlement Agreement and what legal effect if any that may have in this case, is beside the point. The key observation to be made here is that the difficulty in answering those questions reflects Molligan's failure to communicate with plaintiff and illustrates the risks to clients, their legal adversaries, and the orderly administration of justice that result from representation agreements like the one that gave Molligan the purported authority to bring and eventually resolve cases without the client's informed consent and without keeping the client reasonably apprised about the case and how it was progressing.

All of these problems and questions about Molligan's relationship with plaintiff inform the analysis of Molligan's other conduct in the case and the determination that she acted in bad faith by bringing a contrived lawsuit that was designed, using plaintiff's visit to the property and the requested repairs as a pretext, to extract an attorney fee settlement from defendant, all to Molligan's benefit. *See also* Mot. Sanctions 12, ECF 38 ("[P]laintiff's retention agreement in which he allegedly vested all settlement authority in plaintiff's counsel, and plaintiff's counsel's efforts to execute settlement agreements without plaintiff's signature, indicates a wider sanctionable effort to use the ADA as a tool to engage in frivolous litigation" with a "focus on attorney fees.").

The repairs requested in Molligan's initial demand for $13,000 in attorney fees do not appear to be rooted in any discussion or consultation that Molligan had with plaintiff about any barriers that he experienced at the property. Molligan admitted she did not know whether plaintiff ever intended to return to the property and did not discuss with plaintiff the actual barriers (if any) that he encountered during his November 2022 visit, meaning that the repairs

requested in the demand letter could not have been based on Molligan's sincere belief that they were actually needed or were meant for plaintiff's benefit. Some of the requested repairs were for issues not even present at the property—for example, the request in the demand letter that "designated accessible spaces . . . need[ed] to be dispersed evenly throughout the property" was not based on the reality of the parking lot—there are four spaces in total, including one designated space, thus the spaces could not be "dispersed evenly" in any sense of the phrase.[114] Furthermore, ADA regulations only require one accessible space in a parking area with between 1 and 25 spaces, so no additional space was required at defendant's property. *See* 36 C.F.R. § Pt. 1191, App. B § 208.2. Including such a baseless request suggests that Molligan was motivated to exaggerate the alleged ADA violations at the property in an attempt to bolster her claim for attorney fees.

Additionally, Molligan's initial demand of $13,000 in attorney fees vastly outpaced the value of the work she appears to have put into the case, or reasonably could have been expected to perform "short of litigation."[115] Apart from parroting the "initial inspection report" purportedly prepared by an unidentified "expert" and writing a demand letter, it appears that Molligan did little else in developing the case to that point (or much after, for that matter) that would justify her $13,000 demand for attorney fees at the outset. Moreover, because the requested repairs were not based on the true condition of defendant's property, this calls into question whether Molligan had a reasonable basis to request fees for the "monitoring" of defendant's "remediat[ion of] the property" in the future.[116]

---

[114] *See* Demand Letter at 1, ECF 60-2; Def. Reply Mot. Sanctions 4 n.3, ECF 43.
[115] *See* Demand Letter at 2, ECF 60-2.
[116] *See id.*

Molligan then relied on false or at best misleading allegations and statements to strengthen her settlement leverage when it appeared that the suit was headed towards early summary judgment in defendant's favor. Defendant's motion for summary judgment in March of 2024 was supported by pictures appearing to show that all of the alleged barriers or other issues identified in the complaint did not exist or, at least had been fixed since plaintiff's initial visit in November of 2022.[117] In response, Molligan sought a Rule 34 inspection of defendant's entire premises, including the interior of the two stores. As described above, Molligan represented that the allegations in the complaint were based on "what [plaintiff] was able to observe at the time" and that the entrance to the dispensary was "maybe two feet wide," implying it was too narrow to accommodate a wheelchair.[118] Molligan said that she "need[ed] to know" what repairs defendant had made and also that plaintiff "ha[d] the right to go inside" and inspect defendant's property because "tomorrow someone else in a wheelchair would have the same exact problem trying to get into that property[.]"[119] Based on those representations and other false allegations regarding plaintiff's ability to access the property, the condition of the signage, and plaintiff's intention to return, the court granted in part plaintiff's motion for an inspection (except for the vacant store and areas of the property that were restricted to employees) on May 7, 2024.[120] That order was, according to defense counsel, "a material factor in Defendant's decision to offer a nominal settlement amount in June 2024."[121] Additionally, during the Inspection Hearing, Molligan discovered the photos of plaintiff's initial visit to the property, and despite the photos quite obviously calling into question at least some allegations in the complaint, she continued the

---

[117] *See* Mot. Summ. J. 5–8, ECF 16; Blumm Decl., Exs. 1–6, ECF 17-1–17-6.
[118] Inspection Hearing Tr. 6:22–23, 7:13–14, ECF 76.
[119] *Id.* at 13:9–13, 15:20-25.
[120] *See* Order (May 7, 2024) 2–6, ECF 23.
[121] Def. Reply 10, ECF 59.

charade of seeking an inspection based on flimsy evidence and seemingly without knowing much of anything about the true state of defendant's property.

