IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR THE COUNTY OF MULTNOMAH

CONNER SLEVIN, )
)
Plaintiff, )
)
vs. ) No. 24CV37526
)
JESSICA LEE MOLLIGAN, )
)
Defendant. )
)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

CONNER SLEVIN

Taken in behalf of Defendant

* * *

October 13, 2025

Portland, Oregon 97211

Heather Guevarra, CCR

Court Reporter

APPEARANCES:

For the Plaintiff:
MS. EMILY C. TEMPLETON
Underdog Law Office
Suite 3150
111 S.W. Fifth Avenue
Portland, OR 97204
emily@underdoglawyer.com

MS. KELLY D. JONES
Law Office of Kelly D. Jones
Suite 255
819 S.E. Morrison Street
Portland, OR 97214
kellydonovanjones@gmail.com

For the Defendant:

MR. TAYLOR B. LEWIS
MS. JANET M. SCHROER
Hart Wagner, LLP
Twentieth Floor
1000 S.W. Broadway
Portland, OR 97205
tbl@hartwagner.com

Videographer:
MS. EVE GOLDEN-FIELDS
River City Media
10423 S.E. 23rd Avenue
Milwaukie, OR 97222
info@rivcitymedia.com

Also Present:

Ms. Jessica Molligan

(All parties appearing via videoconference)



INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Lewis | 5 - 175 |


EXHIBITS


| Exhibit Number | Description | Page No. |
|---|---|---|
| Number 1 | Text Messages | 30 |
| Number 2 | Initial Representation Agreement | 52 |
| Number 3 | Molligan Representation Agreement | 87 |
| Number 4 | Complaint | 125 |
| Number 5 | YouTube Post | 130 |
| Number 6 | Mehrens Representation Agreement | 135 |
| Number 7 | Second Amended Complaint | 145 |
| Number 8 | Settlement Demand | 172 |




PORTLAND, OREGON; MONDAY, OCTOBER 13, 2025
1:08 p.m.
* * *

THE VIDEOGRAPHER: We are now on the record. The time is 1:08 p.m. Here begins the videotaped deposition of Conner Slevin in the matter of Slevin versus Molligan, case number 24CV37526, in the Circuit Court of the State of Oregon, for the County of Multnomah.
Would the attorneys please identify themselves and their affiliations for the record?
MS. TEMPLETON: Emily Templeton for the Plaintiff, accompanied by Kelly Jones.
MR. LEWIS: And Taylor Lewis for Defendant, Jessica Molligan. My partner Janet Schroer -- there she is -- is also going to be observing today.
Would the court reporter please swear in the witness?

CONNER SLEVIN
called as a witness in behalf of the Defendant,
having first been sworn by the Notary,
testifies as follows:
///



EXAMINATION
BY MR. LEWIS:
**Q. Good afternoon, Mr. Slevin. My name is Taylor Lewis. We met off record but I represent Jessica Molligan in the lawsuit that you filed against her.**
**Do you understand that?**
A. Yes. Thank you.
**Q. So have you ever had a deposition taken before?**
A. No.
**Q. Okay. I'm going to go over some ground rules and explain why we do depositions and how they work so that things go smoothly today; okay?**
A. Thank you.
**Q. All right. So the purpose of a deposition is for the lawyers in this case to find out more about what you would testify to if this case were to go to trial.**
**There is a court reporter taking everything -- taking a transcript of everything that is said today.**
**Do you understand that?**
A. Yes. Thank you.

A. I was a manager.
**Q. And how long had you been a manager at Loyal Legion?**
A. Probably would have been about three years at that point.
**Q. Did you work in some other capacity at Loyal Legion before that?**
A. No.
**Q. Where did you work before going to Loyal Legion?**
A. Before Loyal Legion, I was at a now closed establishment called Pearl Tavern. I was their bar manager.
**Q. How long were you at Pearl Tavern?**
A. That was probably about a six-month stint. I helped them open.
**Q. What did you do before the Pearl Tavern?**
A. Before the Pearl Tavern, I was at another now closed place called Hamlet. I was the bar manager there as well.
**Q. How long were you at Hamlet?**
A. About a year.
**Q. Any jobs between graduating college and Hamlet that we haven't talked about?**
A. Yeah. Yes. Do you just want me to go through? Sure, sure. So before Hamlet, I was at Oven and Shaker. Before that I was in San Francisco before I moved from -- back from San Francisco after graduating. Before moving up here, I worked at an establishment called Cafe Muse on and off. I worked at a place called Plate Shop, Sausalito. I worked at a wine bar called Robert Baren. I worked at a butcher shop called Belcampo. I worked in fine dining at an establishment called Jardiniere. Yeah, definitely a plethora of all restaurants and hospitality industry jobs.



**Q. Restaurants, bars, hospitality, that's basically been your entire career up to 2020?**
A. Correct.
**Q. I understand that you suffered an injury in 2020 in Mexico; correct?**
A. Correct.
**Q. And I don't need to go through it all but can you just give me a general overview of what happened and what your injury was?**
A. Yes. I was swimming in the ocean and got caught in a wave that threw me down head first onto the bottom of the ocean floor. It resulted in a stress fracture and a burst fracture of two vertebra in my -- to the cervical vertebra in my spine resulting in incomplete spinal cord injury, which has led to high levels of paralysis, loss of function in all extremities as well a plethora of other complication but that's the main of it.



**Q. And have you -- so you've been needing to use a wheelchair for ambulation ever since that injury; is that correct?**
A. Correct.
**Q. In addition to the wheelchair, are there any other assistive devices that you use for activities of daily living?**
A. Yes. I use other adaptive tools around my home such as grabbing claws, different altered handles for doors.
**Q. Since your injury, have you been able to drive a vehicle?**
A. I have not.
**Q. Have you -- since your injury, have you needed to hire a caregiver to assist you with activities of daily living?**
A. Yes.
**Q. How often does a caregiver -- do you have assistance from a caregiver, every day, couple times a week?**
A. Every day.



**Q. Has that been the same from 2020 until today?**
A. Correct.
**Q. Was there one -- did you have one caregiver, like one particular person that helped you in 2022?**
A. No, I've had a pretty consistent care team comprised of about shifting I'd say four to seven people on the calendar at any given time.
**Q. Do you pay caregivers directly, through insurance, someone else pays for them?**
A. It comes through the State.
**Q. So the State provides financial assistance for caregivers?**
A. Correct.
**Q. Do you know how much a caregiver charges per hour through the State?**
A. It is -- it's varying. The State has last I checked, I believe, they were around at $17 an hour. But with that being said, I'm on a slightly different program so I'm able to adjust my hours and wages accordingly. So they're approximately $30 an hour now.

**Q. And how about Shannan?**
A. Her last name is Slevin, same as mine.
**Q. Okay. Have you spoken -- sorry. Have you had any written communications with Ms. Spicer about the events described in your lawsuit?**
A. I do not believe so.
**Q. How about with your sister, Shannan Slevin?**
A. I do not believe so. And I can say that it would be nothing that is any kind of specific whatsoever if I mentioned it at all.
**Q. So I'm going to ask you some questions about Shane Crider.**
**Do you know who I'm referring to?**
A. I do.
**Q. Okay. Well, let's just start there.**
MR. LEWIS: Eve. Can you pull up the exhibit that is exhibit messages with Shane Crider?
This will be Exhibit 1.
(Deposition Exhibit Number 1 marked for identification.)
**Q. (By Mr. Lewis) Mr. Slevin, can you see that okay?**



A. Yes. Even better.
**Q. So do you recognize the communications that are in Exhibit 1 here?**
A. Yes.
**Q. Okay. And so this is -- these are some communication I received over the weekend from your attorney.**
**It appears to be a message from Mr. Crider to you dated June 15, 2022; is that right?**
A. Yes.
**Q. Okay. So who is Shane Crider to you?**
A. Shane Crider was and still is a stranger. I guess acquaintance at best. We have a mutual friend in the -- the spinal cord injury community. They know each other through playing rugby and he reached out with this message here very much out of the blue and I just had seen that we have our mutual friend in common on Facebook and I assumed at the time that they had known each other and that he had steered him my way for this opportunity to do some good for the ADA community.
MS. TEMPLETON: Mr. Lewis, can we take a brief break?



MR. LEWIS: Yeah.
MS. TEMPLETON: Five minutes?
MR. LEWIS: That works.
MS. TEMPLETON: Thanks.
THE VIDEOGRAPHER: We are now off the record. The time is 1:44 p.m.
(A recess was taken from 1:44 p.m. to 1:52 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 1:52 p.m.
MR. LEWIS: Eve, if you could pull up Exhibit 1 again, please.
**Q. (By Mr. Lewis) All right. Mr. Slevin, before we went off the record, we were talking about Exhibit 1 and how you know this Mr. Shane Crider.**
**You testified that you knew Mr. Crider through a mutual friend; is that right?**
A. I -- I looked at the Facebook and Facebook said that we had a mutual friend.
**Q. Okay.**
A. That was about as far as I took it at the time.
**Q. So prior to this message from Mr. Crider on June 15, 2022, did you have any communication**



**with him?**
A. No.
**Q. Who is the mutual friend?**
A. What is his name? Sorry. It's not coming to me off the top of my head. I'm sorry. I can -- I can find you that information. It's just not coming to me right now.
**Q. Do you know -- do you have any idea why Mr. Crider decided to reach out to you?**
A. I do not. I was under the assumption at the time it was because we had a mutual friend and, again, I was assuming that he had reached out to him and he's already employed and busy. So I was just working under the assumption that he had reached out to him with this and he had basically passed it off to me but these are -- these are all assumptions.
**Q. So there at the top in his original message, it says, Hey, Conner, I hope all has been well.**
**Do you see that?**
A. Yes.
**Q. Okay. That just indicates to me that he knew you from before since he's wondering or hoping that all things have been well.**

**Is that -- is that incorrect, you didn't know him prior to this?**
A. That is incorrect. This is the first time we have had any kind of -- any kind of interaction at all.
**Q. I'm reaching out because the attorneys that I do ADA cases with have given me the green light to extend to the Portland area and need some local people to participate in an Americans of Disabilities Act project.**
**Do you see that?**
A. Yes.
**Q. Couple of questions, do you know what he meant by ADA cases?**
A. No.
**Q. Do you know about at that time back in June of 2022, did you know what the Americans with Disabilities Act was?**
A. I heard of it, never knew any of the details.
**Q. Prior to June of 2022, had you ever been involved in a lawsuit?**
A. No.
**Q. How about a prior criminal matter?**
A. In 2008, I had a misdemeanor DUI.



**Q. And I assume that you interacted with attorneys as part of that matter?**
A. Yes.
**Q. And you probably had to go to court as part of that matter as well; right?**
A. Correct.
**Q. So you had some familiarity with the legal system prior to 2022?**
A. Yes. And, again, I'll add an addendum to that. I was 18 and I relied very heavily upon my parents as my go-between with the lawyers. Although I definitely did have interactions with the lawyers and went to court, it was -- it's not something that I think of, you know, over ten years later on any kind of regular basis but as far as how attorneys are to act, you know, I just do not -- I -- I still do not feel like I am very versed in the legal system.
**Q. Do you have any friends that are attorneys?**
A. No.
**Q. Anyone from your past that you know who went to law school?**
A. Yeah, I'm sure at some point.



**Q. Does anyone in particular come to mind? Sorry.**
A. One of my old roommates moved on to a different house and lived with a guy. That's about as close as I can really -- yeah, acquaintance at best. I can't think of anybody in particular that I think, yeah, they are, you know, been going to law school or in law school when I was around.
**Q. So going back to Exhibit 1. The attorney I work with will probably take on two more clients in the Portland area. The project itself is pretty simple. The attorney will send you out to two to five places at a time that have already been evaluated to not be ADA compliant with at least nine violations and you will have to purchase a small item, like a Coke or something, and keep the receipt to establish legal standing.**
**Do you see that?**
A. Yes.
**Q. Is that your understanding of what your role would be in this ADA project if you were to join it?**
A. Yes.



**Q. The attorney I work with pays 200 per store immediately after you visit them and is likely to send you to around to ten stores per month.**
**Did I read that right?**
A. Yes.
**Q. Was it your understanding if you agreed to be a part of this project, you would be paid 200 per store?**
A. Yes.
**Q. And that you would go to about ten stores a month?**
A. It was never actually ten stores a month but at that time, yes, that's what I was under the impression of.
**Q. So doing the math about $2,000 a month?**
A. Correct. That's what is being proposed here, yes.
**Q. And I'm just talking to you about what Mr. Crider is saying to you. We'll talk about your interaction with the attorneys from Tennessee later but I just want get what your understanding of this was prior to even contacting them; okay?**
A. Excellent.

**Q. So further down it says, The primary requirement is that you drive or have reliable transportation.**
**Did you have reliable transportation at that time?**
A. I did.
**Q. Through your caregivers?**
A. Yes.
**Q. What about your parents, did they help transport you?**
A. No.
**Q. He also prefers that you be on disability but you don't have to be. He will work with you on how you would like to be paid.**
**I think you testified earlier you were on disability at this time?**
A. Correct.
**Q. Further down it says, I like to give first option to people I know as it's a way to make good money for minimal work while also serving a good cause.**
**Again, from your earlier testimony, you didn't know this guy?**
A. Correct.
**Q. Feel free to ask me whatever you want,**



**and then it looks like you -- actually, I can't -- I just want to clarify.**
**Is the first message from Mr. Crider on June 15, 2022, at 7:37 p.m.**
**Am I reading this right?**
A. I believe so, yes.
**Q. Okay. And so these dates and timestamps, they're below the message.**
**Is that how you see it?**
A. Yes.
**Q. Okay. So this one at the same date at 9:31 p.m., that's your message back to Mr. Crider?**
A. Yes.
**Q. You say, Shane, what up, man? I'm super interested. Thank you for reaching out. I've got some questions but I like the sound of things overall. What's next?**
**Do you remember sending that message?**
A. Yes.
**Q. Okay. Before we get into that, what is this -- what are you messaging on? Is this Instagram, Facebook? What is this?**
A. Facebook Messenger.
**Q. You say, I'm super interested. Thank**



**you for reaching out.**
**Why were you super interested?**
A. Because this seemed like a great way to make a difference for my community in the Portland area. It seemed like an opportunity to help people and to make change for the better. To make a difficult situation that I am in, try to make it little bit less difficult for others, yeah.
**Q. Were you also interested in the $200 payments?**
A. I mean, it was like -- it was like a cherry on top. It was a sweetener. You know, I definitely -- I'm not going to sit here and say like money is not like what makes the world go around. At the same time, it's -- it's -- it wasn't about the money ever. It definitely is and has been and still is about trying to make positive change.
**Q. Would you have done it for free?**
A. Yeah, probably. I mean, there were plenty of times that I didn't -- I mean, I just was negligent in cashing the checks they would give. It was, you know, it wasn't about that. I had to have them reissue a couple of times.



**Q. This wasn't a situation where like you were short on cash and you really needed these $200 payments to survive?**
A. Correct.
**Q. So then we go down to Mr. Crider's message to you which is, Awesome, Bro. Please shoot me your phone number and I will forward it to BJ Wade, who is the primary attorney that will be reaching out to you.**
**Did I read that right?**
A. Correct.
**Q. Okay. Did you send him, him being Mr. Crider, your phone number?**
A. I believe I did, yes.
**Q. Did you have any idea who BJ Wade was prior to seeing his name in this message?**
A. No.
**Q. You never met Mr. Wade?**
A. Correct.
**Q. All right. At this point in time, had you ever met or known anything about Jessica Molligan?**
A. No.
**Q. What about Luke Sanderson?**
A. At this time, no.

**Q. And do you know who I mean by Luke Sanderson?**
A. Yes.
**Q. Is it your understanding that Luke Sanderson is with the Wampler Law Firm in Tennessee?**
A. Yes.
**Q. Is it also your understanding that Mr. Wade is an attorney in Tennessee?**
A. Yes.
**Q. Mr. Crider goes on to state, He will typically text you and set up a time to talk. I will also shoot you a text so you have my number and I will send you BJ's number so you can save it in your phone to recognize when he contacts you great to have you on board. Feel free to ask BJ anything. He's a great guy and super accommodating.**
**Did I read that correctly?**
A. Yes.
**Q. Did Mr. Crider send you a text message after this?**
A. I am unsure at this time. We -- we never texted back and forth in any meaningful way.



**Q. During the course of this lawsuit, did you search your phone to see if you had any texts from Mr. Crider?**
A. I'm unsure if I did. Yeah, I -- I -- I'm unsure. I don't know if I even saved his number. Again, I didn't have any kind of meaningful conversations with Shane Crider. It was very much getting passed off from him to BJ Wade who I had conversations and more interactions with.
**Q. Have you switched phones since June of 2022?**
A. Yes.
**Q. Did you copy over your text messages and contacts and all of that in switching phones?**
A. Yes.
**Q. What kind of phone do you have?**
A. An Apple.
**Q. iPhone?**
A. iPhone 16, yes.
**Q. Nice. Have you had iPhones this entire time from 2022 through the present?**
A. Yes.
MR. LEWIS: Eve, could you go to page two of this exhibit, please?



**Q. (By Mr. Lewis) So now we're on June 16, 2022. You message back that, This seems pretty bad ass, and you provide Mr. Crider with your phone number; correct?**
A. Correct.
**Q. But you don't remember if he hit you up as you suggested?**
A. Correct. Yeah.
**Q. So he does go on to say, Good deal. I sent you a text.**
**Does that refresh your memory?**
A. As I say, he definitely could have, yeah, but it was nothing that stood out to me.
**Q. Would you be willing to search your cell phone and see if you still have that text?**
A. I would, yeah.
**Q. The last message here -- actually let me say this.**
**In his message to you, he says, Good Deal. I sent you a text.**
**Later he says, Yes, this program has been awesome for me and many of my friends. I have been doing it for over 30 years.**
**When he says program -- at this point in time, June 16, 2022, or maybe June 17, 2022, did you have any idea of what program he was talking about?**



A. Nothing besides the information that he had already given me above and that's the entirety of the information that I had at the time.
**Q. And then he -- he ended the conversation -- he being Mr. Crider -- just be as responsive as possible to BJ when he contacts you. He really appreciates that.**
**So that appears to be the last message in this Facebook exchange?**
A. Correct.
**Q. And I understand that you obtained this document and provided it to your attorney who provided it to me, which I appreciate.**
**Are there any other Facebook messages that you had with Mr. Crider after this?**
A. I can definitely look, but to my knowledge, I provided you with all of my interactions with Mr. Crider.
**Q. Okay. So correct me if I'm wrong but my understanding is that you then got in touch with Mr. Wade after this; is that correct?**
A. Correct. Yes.

A. To become ADA compliant. Whatever was not compliant, I was under the assumption that they would be working to bring buildings into compliance.

**Q. Right. So I understood -- let me just unpack that a little bit.**

**It's your understanding that before your involvement, these businesses would have been notified a minimum of five times that they were not compliant with the ADA.**

**Is that your testimony?**

A. Correct. Yeah. That's what BJ Wade was leading me.

**Q. Okay. And if that didn't work, if they still refused to be ADA compliant, what would happen?**

MS. TEMPLETON: Object to the form. Calls for speculation.

Go ahead.

THE WITNESS: Could you repeat that question?

**Q. (By Mr. Lewis) I'm not asking you to speculate. I'm asking you to tell me what Mr. Wade told you about what your role would be in these projects.**



**If they didn't get compliance, what was your role then?**

A. Then my role would be to come in to create a paper trail through making a purchase or getting some sort a tri-folder and then getting the necessary pictures for them. To then bring a -- I mean, as a layman, myself understand it, they would do the lawyering necessary and if I was the one to add the leverage and my name on it, that that was how it was -- that's how it was going to work. That was my point in it. My name, Conner Slevin, being on the document to become ADA compliant or we are going to have to make moves to further these actions.

**Q. And did Mr. Wade tell you what moves those were?**

A. No, not -- not nothing that really comes to mind right now, no specifics.

**Q. You did know that there would be some sort of legal maneuvering, though?**

MS. TEMPLETON: Object to the form. Vague and ambiguous. Lacks foundation.

Go ahead.

THE WITNESS: Yes.



**Q. (By Mr. Lewis) You just didn't know exactly what that would entail?**

A. Correct.

MS. TEMPLETON: Same objections.

**Q. (By Mr. Lewis) Did you speak with Mr. Sanderson prior to entering the representation agreement?**

A. It's possible. I do believe I probably had a phone call or two with him. I don't know if it was specifically before or after entering the agreement.

**Q. So your -- your conversations leading up to this representation agreement were primarily with Mr. Wade?**

A. Yes.

**Q. All right. So let's look at Exhibit 2 a little bit. There at the top under Purpose of Representation, there's subsection 1.1, The attorneys legal services.**

**Do you see that?**

A. Yes.

MR. LEWIS: Eve is going to help us out. Thank you.

Attorneys will file lawsuits in the US District Court on Client's behalf involving



claim of discrimination as a result of the conduct of Defendants subject to Title III of the Americans with Disabilities Act where attorneys find the case to have merit.

Did you understand that subparagraph when you read it?

A. I'm sorry. One second here. Yes, I believe I did.

**Q. So you understood that as within the scope of the representation agreement was that the attorneys who signed the agreement would file lawsuits on your behalf; is that correct?**

A. Yes.

**Q. And those lawsuits would be for a claim of discrimination under the Americans with Disabilities Act; is that correct?**

A. Yes, I believe so.

MR. LEWIS: Eve, we're done with this paragraph. Thank you.

**Q. (By Mr. Lewis) What was your understanding of what it means to file a lawsuit?**

MS. TEMPLETON: Object to the form.

Go ahead.

THE WITNESS: Again, just being the

layman, I'm so far from a lawyer, I understood that as being the necessary push that they needed to become compliant.
**Q. (By Mr. Lewis) Right. So you filed a lawsuit against Ms. Molligan?**
A. Yes.
**Q. And that's why we're here today; correct?**
A. Correct.
**Q. Do you understand what your role is in the lawsuits against Ms. Molligan?**
MS. TEMPLETON: Object to the form. Go ahead.
THE WITNESS: Yes.
**Q. (By Mr. Lewis) You understand that you're the plaintiff?**
A. Yes.
**Q. And she's the defendant?**
A. Yes.
**Q. Okay. So when you entered into this representation agreement, did you understand that the attorneys would file lawsuits on your behalf where you would be the plaintiff and the property owner who was not compliant with the ADA would be the defendant?**



A. Yes.
MR. LEWIS: Eve, can you pull up paragraph 2.2, please?
**Q. (By Mr. Lewis) All right. So about halfway down it says if the Client does not obtain a recovery or benefit in connection with this matter, there will be no obligation to pay any legal fees or expenses.**
**Do you see that?**
A. Yes.
**Q. Was it your understanding at the time that you signed this agreement that you would not need to reimburse Mr. Sanderson or Mr. Wade for any of the fees that they incurred in bringing lawsuits on your behalf?**
A. Yes.
**Q. It goes on to say, If the action is unsuccessful, the court may assess fees or costs against Client, including any attorney fees or costs. In such an event, attorneys agree to reimburse Client on a timely basis for all such fees and costs as assessed or awarded by the court to the fullest extent permitted by law.**
**Do you see that?**
A. Yes.



**Q. Was it your understanding that if the court assessed fees or costs against you as part of one of these cases, you would not be responsible for that?**
A. Correct.
MR. LEWIS: Okay. I'm done with this paragraph, Eve. Thank you. So let's go to the second paragraph in paragraph 2.2. Perfect. Thank you.
**Q. (By Mr. Lewis) So this is the second paragraph of paragraph 2.2.**
**If resolution of this matter results in any benefit or recovery for Client and in all other situations in which a benefit or recovery is obtained by virtue of attorneys efforts, the Client agrees that attorneys are to be paid a fee commensurate with attorneys efforts as well as reimburse costs and expenses advances.**
**Did I read that correctly?**
A. Yes.
**Q. Okay. So when you entered this agreement, you understood that your attorneys might be paid a fee commensurate with their efforts?**
A. Correct.



**Q. You did not believe that your attorneys were doing this work for free?**
A. Correct.
**Q. So if -- at the beginning says, If resolution of this matter results in a benefit of recovery for Client.**
**Did you understand that included a situation where your attorneys obtained a settlement of one of your cases, that it included an amount allocated for attorney fees?**
MS. TEMPLETON: Object to the form. Go ahead.
THE WITNESS: Yes.
**Q. (By Mr. Lewis) Then the last sentence of that same paragraph, Whether the benefit or recovery is obtained by settlement, judgment, or otherwise, attorneys will obtain the fees as well as costs and expenses exclusively from defendants or by application to the court.**
**Do you see that?**
A. Yes.
**Q. You understood that these fees and costs, this award of fees, costs, expenses, whether by settlement, judgment, or otherwise would come from the defendants who you sued?**

A. Yes.
MS. TEMPLETON: Object to the form.
**Q. (By Mr. Lewis) That's a yes?**
A. Yes.
MR. LEWIS: Okay. I'm done with this paragraph. So let's go to subparagraph 2.3.
**Q. (By Mr. Lewis) Can you see it okay right now, Mr. Slevin?**
MR. LEWIS: Eve, yeah. It goes into the second page.
THE WITNESS: Yes.
MR. LEWIS: Let's see if we can pull -- oh, yeah. There we go. Perfect.
**Q. (By Mr. Lewis) So subsection 2.3 is entitled Association of and Payment to Other Attorneys.**
**It says, Client authorizes its attorneys to associate one or more other co-counsel on Client's behalf if attorney finds it necessary.**
**Did I read that right?**
A. Yes.
**Q. So at the time you entered the representation agreement, did you understand that Mr. Wade and Mr. Sanderson might associate with co-counsel to represent you?**



A. Yes. And being just a layman, I assumed that this was all up to snuff.
**Q. It goes on to say that, Client agrees that co-counsel may appear on Client's behalf in any proceeding involving this matter and attorneys and co-counsel will share any award of attorney fees and expenses awarded by the Court against Defendants or obtained through a settlement agreement in accordance with the agreement between attorneys and co-counsel.**
**Did I read that right?**
A. Yes.
**Q. So in signing this agreement, you agreed that co-counsel could appear on your behalf in any proceedings involving the ADA cases?**
MS. TEMPLETON: Object to the form.
THE WITNESS: Correct.
**Q. (By Mr. Lewis) Okay. And you also understood that your co-counsel and you authorized your co-counsel to share in any award of attorney fees and expenses awarded by the court against defendants or obtained through a settlement agreement?**
MS. TEMPLETON: Object to form.
THE WITNESS: Correct.



MS. TEMPLETON: Can we take a brief break?
MR. LEWIS: We can.
THE VIDEOGRAPHER: We are now off the record. The time is 2:33 p.m.
(A recess was taken from 2:33 p.m. to 2:41 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 2:41 p.m.
MR. LEWIS: Okay. Let's go back to Exhibit 2, please. So let's go to subparagraph 3.3 and let's start with the first paragraph, please. That's fine. Thank you.
**Q. (By Mr. Lewis) Okay. Mr. Slevin, and this is Exhibit 2, subparagraph 3.3. It's entitled No Special Benefits.**
**Do you see that?**
A. Uh-huh.
**Q. Is that a yes?**
A. Yes.
**Q. That's that thing, yeah.**
A. Yes.
**Q. So Client understands and acknowledges that Client will not receive any special benefits or monetary recovery. Client fully**



**understands and Client has agreed that currently Title III of the ADA specifically disallows any monetary award to be recovered by individual plaintiffs and the only remedy currently available in ADA Title III cases is that of injunctive relief to remove barriers that prevent equal access to qualified persons with disabilities.**
**Did I read that correctly?**
A. I believe you did.
**Q. Thank you. You understood in signing this agreement that you would not receive any special benefits or monetary recovery through the ADA litigation; correct?**
MS. TEMPLETON: Object to the form. Go ahead.
THE WITNESS: Yes. Yeah. That was my assumption. That was my understanding.
**Q. (By Mr. Lewis) So if you sued a business for ADA violations, you personally could not recover any money through that lawsuit; correct?**
MS. TEMPLETON: Object to the form. Vague and ambiguous. Lacks foundation. Calls for speculation and a legal conclusion.
Go ahead.

66

**Q. (By Mr. Lewis) That was your understanding?**
A. Yeah, that was my understanding.
**Q. Did you understand at the time that you entered this agreement that plaintiffs, so someone like a plaintiff in this lawsuit like you are in this one, plaintiffs in ADA Title III cases could not recover monetary awards?**
A. At the time when I was reading it, again, I was very -- I was not very well read and so, yes, I understand the -- I understand that. Again, it has never been about money for me, so yes.
**Q. Further down it says -- so this is the third paragraph now.**
**It says, Client agrees that Client is not entitled to any portion of any recovery by the attorneys in the form of attorney fees associated with the subject litigation and it goes on to say initiated on Client's behalf.**
MR. LEWIS: Eve, if you could show him that part as well. If you could just highlight that whole paragraph. Perfect.
**Q. (By Mr. Lewis) Okay. So I'll read it again.**

67

**Client agrees that Client is not entitled to any portion of any recovery by the attorneys in the form of attorney fees associated with any of the subject litigation initiated on Client's behalf. Client agrees that all monies recovered in the form of statutory attorney fees or in lieu of statutory attorney fees for the purpose of settlement as a result of attorney's prosection of Client's cases belong exclusively to attorneys for providing said services.**
**Did I read that right?**
A. I believe you did.
**Q. When you signed or entered into the representation agreement, was it your understanding that your attorneys might recover attorney fees in these ADA lawsuits?**
A. I did know that, yes. I have no idea as to the amounts of those fees or any of the details of it but I was -- I did know that they would be looking to get their fees from the defendants.
**Q. And you also knew that the attorneys might obtain attorney fees through settlement agreements with the defendants?**

68

MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: Yes.
**Q. (By Mr. Lewis) And you also knew that if that happened where your attorneys obtained attorney fees, either through a lawsuit or settlement, you didn't have any right to those attorney fees?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: Correct.
MR. LEWIS: All right. I'm done with that subparagraph. So let's go to 4.1, Power of Attorney.
**Q. (By Mr. Lewis) So subsection 4.1 is entitled Power of Attorney.**
**When you entered into the settlement (sic) agreement, did you know what the term power of attorney meant?**
A. I had heard it.
**Q. What was your understanding of what power of attorney meant?**
A. Where somebody has the ability to make legal decisions in your name.
**Q. This paragraph says, Attorneys are**

69

**granted a power of attorney as related to these cases so that they have full authority to prepare, sign, and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to commence, conduct, and conclude their representation, including reducing to possession any and all things of value due Client under these claims should the court choose to make such awards as fully as Client could do in person.**
**Did I read that correctly?**
A. Yes.
**Q. Okay. What did you understand this subparagraph to mean with respect to your role in the ADA cases?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: I was under the assumption that this was a rather standard part of a lawyer and client relationship. So I was still working under the assumption that they had my best interest in mind and that they were going to be using that moral compass to be able to streamline, for lack of a better term. I was under the assumption that this was a completely

normal -- a normal thing that attorneys did for their clients.
**Q. (By Mr. Lewis) So you believed this would help streamline the process?**
A. That's how it was -- yeah. That's what they had led me to believe, yes.
**Q. Have you ever prepared a legal instrument before?**
MS. TEMPLETON: Object to the form. Vague and ambiguous.
Go ahead.
THE WITNESS: I have not.
**Q. (By Mr. Lewis) Do you know how to prepare a legal instrument?**
MS. TEMPLETON: Same objection.
Go ahead.
THE WITNESS: I do not.
**Q. (By Mr. Lewis) So it says here you were giving the attorneys the authority to prepare legal instruments, which you would not know how to prepare; correct?**
A. Correct.
**Q. All right. Same thing with it says here sign legal instruments.**
**Do you know whether or not you're**



**allowed to sign a legal instrument not being an attorney?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: I'm not even aware as to what a legal instrument is.
**Q. (By Mr. Lewis) And that's okay. Do you know what a pleading is?**
A. Not enough to speak to it, no, not necessarily.
**Q. Do you know what a complaint is?**
A. Yes.
**Q. Okay. Do you know -- and I'll represent to you that a complaint is also a pleading?**
A. Okay.
**Q. Have you ever prepared a complaint before?**
A. No.
**Q. You have not?**
A. I do not believe so.
**Q. Okay. So you would rely on attorneys to prepare complaints for you in these cases?**
A. Correct.
**Q. Just like you relied on your attorneys in this lawsuit to prepare the complaint they**



**filed on your behalf in this litigation?**
A. Correct.
**Q. Okay. Do you know how to file a document with the court?**
MS. TEMPLETON: Object to the form.
THE WITNESS: I do not offhand, no.
**Q. (By Mr. Lewis) Meaning you need to rely on attorneys to file legal instruments on your behalf?**
A. Correct.
**Q. Have you ever settled a lawsuit before?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: No.
**Q. (By Mr. Lewis) And I should have asked a better question.**
**Have you ever settled a lawsuit without assistance from an attorney?**
A. No. I just want to try to make sure I'm covering my bases. I had some sort of a class action for a job I used to work at. I had no idea what was happening and got a minimal, very minimal amount of money from. I don't know if that counts.
**Q. Was that one of those like class actions**



**you get in the mail that notifies that you're entitled to a certain portion of a class action settlement?**
A. Yes.
**Q. Have you ever prepared a settlement agreement in a legal action?**
A. No, I have not.
MR. LEWIS: I'm done with this paragraph. Thanks, Eve.
**Q. (By Mr. Lewis) Prior to entering the representation agreement on June 25, 2022, had you ever met or spoken to Jessica Molligan?**
A. No.
**Q. Did she in any way influence your decision to enter into this representation agreement?**
A. No.
**Q. Okay. So after you entered into this representation agreement, what happened next as far as your role with the attorneys from Tennessee, Mr. Wade and Mr. Sanderson?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: After this, we moved straight into -- at the time, I believe it was

it started as text messages from BJ Wade and then it was e-mails telling me different location to go to that they had already seen qualified as not being up to ADA standards and notifying. It was my assumption at the time. So we started moving forward with how to start the process, where to go, how to take the pictures, those details.

**Q. (By Mr. Lewis) so what were you instructed to do as far as this process?**

A. I was to go to an already predetermined site, create a paper trail, whether it be buying anything to get a receipt, nominal purchase of some sort or in some cases even just getting a pamphlet would be enough. And then taking a picture of the -- they asked for the ADA parking spot. They asked for a picture of me outside of the front of the building and then a picture of the receipt or pamphlet.

**Q. You said someone had predetermined the locations that you were sent to; is that right?**

A. Correct.

**Q. Who made that determination?**

A. I got that information from BJ Wade at first and as far as who was doing the



inspections, unbeknownst to me.

**Q. But your understanding was that an inspection was done prior to you going to these properties?**

A. Correct.

**Q. And at least in some of these cases, those inspections uncovered ADA violations?**

A. I was told that all of the places that I was sent to that they had ADA violations, correct.

**Q. Prior to going to these properties, did you have any, I guess, training or education on ADA violations?**

A. No. In fact, in multiple messages, it was -- it was told outright that I did not need to look for any kind of compliance issues as they had already done it.

**Q. Fair to say you wouldn't know what to look for either?**

A. Correct.

**Q. So you said initially it was Mr. Wade who was telling you which properties to visit?**

A. Correct.

**Q. Did that change at some point?**

A. It did.



**Q. How did that change?**

A. After we changed from initially it was text messages and then it was e-mails and then eventually they created their own hub and it was e-mail site -- sorry -- a website login. They give you contact password information and then from there, they had the expected places for you to go visit as well as the central spot for uploading the pictures and adding any other notes.

**Q. Okay. So just to get this right. So it started with text messages and e-mails. Later the Tennessee attorneys created a website that you could go to and log into?**

A. Correct.

**Q. Do you remember when they switched to this website?**

A. I do not offhand unfortunately. Sorry. But I could find that information for you if you'd like.

**Q. How would you find that information?**

A. Oh, man, I would have to go back into my e-mails and see when they were sending me the -- the links and the -- the notifications that they were switching over to this style.



**Q. Do you think -- I'm sorry. Do you think they switched to the website prior to July of 2023?**

A. I don't know. I'm so sorry. I'm just genuinely bad at dates.

**Q. But we should be able to tell from your e-mails?**

A. Correct. Yeah. The information is there. I just don't have it offhand.

**Q. Did the website have a name?**

A. Again, unfortunately I -- I can't remember offhand.

**Q. Does the name Lidify ring a bell?**

A. Yes.

**Q. Was this website called Lidify?**

A. It -- it definitely could have been. Sorry. I just had it as a book note.

**Q. Like a tab on your browser?**

A. Thank you. Yes.

**Q. Like Google Chrome at the top there?**

A. Exactly, yeah.

**Q. What's your dog's name?**

A. Paloma. Running around.

**Q. So on a -- so just run through with me how would you access Lidify?**

A. I would access Lidify through the -- through the web browser. So go on, hit the tab, sign in. That would be the hub with their information.
**Q. Do you remember what your login was?**
A. I do not. I do remember, though, that I was cut off access to it as soon as I notified BJ Wade that I no longer wanted to be associated with them. So at that point, I no longer had access to any of the filings that were happening, any of the information that was happening in any of the cases.
**Q. When did that happen when you cut off or I guess told Mr. Wade that you didn't want to do these cases anymore?**
A. I believe it was around November of last year. It was as soon as the KGW article came out.
**Q. So the e-mails I received from you, at least it indicated to me that you first did that in May of 2024. And I can show you this later but does that sound accurate?**
A. Yeah. I mean, definitely you have the information there more than I do.
**Q. So it was around the first KGW article?**



A. Yes. As soon as I saw that first KGW article, that day I reached out to BJ Wade and Ben Brumleve. I don't know how to say his name but it was that day that I reached out to them and it was soon after that that I realized that I no longer had access to the hub.
**Q. So I want to go back to Lidify for a second. You said it was a program where you could upload photographs?**
A. Correct.
**Q. These are photographs that are being taken of you at these properties?**
A. Correct.
**Q. What other type of information could you upload or did you upload?**
A. Again, as they were evolving, they had added a point for -- they were looking for a simple one or two sentences that they could show a judge as to reasons that you were in the area or that you frequent the location in question and that was right at the same time that I was pulling out of the project altogether.
**Q. Was this like a form you -- you entered information into?**
A. Yeah, they had it split onto a couple of



different screens but, yeah, it was all -- they had their tab set up, photos here, notes here, anything else, when did you go, all pretty baseline.
**Q. What else did you see in Lidify for information?**
A. Not a whole lot. I mean, it was -- it was mainly used as -- I don't know. From what I -- from what I would use it as, I would go on, see what the assignments were, see what places were not ADA compliant, go do my part, and then go and upload the pictures there, yeah. As far as the other, you know, I didn't have any kind of an onboarding or anything to speak of. So, yeah, I never spent a lot of time on there besides doing what they were asking me for on the -- in the hub. There's nothing that -- any other information that I could think of offhand that I used in any meaningful amount.
**Q. Did you explore the whole Lidify web page, click on all the tabs, see what all was on there?**
A. I mean, I'm sure that -- I'm sure that I did but I don't -- nothing that stands out to me.



**Q. My understanding is that there was a tab or program through Lidify that would allow you to view things like demand letters or complaints that were sent or filed in your cases.**
**Do you recall that?**
A. It is a possibility but it was never anything that was brought up for me to pay any attention to and I mean at the time too I -- I, you know, I could have looked but, again, I was just going under the assumption that my lawyers were doing good work and there was no need for me to be extra vigilant.
**Q. What do you mean by extra vigilant?**
A. In retrospect, I was too trusting of the lawyers to do what's right, to act ethically and within the scope of my morals but it's in hindsight now. At the time, I was under the assumption that this was all above board and they -- my lawyers were doing regular, morally acceptable lawyer work to better my community.
**Q. You didn't feel the need at the time -- I'm talking about at the time without the benefit of hindsight -- the need to check in on the status of the cases related to the properties that you visited?**

A. Correct. Yeah. Insomuch as I wasn't even informed if things were settled, if things were -- what cases were demand letters being sent to. It was all out of my hands and I -- I mean, I some cases I wouldn't even know what I'd be checking for.

**Q. I guess were you curious what was happening with these cases?**

A. I mean, yeah. I was curious insofar as if they're making the changes or not. You know, I -- certain level of curiosity but it doesn't go over my level of what -- again, working on the assumption that they had already been told so many times and as long as they were coming into compliance at the end of the day, like I had assumed the lawyers I was working with were heading towards. You know, that's all the assumption that I was working on and so that's what I was -- information that I was given. So I -- I wasn't given any kind of reasoning to go back and see what they had been doing in these cases. I'd assumed if anything was out of the ordinary or if anything was bad that I would have been informed, you know, of things, so...

**Q. I guess to -- maybe this an incomplete**



**summary but I'll just ask you the question.**

**Was your goal then, primary goal, going to these properties to get the property owners to be ADA compliant?**

A. Yes.

**Q. Okay. Did you have any other goals other than that?**

A. No. I mean, that's it. At the end of the day, it's the ability for my community to make the most of an already very difficult to maneuver world. Yeah, so anything I could do to try to help people that are in position, people in similar positions, really that's all -- that's what I'm after for all of it, yeah.

**Q. What did you do to check and see if these property owners were making the requested changes to the properties?**

A. I was going on the assumption that my legal team was doing their job and what we had contractually had an obligation to make happen. I was just working on the assumption that they were doing their job in bringing these places into compliance.

**Q. If you wanted to -- I'm talking about, you know, back when you were visiting these**



**properties, when you first started visiting these properties, if you wanted to check on the status of whether ADA compliance repairs were being paid, who would you reach out to?**

A. Google search. I don't -- I don't know. Maybe I would probably reach out to the lawyers and see what kind of action has been made. But, again, I didn't see the merit in it when I was working under the assumption that the lawyers were doing this on my behalf. I had no reason to think anything else.

**Q. Earlier you testified about receiving $200 payments for each property you visited; is that correct?**

A. Correct.

**Q. Who provided the $200 payments to you?**

A. That came from the Wampler Carroll Sanderson.

**Q. Did any of the payments come from Mr. Wade?**

A. No, they all came, to the best of my knowledge, from the WCWS, Wampler Carroll.

**Q. Did any of the payments come from Ms. Molligan?**

A. I do not believe so.



**Q. What was your understanding of what the payments said were for?**

A. Reimbursements.

**Q. Reimbursement for what?**

A. For the purchase and for the gas. Again, that's how they -- that's how they always packaged it to me was reimbursement.

**Q. What about your caregiver's time?**

A. In respect to what? Sorry.

**Q. I guess my understanding from your testimony is that you cannot drive?**

A. Correct.

**Q. And that you need a caretaker to drive you around?**

A. Correct.

**Q. And so did caretakers take you to the properties that you visited?**

A. Yes.

**Q. Okay. And so did these reimbursements include the -- their time, the amount of time that you had to pay them to be your caretaker?**

MS. TEMPLETON: Object to the form. Go ahead.

THE WITNESS: Tough to say. They never really gave me -- they never gave me specifics



EXHIBIT 1
PAGE 15 of 29

about what the, quote/unquote, reimbursements were exactly for. But being as though that I pay my caregivers through the State, that doesn't really translate one-to-one.
**Q. (By Mr. Lewis) Did you tell anyone at the Wampler firm or Mr. Wade that you paid your caregivers through the State?**
A. I would -- I would assume, yes, because I had for my entire time since being hurt but I don't have any offhand -- any specific messaging.
**Q. Have you ever hired a caregiver not through the State?**
A. Well, so I hire all of my caregivers but they all go through like a background through the State, background check, and the State is the one that pays, signs the checks. So it's all technically through the State even though I am the one making the hirings and firings.
**Q. Have you -- I guess I'll ask it a different way.**
**Have you ever directly paid a caregiver as opposed to going through the State?**
A. No.
**Q. Going back to the reimbursements, you**



**would agree that you incurred expenses, including the purchases you made at these properties, gas and insurance for a vehicle in going to those properties?**
A. Yeah. That's what they were reimbursing me for, yeah.
**Q. Do you remember when you entered into the representation agreement with Ms. Molligan?**
A. I do not have that information onhand.
**Q. If I represented to you that it was on July 26, 2023, does that sound about right?**
MS. TEMPLETON: Object to the form. Go ahead.
THE WITNESS: That sounds very possible, yeah.
MR. LEWIS: Okay. Eve, can you, please, pull up the exhibit labeled rep agreement with Molligan. This will be Exhibit 3.
(Deposition Exhibit Number 3 marked for identification.)
MR. LEWIS: So this is -- Exhibit 3 is a representation agreement that I received from your attorneys in this case. It's Bates numbered Slevin 000029 through 000032.
Eve, if you could go to Slevin page 31,



please.
**Q. (By Mr. Lewis) Do you see there at the bottom there's a signature above Client Signature?**
A. Yes.
**Q. Is that your signature?**
A. Yes.
**Q. All right. And then this agreement is dated July 26, 2023.**
**Do you see that?**
A. Yes.
MR. LEWIS: And, Eve, if you can go to the next page, 32.
**Q. (By Mr. Lewis) So now under For Attorneys, in addition to Mr. Wade and Mr. Sanderson, we have a third signature block, Jessica Molligan.**
**Do you see that?**
A. Yes.
MS. TEMPLETON: Mr. Lewis, sorry. Can we take a two-minute break?
MR. LEWIS: We can.
MS. TEMPLETON: Thanks.
THE VIDEOGRAPHER: We are now off the record. The time is 3:16 p.m.



(A recess was taken from 3:16 p.m. to 3:23 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 3:23 p.m.
MR. LEWIS: Eve, can you, please, pull up Exhibit 3 again? Thank you.
**Q. (By Mr. Lewis) And so before we went off the record, I just pointed out Ms. Molligan's signature on this document.**
**Do you see that?**
A. Yes.
**Q. And we earlier talked about your signature is on the document and it was dated July 26, 2023; correct?**
A. Correct.
**Q. So prior to the date of this agreement, had you ever met Ms. Molligan?**
A. No.
**Q. Had you ever spoken to her?**
A. Not to my knowledge.
**Q. Had you communicated with her in any way, social media, text message, e-mail?**
A. I can say for a fact that I have definitely not been on any kind of social media with Ms. Molligan. I assume this is my first

interaction with her. If there is -- if I'm misremembering, I do have access to all of our interactions. Yeah, at the time, I do believe this is probably one of the first, if not the first interaction.

**Q. And if there had been earlier written communications with Ms. Molligan, you would have provided those communication to your attorney to provide to us; correct?**

A. Correct.

MR. LEWIS: Eve, you can take Exhibit 3 down.

**Q. (By Mr. Lewis) So prior to entering into this representation agreement with Ms. Molligan on July 26, 2023, how many properties had you visited?**

A. Man, that it -- it is a very difficult one to answer, especially being split before 2023. I was -- I was visiting -- I was averaging between three and five visits a month. So if I had been working with them at that point for -- how long is that -- about a year and a half?

**Q. About a year, yeah.**

A. So we can get a ballpark but, yeah, at



this time, I don't know the specific before Ms. Molligan versus after.

**Q. Okay. And did you receive $200 for all of those properties visited prior to entering the agreement with Ms. Molligan?**

A. I did, yes.

**Q. In total, can you give me just best estimate as to how much in payments you received from the Wampler firm as your role in this ADA project?**

A. My best estimate off of the top of my head, I believe, it was around $11,000. I believe somewhere around there.

**Q. And how did they pay you?**

A. Electronic cash -- or electronic check.

**Q. I guess, do you deposit those in your bank account then or how does that work?**

A. Correct. Yes. The mechanics of it were like any other check.

**Q. Did Ms. Molligan ever pay you any money?**

A. No.

**Q. Did you include those $200 payments on your tax returns?**

A. I've had to retroactively go and get a specialist to help with my taxes.



**Q. How many property assignments do you think you got in total?**

A. That's difficult. It's a lot of estimates and then, I mean, taking into account how many places I was assigned to go versus that I actually went versus spots that were already closed. So are you asking -- sorry. To clarify -- just specifically how many places you think I was assigned to go over the whole extent of my time with the Wampler firm?

**Q. That is correct. That is exactly what I'm asking.**

A. Okay. I can -- I will be making an off-the-top-of-my-head guess right now. I wish I had a more reliable number for you offhand but I'm sorry. I just don't.

**Q. Can I just say something? I don't want you to guess.**

A. Yeah.

**Q. But I am entitled to your best estimate.**

A. Sure.

**Q. Do you know what I mean by that?**

A. Yeah. Yeah. Totally. I just don't want to misrepresent. But with that being said, if I'm going to do my best estimate as to how



many places, I want to ballpark just over 100 maybe. And, again, that was my simple math of three years, 12 months in a year, three -- I just went with three spots per month just as, yeah, ballpark.

**Q. Just over 100 properties you visited, none of these were assigned to you by Ms. Molligan, were they?**

A. Correct. That sounds like a lot now.

**Q. Sorry. What was that?**

A. I was just saying over 100, that might sound inflated but, again -- I'm sorry. I'm giving you my -- my best but I -- yeah. At this time, that's my best understanding. I'm so sorry.

**Q. Okay. And -- and just to be doubly clear.**

**Of all of the properties that you visited as part of this project, none of them were assigned to you by Ms. Molligan?**

A. Correct.

**Q. Prior to going to these properties, did you inquire about whether they were ADA compliant?**

A. No. And I had already been told by

**Q. (By Mr. Lewis) What's the first time you speak with Ms. Molligan?**
MS. TEMPLETON: Object to the form.
THE WITNESS: Are you talking about in any medium or are you talking about a phone call, or...
**Q. (By Mr. Lewis) Do you remember if your first contact with Ms. Molligan was -- I guess do you know what type of contact it was, phone call, e-mail, text?**
A. I believe it was e-mail, I believe.
**Q. Tell me about that e-mail. What do you remember about it?**
A. Not a whole lot. It was not the first time that the lawyers in Tennessee had me working with a different lawyer, another different local lawyer.
So to me, again, it was working under the assumption that they are working well on my behalf and anybody that they would bring in to then work with them and for me on my behalf would be working with my best interests and be working morally. So I was still working under that assumption and I didn't necessarily feel the need to do any further research. As well as



when they had handed me off to the different local lawyers before, it wasn't necessarily a big change from one person to another.
**Q. What do you mean it wasn't a big change?**
A. The operations still all was the same. So meaning I still got the information from the same people and still did the same -- took the same pictures, sent it to the same places. As far as that structure went, nothing really changed when Jess Molligan started representing me.
**Q. And that's true about who your primary contacts were.**
**Your primary contacts remained the Wampler Firm and Mr. Wade?**
A. Correct. Yeah.
**Q. So my question earlier was a little bit different. I was just asking what you remember about that initial e-mail that was with Ms. Molligan.**
**What do you remember about that?**
A. Not enough to -- nothing of note. You know, again, just assuming, unless I had it in front of me. I would assume it would have been like, hey, what's up? I'm your new lawyer



working with you.
Me saying, okay. Cool. Thanks. I'll let you know type questions.
**Q. Was there a phone call after that e-mail where you spoke with Ms. Molligan about her representation?**
A. I do not believe so. I -- I -- I have a recollection of the first time hearing Ms. Molligan's voice was on that -- from the news clipping. So I don't have any recollection of any phone calls before.
**Q. Do you have Ms. Molligan's number saved in your phone?**
A. Yes.
**Q. Have you searched your phone for a record of your phone calls with Ms. Molligan?**
A. Yes. All of -- I handed all of my technology over to my lawyers so they could to a forensic sweep and I do believe that you have access to all of the messaging that was found.
**Q. And I was talking more about phone calls.**
A. Phone calls, again, same.
**Q. That's information you provided to your attorneys?**



A. As far as phone logs go but as far as an actual phone call, I did not take any notes or anything post conversation and I can't say whether we actually had any kind of phone call pretty almost ever.
**Q. You might have, you just don't remember?**
A. Totally. Yeah, yeah, yeah. Yeah.
**Q. Have you ever met Ms. Molligan in person?**
A. No.
**Q. Did you know that in entering the -- so let me back up a little bit.**
**Earlier you testified that when you first got involved in this project that Mr. Wade, his firm, or maybe the Wampler Firm, was getting in touch with these properties about ADA violations before filing lawsuits; right?**
A. That was the assumption I was working on, yes.
**Q. That was your understanding, okay.**
**When Ms. Molligan was brought on as your attorney here in Oregon, did you know that she was going to be contacting these businesses prior to filing the lawsuits?**
A. Yes.

110

**until you decided to not be an ADA tester; correct?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: Correct. Yeah. And I didn't have any inklings of needing to double check my lawyer's work at that time and then by the time I actually did want to go and have more of an idea as to what was happening under my name, I no longer had access.
**Q. (By Mr. Lewis) Do you know whether Ms. Molligan filed lawsuits or complaints on your behalf in federal court?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: I assume, yes, but I can't say if I actually physically laid eyes on any of them.
**Q. (By Mr. Lewis) Do you know whether copies of lawsuits Ms. Molligan filed on your behalf were available on Wampler Law Firm's web page that we discussed earlier?**
MS. TEMPLETON: Object to the form. Calls for speculation. Lacks foundation.
Go ahead.

111

THE WITNESS: I don't know. I don't know.
**Q. (By Mr. Lewis) Are you claiming as we sit here today that Ms. Molligan never filed a lawsuit on your behalf?**
MS. TEMPLETON: Object to form. Calls for a legal conclusion. Speculation. Lacks foundation.
Go ahead.
MR. LEWIS: I'm -- I'm correcting the foundation. I think that's the only thing you're getting at is does he know that lawsuits were filed on -- on her -- or that she filed lawsuits on his behalf. That's all I'm asking.
THE WITNESS: Yes. Yes, I was under the assumption she was filing lawsuits on my behalf but I was not really privy to any of them. I was not -- I was not in the loop as to any of the details.
**Q. (By Mr. Lewis) Okay. And all I'm getting at is you knew that lawsuits were being filed on your behalf but you don't know whether copies of those lawsuits were available on the Wampler website?**
A. Correct. Yeah. Could be yes, could be

112

no. I never spent enough time on that website digging into say one way or another. But my personal experience with that website is I could be but it's not what I was using it for. I was instructed to use it.
**Q. And I'll repeat this because I got objections last time.**
**Are you claiming that Ms. Molligan never sent demand letters on your behalf to property owners?**
MS. TEMPLETON: Object to form. Calls for speculation.
Go ahead.
THE WITNESS: Yeah. She sent demand letters on my behalf, yes. I just want to say I am not -- I don't know if I know about all of them and that's -- and that's honestly I don't know if I know about all of them that she sent but I know she was sending demand letters on my behalf, correct. Yes.
**Q. (By Mr Lewis) Did you ever ask Ms. Molligan to send you copies of the demand letters she sent?**
A. No.
**Q. How about the complaints she filed?**

113

A. No.
**Q. You listened to Ms. Molligan's deposition; correct?**
A. Correct.
**Q. Do you recall her testifying that she would receive 30 percent of any net settlement amount she obtained in your cases?**
A. I do recall that being brought up as a discussion piece but I don't recall what the -- where we landed on that issue.
**Q. So, for example, if she recovered $1,000 in attorney fees in a settlement in one of your cases, she would get 30 percent of that minus the expenses; correct?**
A. From what I heard earlier today, that does seem to be correct but all of those details are all -- I have no idea the deal that she cut with that other firm.
**Q. Did you -- at the time that Ms. Molligan was representing you before you asked her to withdraw from your cases, did you have any issue with her recovering attorney fees for the work that she did on your cases?**
A. I would have if I would have known how much they were -- yeah -- just the -- yeah.

Yes. But I did not -- I did not know -- I did not know what the demands so, no, I did not.
**Q. As we sit here today, do you know how much Ms. Molligan recovered on the ADA cases she did for you?**
A. I have no idea.
**Q. I just want to clarify. You didn't have an issue with her obtaining attorney fees for the work she did; correct?**
A. Correct.
**Q. The issue was you didn't know how much she was obtaining at the time; correct?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: One of the issues, yeah, absolutely that's one of the issues.
**Q. (By Mr. Lewis) But even today, you have no idea how much she recovered in attorney fees?**
**Correct.**
MS. TEMPLETON: Can we take a break?
MR. LEWIS: Yep.
THE VIDEOGRAPHER: We are now off the record. The time is 3:57 p.m.
(A recess was taken from 3:57 p.m. to 4:06 p.m.)



THE VIDEOGRAPHER: We are now on the record. The time is 4:06 p.m.
**Q. (By Mr. Lewis) Earlier you mentioned another attorney who the Tennessee attorneys had introduced you to.**
**Do you remember that attorney's name.**
A. Not off the top of my head.
**Q. What about David Foster?**
A. There it is. That's one of them.
**Q. Okay. So we have Ms. Molligan, Mr. Foster.**
**Was there any other attorneys that the Tennessee folks put you in touch with?**
A. Yeah, there was another guy. I think either his first name or last name was Conner.
**Q. Was that Conner Spani?**
A. There we are, yes.
**Q. S-P-A-N-I?**
A. N-I.
**Q. Did Mr. Spani ever end up filing lawsuits on your behalf or doing ADA cases on your behalf?**
A. You know, I'm unsure. Yeah, I'm unsure at this time.
**Q. Sorry. Is there someone there right now?**



A. You saw my caregiver just got here. He's in the other room.
**Q. Okay. Are you okay with proceeding?**
A. I am. Sorry. I'm sorry if I should have disclosed that.
**Q. No problem at all. I just wanted to make sure we could continue.**
**With respect to Mr. Foster, did he file ADA complaints on your behalf?**
A. I do not know at this time.
**Q. Do you know if Mr. Foster sent demand letters on your behalf to property owners?**
A. Again, I do not know.
**Q. Did you speak on the phone with Mr. Foster at any point?**
A. Probably but, yeah, nothing really comes to mind.
**Q. Did you ever reach out to Mr. Foster to ask the status of your cases?**
A. I did not.
**Q. Did Mr. Foster ever send you e-mails about the status of your cases?**
A. Not that I know of. Not unless there was some sort of a glitch, something that they needed my involvement with.



**Q. Did Mr. Foster ever reach out to you about the status of your cases?**
A. Not that I know of.
**Q. Do you know if Mr. Foster obtained attorney fees through settlement agreements on your ADA cases?**
A. I have no idea.
**Q. Is there a reason why you sued Ms. Molligan and not Mr. Foster?**
MS. TEMPLETON: Object to the form.
Go ahead.
THE WITNESS: Yeah. I mean, she was misrepresenting me as far as I know. Yeah, it's just so unfortunate that when I found out about how the tactics that the lawyers that were representing me were using and it's so far from anything that I think is acceptable that I, you know, it's just -- it's been really unfortunate that my name has been associated with these court cases. Whereas like, you know, I just thought that I was doing something good for my community and then I was passed from lawyer to lawyer from what I feel with very little regard to me and my best -- and the best intentions,

best wishes, what's best for me as a client. I feel as though I've been misrepresented by the lawyers and that includes Ms. Molligan. And when you ask why her, I mean, she was the one that was the most recently representing me when -- against -- without letting me know the things that she was doing. It's unfortunate. It's unfortunate that it is at this point and it's unfortunate that I have to -- that I am suing Ms. Molligan. I wish that -- that, you know, that there was (inaudible) for the whole thing. I definitely wish it was handled better. I wish I did not get involved with these individuals. She was -- she is most recently representing me in what -- in these cases that I -- I -- I -- misrepresenting. That's the only...

**Q. (By Mr. Lewis) The tactics that you didn't like, what were those?**

A. Everything that I've heard about from -- that I learned in the news article. Sending the demand letters with egregious fees for the attorney fees, just going after predominantly immigrant -- first generation immigrant businesses, Asian-owned businesses, other



at-risk communities that don't have necessarily a lot of the resources. I mean, it's all -- it's just they're taking advantage of another marginalized community. That's one of like -- I mean, I'm disgusted by the tactics that they were using, yeah.

**Q. So I want to -- I want to be clear here. When you say they, your earlier testimony was that Ms. Molligan didn't select the businesses for you to go to; correct?**

A. Correct.

**Q. Okay.**

A. Yes.

**Q. All right. So when you say they, who are you referring to?**

A. I mean, it is the conglomerate they, the lawyers, I put them in my mind. She is working for them, with them. That's the same as the Tennessee lawyers, to me, are all wrapped up. So I look at Ms. Molligan as representing them here. That's -- yeah.

**Q. Do you have any evidence to suggest that Ms. Molligan selected the businesses for you to go to?**

A. No. I do know that she was part of



the -- she was part of the system that was telling me where to go. As far as her specifically, no, but she was definitely part of the framework of it.

**Q. Do you have any evidence that Ms. Molligan targeted Asian businesses?**

MS. TEMPLETON: Object to the form.

THE WITNESS: I -- I do not. As far as Ms. Molligan goes, no, she's not in charge of the deciding where to go. But the facts are that they are at a much higher rate than you would find if it was truly a random search I guess would be the best way to say it.

**Q. (By Mr. Lewis) And that's based off the news article?**

MS. TEMPLETON: Object to the form.

THE WITNESS: Yeah, news article and how many Asian businesses there are in the populous of Portland.

**Q. (By Mr. Lewis) Those statistics you're referring to you got from the KGW news article?**

A. Yeah. I guess I am, yeah.

**Q. The news article about the Asian-owned businesses, when was that article?**

A. I do not have it specifically in front



of me.

**Q. Was that -- was that the first article that was written about this case?**

A. Correct.

**Q. Are you sure about that?**

A. I mean, no. I don't know. It was the first that I read and the first news that I was able to watch on it, yes. If it was the first written, I'm not sure. It was the first that I know about.

MR. LEWIS: I'm going to go off the record for like two minutes. I'll be right back. I just want to pull something up.

MS. TEMPLETON: No problem.

THE VIDEOGRAPHER: We are now off the record. The time is 4:16 p.m.

(A recess was taken from 4:16 p.m. to 4:21 p.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 4:21 p.m.

**Q. (By Mr. Lewis) So before we went off the record, we were talking about some of the news coverage that this -- the ADA projects and your role in it received; right?**

A. Correct.

130

question.
THE WITNESS: Yeah. I guess I just didn't -- I didn't pay any particular attention to that.
MR. LEWIS: I'm going to share my screen. This will be Exhibit 5.
(Deposition Exhibit Number 5 marked for identification.)
MR. LEWIS: I can't share my screen.
Eve, is there a way I can share my screen?
THE VIDEOGRAPHER: You should be able to do so.
MS. TEMPLETON: I think you have to stop share.
MR. LEWIS: Thank you all for your help.
**Q. (By Mr. Lewis) There we go.**
**Can you see my screen okay, Mr. Slevin?**
A. I can. Thank you.
**Q. So this is a youtube page. It's a post by KGW News.**
**Do you see that?**
A. I do. Thank you.
**Q. It says, Asian-owned businesses feel targeted by Portland lawyers who filed dozens of**

131

**ADA lawsuits.**
**Do you see that?**
A. I do.
**Q. Have you watched this news clip?**
A. You know, without knowing exactly which news clip it is, I cannot say yes or no.
**Q. Okay. I'm going to play this video starting at the 3:53 minute mark and then ask you some questions; okay?**
A. Okay.
MR. LEWIS: Of course, now it's not going it work.
(Video playing.)
**Q. (By Mr. Lewis) Did you recognize Mr. Fuller?**
A. Yes, I recognize him and when we were having our initial discussions that he --
MS. TEMPLETON: Hold on, Conner. We're not disclosing any attorney/client communications.
**Q. (By Mr. Lewis) That's correct, Mr. Slevin. I'm not entitled to anything that you and Mr. Fuller discussed.**
**All my question was was that Mr. Fuller?**
A. I believe so, yes.

132

**Q. Participating in the Asian-owned businesses feel targeted by Portland lawyers who filed dozens of ADA lawsuits article?**
A. Yes.
**Q. How did you communicate to Ms. Molligan that you no longer wanted to be involved in the ADA project?**
A. As I have described earlier, the way that I recognized the pyramid of lawyers was with Sanderson and Brumleve hand in hand right under BJ Wade and I e-mailed I do believe it was Ben Brumleve at that point that I no longer wanted anything to do with them at all, any way, shape, or form.
I then heard back maybe a day or two later from BJ Wade and, yeah, I heard back from him again a couple of times and then I still was being contacted by Ms. Molligan. I was trying to get disentangled in the cases that she had already started on my behalf and, yeah.
**Q. Why didn't you reach out to Ms. Molligan?**
A. I had talked -- my -- my interactions with Ms. Molligan were so brief and so like, you know, I talked to her, maybe, count the times on

133

one hand. She was not the point of contact as I understood it. So I reached out to her superiors in this organization would be to tell her that I don't want any part it. She's included with all of -- all of the lawyers that I was doing business with.
**Q. Did you have any -- so after you informed Mr. Brumleve that you didn't want to be a part of the ADA project anymore, did you have a phone call with Mr. Wade or Mr. Sanderson about that?**
A. No. BJ Wade wanted to talk to me. I told him it would be a waste of time. He then followed up with text messages on other times trying to get me to go to other places that he said were ADA incompliant. As well as, you know, about all of the cases he has made big changes in but, yeah, I never had a phone call with him.
**Q. What did you want done with your pending lawsuits?**
A. I mean, the same thing that I wanted with all of the lawsuits. I wanted them to come into ADA compliance and that's it. So even after I was firing Molligan as my

representation. I just wanted that case to be done. I didn't want to do anything with her at all and I was really hoping that all of the cases that we were in, at the end of the day, I wanted them to become compliant. That's the long and the short of it.
**Q. When did you fire Ms. Molligan?**
A. I couldn't tell you the exact day. It definitely happened in messages, yeah. But I'm so sorry, I don't have it offhand.
**Q. But it's in the messages your attorneys have produced?**
A. Correct.
**Q. Prior to firing Ms. Molligan, did you tell her what you wanted done with the pending lawsuits and settlement negotiations?**
A. To be honest, I had no idea what negotiations were being done on my behalf. I had no idea what settlements were open. I was so far in the dark, I wouldn't even know where to start asking questions.
**Q. Did you have issue with Ms. Molligan seeking to recover attorney fees for the amount of time she had already spent on your pending cases?**



A. No, no. I, you know, I believed that people should get paid for the work that you're doing but at a reasonable rate, you know, that's part of it as well. I don't have ill will towards Ms. Molligan for trying to get paid for the work that she's done.
**Q. You then hired Mr. Mehrens; correct?**
A. Correct.
MR. LEWIS: Okay. Give me a second.
Eve, can you, please, pull up the exhibit titled Mehrens representation agreement?
And this will be Exhibit 6.
(Deposition Exhibit Number 6 marked for identification.)
MS. TEMPLETON: If it's helpful, Counsel, it's Mehrens like burns.
MR. LEWIS: Thank you. Mehrens, got it. I feel like I've met Kevin and he didn't correct me. So that's good.
Okay. So this Exhibit 6 is a client agreement with the Law Office of Kevin A. Mehrens, Bates number Slevin 000861. I'll just represent to you I received this from your attorneys in this litigation.
Eve, can you go to the next page,



please?
**Q. (By Mr. Lewis) Mr. Slevin, do you recognize this document?**
A. Yes.
**Q. Okay. What do you understand it to be?**
A. Representation agreement.
**Q. Between you and Mr. Mehrens?**
A. Yes.
**Q. There's no date on this document. Do you see that?**
A. Correct. Yeah.
**Q. Do you remember what date you entered into this agreement with Mr. Mehrens on?**
A. Unfortunately, I do not off the top of my head.
**Q. Sorry. Real quick, so on there's a section called Client and then below there it says, Conner Slevin.**
**Do you see that?**
A. Yes.
**Q. Did you type your name into this agreement?**
A. I'm unsure as to specifically but I assume, yes.
**Q. Have you seen this agreement before**



**today?**
A. Yes.
MR. LEWIS: Okay. Let's go to the first page. Thank you. Let's go to the first paragraph, Attorney is only paid if it wins.
So it says, Kevin Mehrens agrees to represent client in civil lawsuits arising from the actions of client's former attorney, Jessica Molligan. If attorney handles client's cases to completion and recovers money for client, client must pay for attorney's services out of client's recovery.
Did I read that right?
A. I believe so, yes.
**Q. What do you understand that to mean?**
A. I understand that to mean that Kevin Mehrens will only be getting compensation out of the damages that I'm seeking against Ms. Molligan.
**Q. In this case?**
A. Yeah, that they are representing me.
**Q. Do you have -- do you have an agreement with Mr. Mehrens where he will receive compensation if you recover an award in this case?**

this? I am still giving my attorney rights and privileges to act on my behalf. It's a similar power that I gave to Ms. Molligan but I would really, really hope at this point, it's going to be a different outcome where it's not abusing the power that I'm giving somebody. It's worded similarly but it still, you know, it's -- it's got to be -- it's a different intent.

**Q. (By Mr. Lewis) What do you mean by that, intent?**

A. Well, I mean, I guess it is still speculation at this point but I would hope that Mr. Mehrens is going to represent me fairly and use the power that I have given him in my best interest, again, as I assumed that lawyers do.

**Q. You understand that Mr. Mehrens is representing you in the Eton Lane lawsuit; right?**

A. Yes.

**Q. When I say the Eton Lane lawsuit, you know what case I'm talking about?**

A. Yes.

**Q. And in that case, you were sued by Eton Lane individually?**

A. Correct.



MS. TEMPLETON: Can we take a brief break?

MRS. LEWIS: Hold on. I've got a question pending.

**Q. (By Mr. Lewis) What's the status of that case?**

A. You know, it would be something I would have to discuss with my attorney at this point.

**Q. So you don't know if that case was settled or not?**

MS. TEMPLETON: Object to the form.

THE WITNESS: I've got a couple of cases coming at me at this point. I'm trying to keep it all straight but unless you have something for me to look at, I'm so sorry, I do not want to say yes or no at this point.

MS. TEMPLETON: I want to take a brief break.

MR. LEWIS: Okay.

THE VIDEOGRAPHER: We are now off the record. The time is 4:55 p.m.

(A recess was taken from 4:55 p.m. to 5:05 p.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 5:05 p.m.



**Q. (By Mr. Lewis) Mr. Slevin, I understand you want to clarify your testimony?**

A. Yeah. So sorry, on that last segment where we were just discussing Mr. Mehrens' agreement with myself, you know, I'm so sorry. I was confused between this case and my other cases. So it's -- I've had to bring Mr. Mehrens as my defense attorney because of what Jess Molligan has got me involved in.

**Q. Okay. My understanding is that Mr. Mehrens is representing you pro bono?**

A. Yes. So he is definitely representing me on the defensive cases, the cases that I'm actually being sued and there are stipulations. I mean, like everybody here knows I do not have the funds to be able to pay for my lawyers. So it's, you know, it's still -- it's still different cases with different lawyers that I have the different agreements set up but at the end of the day, yeah, Mr. Mehrens has the ability to recoup funds from me if there is an award but that's simply to be paid and that for a different set of court cases.

**Q. Have you paid Mr. Mehrens any money for any of the cases he's represented you in?**



A. Not yet.

**Q. Has he told you that he'll need to?**

MS. TEMPLETON: Object to the form.

MR. LEWIS: I'll withdraw tat question. I'll withdraw that question. You don't need to answer that one.

I want to pull up another exhibit. This will be Exhibit 7.

Eve, this is the exhibit -- it's Complaint Second Amended and then there's a 1 at the end of it.

(Deposition Exhibit Number 7 marked for identification.)

**Q. (By Mr. Lewis) Mr. Slevin, do you recognize this document?**

A. Yes.

**Q. Okay. What do you understand this to be?**

A. My complaint against Ms. Molligan.

**Q. It says, Complaint Second Amended. Do you see that?**

A. I do.

**Q. Do you have an understanding of what an amended complaint is?**

A. Yes, one that has been changed.

MR. LEWIS: Okay. This -- if we go to page 11 of the document, Eve.
**Q. (By Mr. Lewis) Do you see a date there, June 5, 2025?**
A. There it is, yeah. June 5th, yeah. Sorry.
**Q. And it says, Respectfully filed and under there we have Michael Fuller and Kelly D. Jones.**
**Do you see that?**
A. I do.
**Q. And who are they?**
A. Michael Fuller is my defensive representation.
**Q. He's your attorney?**
A. Yes.
**Q. For this matter?**
A. That sounds right.
**Q. And is it your understanding that Mr. Jones is also one of your attorneys in this lawsuit?**
A. My understanding is that -- well, I'm working with Michael Fuller and, yeah, Kelly D. Jones is somebody that is pulled in absolutely, so yes.



MR. LEWIS: Eve, can we, please go back to page one.
**Q. (By Mr. Lewis) There's a section called Amount in Controversy. It says one to four million dollars.**
**Do you see that?**
A. I do.
**Q. Are you seeking four million dollars in this lawsuit?**
A. I -- yeah, please. Sorry Emily.
MS. TEMPLETON: Object to the form.
But go ahead, Mr. Slevin.
THE WITNESS: As I said, it's not about the money to me. I trust a jury in this case to do whatever they see fit but it's -- more than anything I'm just really trying to make sure that this doesn't happen again, yeah. Yes.
So to answer your question, am I looking for four million dollars? I am not. I'm looking for whatever the jury decides and I just want this behavior to stop.
**Q. (By Mr. Lewis) So let's go down to the first paragraph here. So number one, there's factual allegations.**
**Do you see that?**



A. I do.
**Q. Okay. And so it starts with plaintiff.**
**You understand that's referring to you?**
A. Correct.
**Q. And defendant refers to Ms. Molligan; right?**
A. Correct.
**Q. Because you didn't sue the Tennessee attorneys; correct?**
A. Correct.
**Q. You didn't sue Mr. Foster?**
A. Correct.
**Q. You just sued Ms. Molligan?**
A. Yeah. Yes. Correct.
**Q. Any time the Second Amended Complaint uses the term defendant, you understand that to be Ms. Molligan?**
A. Correct.
**Q. Okay. It says, Plaintiff, a disabled Oregon resident, was unwittingly lured into a national lawyer money making scheme by defendant and her agents and associates.**
**Do you see that?**
A. I do.
**Q. That is false that the defendant led you -- lured you into the ADA project, isn't it?**



MS. TEMPLETON: Object to the form. Argumentative. Vague and ambiguous. I don't even understand the question.
**Q. (By Mr. Lewis) You didn't meet Ms. Molligan or even speak with her prior to those initial discussions with BJ Wade about joining the ADA project, did you?**
A. Correct. I spoke to BJ Wade before I spoke to Jessica Molligan.
**Q. So Ms. Molligan did not unwittingly lure you into this lawyer money making scheme, did she?**
MS. TEMPLETON: Object to the form. Misstates the document. Argumentative.
THE WITNESS: Cog in the wheel.
**Q. (By Mr. Lewis) Say that again.**
A. She was -- yeah, she's a cog in the wheel.
**Q. What do you mean by that?**
A. She was -- she was a part of the national lawyer money making scheme as far as I know. As far as her doing -- doing the luring, I mean, it's tough to say one way or another. I was already -- I was already involved with the

lawyers. Yeah, I was already involved with them, but...

**Q. Correct. So she did not lure you into the national lawyer money making scheme as you allege?**

MS. TEMPLETON: Object to the form. Misstates the document and calls for speculation.

Go ahead.

THE WITNESS: Yeah. She continued to profit as I was already lured in I would say.

**Q. (By Mr. Lewis) Sorry. I couldn't hear you. What did you say?**

A. I'm so sorry. I was saying she continued to profit off me who was already being lured by the other attorneys that I had been working with.

**Q. Okay. I understand where you're coming from but my question is very simple.**

**She did not involve you into the national lawyer money making scheme, did she?**

A. No. That's correct, yeah.

MS. TEMPLETON: Same objection.

THE WITNESS: Sorry. I'll give you more time, Emily.



**Q. (By Mr. Lewis) Correct; right?**

MS. TEMPLETON: Same objection.

THE WITNESS: Correct. Yes. Correct.

MR. LEWIS: Go to paragraph two, please.

**Q. (By Mr. Lewis) So paragraph two starts, As part of her role in the national lawyer money making scheme and in her representation of plaintiff, defendant would target local often Asian-owned businesses accusing these businesses of not being in technical compliance with the ADA.**

**That's false, isn't it?**

MS. TEMPLETON: Object to the form. Vague and ambiguous. Compound.

But you can answer if you understand the question.

Oh, and the document speaks for itself.

But you can answer if you understand the question.

THE WITNESS: Yeah, I would love to. I mean, as I said earlier, I'm under the impression that Ms. Molligan was not the one that was choosing the places to go. With that being said, she was still the one that was filing all of the -- all of the paperwork. It's



still simply as I understand as my lawyer, it was still going across her desk and she was the one that was sending out the demand letters.

**Q. (By Mr. Lewis) It goes on to say, Defendant would then send plaintiff to purchase an item for service at the targeted businesses.**

**That isn't true, is it?**

MS. TEMPLETON: Object to the form. Argumentative. Compound.

Go ahead.

THE WITNESS: Sure. I would like to say on that issue that it's -- I see what you're doing and I appreciate it. You're just trying to get to the bottom of it if it was actually Jessica Molligan or the Tennessee firm and it's so difficult for me to differentiate the two without having a very difficult time of answering these questions because they were so tightly intertwined in my mind and they were the same -- generally the same entity where, yeah, I see them as the -- they're all -- they all have -- they all have a part in the scheme and although she might not have been the one that was saying, Conner go here, Conner go there. At the end of the day, it's all going past her desk



as to when, who, why. She's sending stuff out, so...

**Q. (By Mr. Lewis) So earlier you testified that prior to ever meeting or speaking with Ms. Molligan or entering into the representation agreement with her, you went to approximately 50 businesses that either Mr. Wade or Mr. Sanderson directed you to go to; isn't that true?**

A. I believe, yes.

**Q. Right. And so defendant did not send you to purchase an item or service at those businesses, did she?**

MS. TEMPLETON: Object to the form.

Go ahead.

THE WITNESS: She personally did not.

**Q. (By Mr. Lewis) Thank you. Your lawsuit mentioned two entities, AB Hollywood, LLC and Eton Lane, LLC; correct?**

A. Correct.

**Q. Do you know who owns AB Hollywood?**

A. I don't know how I would know that. I have no idea. Sorry.

**Q. So you've never spoken to them?**

A. Not that I know of.

**Q. Do you know their names?**

166

**Q. All right. And just to be abundantly clear, you're not blaming Ms. Molligan for that news coverage, are you?**
MS. TEMPLETON: Object to the form.
**Q. (By Mr. Lewis) Let me restate it.**
**You are not claiming that Ms. Molligan intended for that news coverage to occur?**
A. Correct. Bad for her, even worse for her than it is for me, correct.
MR. LEWIS: We can take down Exhibit 6.
**Q. (By Mr. Lewis) Do you know whether AB Hollywood made any changes to the property after Ms. Molligan contacted them about ADA violations?**
A. As stated before, after I had done my part for the lawyers, for the vast majority of situations, I never heard anything about it ever. So I -- I would include that.
**Q. Okay. Is AB Hollywood -- if Ms. Molligan got AB Hollywood, LLC to make changes to the property to make it ADA compliant, would you have any issue with her seeking the attorney fees that she incurred in doing that?**
MS. TEMPLETON: Object to the form.

167

Calls for speculation. Hypothetical. Lacks foundation.
But you can answer if you know what you would have done.
THE WITNESS: I'm so sorry. Can you repeat the question one more time?
MR. LEWIS: Heather, can you read it back?
(The Reporter read back as follows:
Question: So if Ms. Molligan wanted to make changes to the property to make it ADA compliant, would you have any issues with her seeking the attorney fees that she incurred in doing so?)
**Q. (By Mr. Lewis) So not quite there. So if you learned that Ms. Molligan -- sorry. Strike that.**
**If AB Hollywood, LLC made changes to their property after being contacted by Ms. Molligan about them being noncompliant with the ADA and they agreed to make those changes, would you have any problem with Ms. Molligan seeking to recover the attorney fees she expended in getting them to become compliant?**
MS. TEMPLETON: Same objections.

168

Incomplete hypothetical.
You can answer if you can.
THE WITNESS: Yeah. I -- I have -- I would have no problem with that, as I said. I don't know how to convey this properly but I am of the understanding that I want people to get paid for their work and want people to become ADA compliant. I mean, that's the -- those are a couple of like the bigger things for me. So I have no problem with Jess Molligan recouping her attorney fees from the company.
That being said -- AB Hollywood. That being said, the beef that I have, my unfortunate experience with it, was because of her lack of notification beforehand, as well as the -- her lack of communication with me as far as what the entirety of the process makes it -- makes it very difficult to, you know, say one way or another.
**Q. (By Mr. Lewis) Same question with respect to Eton Lane, do you know whether Eton Lane altered their property or got it to be ADA compliant after Ms. Molligan contacted them about ADA violations?**
MS. TEMPLETON: Same objections.

169

Go ahead.
THE WITNESS: Sorry. I have no idea. I visited the property once.
**Q. (By Mr. Lewis) If she got them to be compliant, would you have any problem with her about reaching out to them and recouping the attorney fees she incurred in doing so?**
MS. TEMPLETON: Same objections.
Go ahead.
THE WITNESS: This is where I feel like I'm splitting hairs and I'm trying to be as clear as possible in this. I believe people should get paid for the work that they do, you know, just something across the board. But the -- the way she was going about it, as well as the astronomical fees make it harder for me to stomach.
Again, I'm new to this. I'm figuring it out right now. I don't know how much lawyer fees are put it still seems -- it's egregious. It's above and beyond. And that's another -- I want the changes to be made but I want the businesses to be open. I want the business to be able to serve the community. I mean, again, the community keeps coming out of my mouth

because it's like so high on what I care about. It's not even, you know, it's just -- yeah, it's above and beyond what I feel is a responsible amount of legal fees. Especially when they are being negotiated without me. I have -- I don't know -- I have no idea how much work anybody had done on my behalf. I was so far in the dark, you know, like I say, I have no idea how many hours anybody worked on any of the cases that I'm involved in. So asking, you know, if I think that Jess Molligan should be able to recoup her expenses, as I say, again, yes, within -- within a responsible amount and I just wish I would have known anything about any of it. Just being kept in the loop at all, I would have been able to have more to say but it's -- it's -- I was never given the opportunity.

**Q. (By Mr. Lewis) Did you know that at one point, AB Hollywood agreed to settle your lawsuit against them for $1,000 in attorney fees?**

A. I was made aware of that.

**Q. All right. Yeah. Because you signed the settlement agreement?**



A. Uh-huh.

**Q. And we talked about it earlier that under Ms. Molligan's terms of her co-counsel agreement with the Tennessee attorneys, she would only take 30 percent of that amount?**

A. Again, speculation on my part. I've heard that. I heard that earlier today but I have no idea.

**Q. Thirty percent of $1,000 is 300 bucks. Are you saying that's an exorbitant amount of attorney fees?**

MS. TEMPLETON: Object to the form. Vague and ambiguous. Misstates the evidence. But you can answer if you understand the question.

THE WITNESS: Yeah, I understood the question. I would say that -- that they're all case by case but I feel as though you're choosing an example that was exorbitantly lower than others, you know, $1,000 case versus ten, 13, $15,000 case, you know and, yeah.

**Q. (By Mr. Lewis) Well, again, you don't know how much in an attorney fees Ms. Molligan obtained through your cases; right?**

A. There's a plethora of things that I



don't know that Ms. Molligan was doing in my cases and that just happens to be one of them. Absolutely.

MR. LEWIS: Eve, can you, please, pull up -- this will be -- I think we're up to Exhibit 8, the demand letter to Molligan?

(Deposition Exhibit Number 8 marked for identification.)

**Q. (By Mr. Lewis) All right. So Exhibit 8 is a settlement demand letter dated August 13, 2024?**

**Do you see that?**

A. I do.

**Q. Do you recognize this document?**

A. To be honest, I don't know if I have seen this one but it looks pretty straightforward and it does definitely -- it definitely does execute all my wishes for Underdog lawyers to help in the case with Molligan, yes.

**Q. So let's go through it. So the regard line is Settlement Demand Slevin versus Molligan, case number 24CV37256.**

**You understand that that's this lawsuit; right?**



A. I do.

**Q. Okay. The letter is by Michael Fuller.**

**Do you see that at the bottom?**

A. I do.

**Q. And it's addressed to Jessica Molligan at the top?**

A. Sure looks like it.

**Q. First paragraph, As you know, my law firm has been retained by Mr. Conner Slevin to prosecute a cause of action against you for legal malpractice.**

**Do you see that?**

A. I do.

**Q. Mr. Slevin has had to retain separate counsel to protect his interests, otherwise defend himself in the various claims, sanctions, motions, and other legal liabilities created by your malpractice.**

**Do you see that?**

A. I do.

**Q. Mr. Slevin is willing to settle all claims against you in exchange for a payment of policy limits of $375,000.**

**Do you see that?**

A. I do.

**Q. Are you aware of any demand letters that Ms. Molligan sent out that demanded payment of $375,000 or more or a number even close to that?**
A. No, I just know that she was signing -- no. Sorry. I do not know of anything that -- that is that high of a number. I'm sorry.
**Q. If Ms. Molligan were to pay that amount, the $375,000, how much would your current attorneys take from that?**
MS. TEMPLETON: Object to the form. Don't answer that.
THE WITNESS: I don't know how to answer that. I told you so many times it's not about the money.
**Q. (By Mr. Lewis) So this is what we call a demand letter.**
**Do you see that, Settlement Demand?**
A. I do. Thank you.
**Q. Earlier I testified -- or you testified that one of the issues that you had with Ms. Molligan and the Tennessee attorneys is that they were threatening attorney fees and bringing complaints before notifying folks or before filing lawsuits.**
**Do you remember that?**



A. I do. I see where this is going and let's get there.
**Q. You realize that this letter was sent out seven days after you filed your lawsuit against Ms. Molligan?**
A. Uh-huh.
**Q. Did you authorize that?**
A. I did, yes.
MR. LEWIS: Let's go off the record. I want to -- I'm almost done. I just want to review a few things with my co-counsel.
THE WITNESS: Sure. Sure.
THE VIDEOGRAPHER: We are now off the record. The time is 5:43 p.m.
(A recess was taken from 5:43 p.m. to 5:52 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 5:52 p.m.
MR. LEWIS: Mr. Slevin, thank you for your time today. Those are all the questions that I have for you.
THE WITNESS: Okay. Great.
MR. LEWIS: Ms. Templeton may have some follow-up questions for you.
MS. TEMPLETON: No questions. We can go off the record.



THE VIDEOGRAPHER: We are now off the record. The time is 5:53 p.m.
(Signature reserved.)
(The deposition concluded at 5:53 p.m.)



CERTIFICATE

I, Heather Guevarra, a Notary Public for Oregon, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, CONNER SLEVIN virtually appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 1 to 176, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

Witness my hand and Notarial stamp at Vancouver, Washington, this 20th day of October, 2025.

Heather Guevarra

HEATHER GUEVARRA
Notary Public in and for the
State of Oregon, residing at
Vancouver, Washington
My Commission Expire 6/15/27