Molligan's lack of knowledge was made further apparent at the Sanctions Hearing, where she claimed that the "biggest issue with the access was the narrow entrance" of the former dispensary.[122] However, when asked, Molligan could not identify which regulation was purportedly violated, and none of the three complaints that she filed mentions a narrow entryway.[123] Molligan also claimed the ramp was "problematic" and described a ramp "leading up to the front door of the teriyaki restaurant," but could not clearly articulate what the problem was.[124] In fact, there is no ramp to the teriyaki restaurant; a photo taken of plaintiff when he visited the property in November of 2022 shows a ramp that was formerly in front of the dispensary and other photos show no ramp leading up to the teriyaki restaurant.[125]

Molligan's conduct in attempting to settle and then subsequently dismissing the case further supports the conclusion that she was using this case as a vehicle to generate fees. After the pictures of plaintiff's initial site visit were produced in April 2024 and the first media stories began to come out in May 2024, defense counsel sent Molligan a request for admission that showed they had uncovered serious and troubling problems with the complaint.[126] Molligan immediately agreed to settle the case for $1,000 in attorney fees without consulting plaintiff, and the resulting Settlement Agreement did not even mention any future inspection or obligation on defendant to make any repairs.[127] This is directly contrary to plaintiff's reason for bringing the

---

[122] Sanctions Hearing Tr. 28:13-14, ECF 53.
[123] *Id.* at 30:9–18.
[124] *Id.* at 27:9–25.
[125] Def. Hearing Exhibits, Ex. 1, ECF 49; Mot. Summ. J. 5, ECF 16; Blumm Decl., Exs. A–F, ECF 17.
[126] Def. Supp. Ex. 3 at 1, ECF 73.
[127] *See* Settlement Agreement 1–9, ECF 44-1.

suit; plaintiff told the court that he "enter[ed] these cases . . . as an effort to make life more accessible for people with disabilities," and he told Wade the same thing.[128]

Molligan disavows an improper purpose and asserts that the lack of repair terms in the Settlement Agreement was because the agreement arose "after it became known to [her] that [p]laintiff no longer wanted to pursue ADA claims and after [de]fendant had made some repairs and modifications."[129] This contradicts other evidence in the record. As explained above, Molligan immediately accepted defendant's offer to settle the case for $1,000 in fees on June 1, 2023, and she delivered the first draft of the Settlement Agreement on June 4, 2024.[130] On June 18, 2024, Molligan delivered the signature page, which she had signed in her own name as "Power of Attorney" for plaintiff.[131] Molligan later represented that "it really wasn't until the actual signature was requested . . . that it became clear to me that [plaintiff] did not want anything to do with any of this,"[132] but that could have happened only after defense counsel told Molligan on June 20, 2024, that they needed plaintiff's signature for the agreement; the terms, including the lack of repairs, had long been set. Moreover, Molligan knew that defendant had made the repairs after it filed the motion for summary judgment in March of 2024, yet she still pursued the Rule 34 inspection under the pretense that plaintiff suspected additional barriers could be found inside. Molligan's post-hoc rationalizations regarding why the Settlement

---

[128] Mot. Withdraw Hearing Tr. 12:18–21, *Slevin v. Baek Family Partnership*, Case No. 3:23-cv-01487-HZ, ECF 15; *see also* Mehrens Decl., Text Message Ex. 40, ECF 68 ("I want to make changes for accessibility in my community, but I do not agree with the way that your firm handles this business and I do not want to be associated.").
[129] Molligan Surreply 4, ECF 63.
[130] Blumm Decl., Ex. A at 11, ECF 39-1; *see also* Sanctions Hearing Tr. 10:23–25, ECF 53 (wherein Molligan states she believed they "had already settled the case" sometime around May 29, 2024, when defendant served the Request for Admission regarding plaintiff's initial site visit).
[131] Blumm Decl., Ex. A at 7, ECF 39-1.
[132] Sanctions Hearing Tr. 13:16-19, ECF 53.

Agreement is totally silent as to inspection or repairs, like many of her other representations in this case, ring hollow.

Molligan claims "that proceeding with the case and getting out of it to [her] were two different things," and she did not "understand that what [plaintiff] meant was that he wouldn't sign" the settlement agreement.[133] She explained, "In other words, because I was authorized to do settlements, I assumed that he would want to extricate himself as quickly and as easily as possible and -- Well, that's what I thought."[134] But Molligan's ill-informed and ultimately incorrect assumption that her disabled client only wanted her to benefit from the settlement agreement underscores her failure to communicate with her client and determine how he actually wished to proceed.

In sum, Molligan brought this case without any meaningful investigation into the facts, using an unethical representation arrangement that was designed to allow her to use plaintiff and his visit to the property as a vehicle to facilitate obtaining fees. She misled the court to obtain an order allowing an inspection of defendant's property, and then, when the case appeared doomed, she attempted to settle the case without her client's informed consent and on terms that only served her own interests. She later dismissed the case, again without talking to her client, and did so under extraordinarily suspicious circumstances after defendant had apparently withdrawn its consent to dismissal. Molligan's misconduct and bad faith infected this case from its inception, and thus "every cost of defense is attributable only to sanctioned behavior." *Goodyear*, 581 U.S. at 110. A blanket award based on the total amount of fees that defendant has incurred in defending against Molligan's "sordid scheme" is justified. *Id.*

---

[133] *Id.* at 14:3-24.
[134] *Id.*

**ORDER**

Defendant's Rule 11 Motion for Sanctions (ECF 38) is denied; however, attorney Jessica

Molligan is sanctioned under the court's inherent power for bringing and litigating this case in

bad faith, and because this conduct permeated the entire case from the beginning, defendant is

awarded the entire amount of reasonable fees incurred in defending it.

DATED October 2, 2025.

_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge