UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


CONNOR SLEVIN, an individual,

        Plaintiff,

        v.

AB HOLLYWOOD, LLC, a limited liability
company,

        Defendant.

Case No. 3:23-cv-01404-YY

OPINION AND ORDER


YOU, Magistrate Judge.

On a November evening in 2022, plaintiff Connor Slevin visited a strip mall in southeast Portland owned by defendant AB Hollywood, LLC. At the time, two businesses were operating there—a teriyaki restaurant that is still open and a cannabis dispensary that has since closed. The storefront where the cannabis dispensary was operating is currently vacant. Plaintiff, who uses a wheelchair for mobility, entered each business and made a purchase. Approximately nine months later, plaintiff's then-counsel Jessica Molligan sent a letter to defendant that demanded a number of repairs be made to the property's parking lot and curb ramps to bring the property into purported compliance with the Americans With Disabilities Act ("ADA"). The letter also demanded $13,000 in attorney fees. After defendant refused Molligan's settlement demands, she filed this lawsuit on plaintiff's behalf in September of 2023.

1 – OPINION AND ORDER

Eventually Molligan, purportedly acting on plaintiff's behalf, voluntarily dismissed the case in July of 2024. The circumstances leading up to and surrounding how and why the case was brought and later dismissed, Molligan's role in the now-uncovered scheme, and her conduct in litigating the case and in representing plaintiff are the subject of defendant's pending Rule 11 Motion for Sanctions (ECF 38), as well as an order this court issued directing Molligan to show cause why she should not be sanctioned under the court's inherent power. *See* Order (Dec. 19, 2024), ECF 56.

As explained more fully below, defendant's motion for Rule 11 sanctions is denied because the case had already been dismissed, albeit under suspicious circumstances, before defendant brought the motion and therefore Rule 11 sanctions are not available.[1] The evidence, however, clearly shows that Molligan acted in bad faith by bringing and maintaining a lawsuit based on a misrepresentation of facts for the improper purpose of extracting an attorney fee settlement from defendant, using plaintiff's visit to the property as a pretext. All the while, Molligan was relying on her purported authority under an unethical representation agreement to settle cases on plaintiff's behalf and without, it appears, ever consulting plaintiff about the case and how it was proceeding. This conduct permeated the entire case from the very beginning, and

---

[1] On October 2, 2025, the court issued an initial Opinion and Order finding that Molligan was subject to sanctions under the court's inherent power for her conduct related to this case. ECF 77. Molligan subsequently filed Objections to the Opinion and Order and, because the objections raised matters and evidence that were not part of the record before the initial Opinion and Order was issued, the court construed those objections as a motion for reconsideration. *See* ECF 80, 81. This current Opinion and Order considers the arguments and new evidence raised in Molligan's motion for reconsideration and accompanying briefing and, where appropriate, incorporates them here. The previous Opinion and Order has been withdrawn and is superseded by this Opinion and Order.

2 – OPINION AND ORDER

therefore Molligan's conduct is sanctionable under the court's inherent power, and defendant is

entitled to recover the entire amount of attorney fees it spent in defending this case.[2]

## I.    Background

This suit was among the first in what became a flurry of ADA actions brought in this

district between 2023 and 2024. Eventually, 52 such cases were filed. The majority of the cases

were handled by Molligan—4 on behalf of plaintiff Slevin, and another 36 cases on behalf of

two other disabled individuals. *See, e.g., Burley-Beavers v. Nguyen*, No. 3:23-cv-01890-YY;

*Roberts v. Randy L L Corp.*, No. 3:24-cv-00523-HZ. Although it was not clear at the time this

case was filed, developments have revealed that this case appears to be part of a larger

coordinated effort, and it seems to be roughly representative of the way Molligan brought and

litigated other similar cases. The analysis that follows is based on Molligan's conduct in this

particular case. The existence of a broader scheme and Molligan's alleged role in such a scheme

---

[2] The law in the Ninth Circuit is clear that magistrate judges may decide whether to impose Rule 11 sanctions when they are nondispositive of a claim or defense of a party. *U.S. v. Rivera-Guerrero*, 377 F.3d 1064, 1067 (9th Cir. 2004) (quoting *Maisonville v. F2 America, Inc.*, 902 F.2d 746, 747 (9th Cir. 1990)); *see also* FED. R. CIV. P. 72(a), (b) (distinguishing nondispositive from dispositive matters); 28 U.S.C. § 636(b)(1)(A), (B) (describing magistrate judge jurisdiction over "any pretrial matter," excluding eight categories of dispositive pretrial motions). Here, as in *Maisonville*, the imposition of sanctions is not dispositive of a claim or defense of a party because the action has already been dismissed and the motion for sanctions is all that remains for the court to decide. 902 F.2d at 747 ("[T]he Rule 11 sanctions imposed here were not dispositive of a claim or defense of a party. In fact, the parties had already settled the case prior to Dombroski's filing his motion for reconsideration. Thus, under Rule 72(a), the Rule 11 sanctions imposed in this case are properly characterized as non-dispositive.").

Sanctions imposed under the court's inherent power may similarly be non-dispositive, as they are here. The Ninth Circuit has analogized sanctions under the court's inherent power to sanctions under Rule 11 and Rule 37. *See Stanley v. Woodford*, 449 F.3d 1060, 1064 (9th Cir. 2006) ("[T]he policies undergirding Rule 37(a) sanctions are not relevantly different from those justifying sanctions under § 1927 or a court's inherent powers."); *Grimes v. City and County of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991) ("[W]e see no material distinctions between Rule 11 sanctions and Rule 37 discovery sanctions.") (quoting *Maisonville*, 902 F.2d at 748) (simplified).

are the subject of a recently-filed putative class action lawsuit by a group of business owners against Molligan and the Tennessee-based law firm Wampler, Carroll, Wilson & Sanderson (hereinafter "Wampler") that Molligan and plaintiff, among others, are alleged to have worked with in bringing cases against them. *See Baek Family Partnership, LLC v. Wampler, Carroll, Wilson & Sanderson, P.L.L.C.*, No. 3:25-cv-00584-AN. Details about that wider effort, to the extent they are supported by the record in this case, are presented to place Molligan's specific actions in this case in context and to help explain, in part, how this case unfolded and eventually unraveled the way it did.

Plaintiff was recruited by B.J. Wade, a Tennessee attorney, to act as a paid "tester" to "start the process" of bringing lawsuits under the ADA against businesses in this district.[3] He entered into a representation agreement with Wade and Wampler attorney J. Luke Sanderson in June of 2022,[4] and began receiving directions about "locations to visit" shortly thereafter.[5] According to text messages between plaintiff and Wade, plaintiff visited approximately two to five sites per month between July of 2022 and May of 2023.[6] Plaintiff visited defendant's

---

[3] *See* Mehrens Decl., Text Messages Ex., ECF 68 at 29 (note that the text message exhibit is not individually marked and thus all citations to this exhibit reference the page numbers as assigned by the court's docketing system); Blumm Decl. ¶ 13, ECF 39; Pl. Resp. Mot. Sanctions 6–7, ECF 42. The Wampler firm also has filed a "high number" of cases in the Middle District of Tennessee, Nashville Division. *Jordan v. Joe B. Beasley & Assoc., L.P.*, No. 3:23-cv-00496, 2024 WL 150584, at *8 (M.D. Tenn. Jan. 12, 2024), *aff'd sub nom. Jordan v. Joe B. Beasley & Assocs., L.P.*, No. 24-5122, 2024 WL 4710157 (6th Cir. Nov. 7, 2024). In one case, a district judge observed that the "attorneys and testers follow a suspect playbook" and their "conduct raises serious ethical issues under the Tennessee Rules of Professional Conduct and the intention of the ADA's civil suit provision." *Id.* The district judge noted that "[c]ourts across the country have condemned this shakedown-like behavior," and "advise[d] that counsel proceed with caution." *Id.*

[4] Molligan Supp. Decl., Ex. 2 at 3–4, ECF 80-3.

[5] Mehrens Decl., Text Messages Ex., ECF 68 at 31.

[6] *Id.* at 31–39; *see also* Hearing (Nov. 12, 2024) Transcript ("Sanctions Hearing Tr.") 14:3–8, ECF 53 (wherein Molligan states that plaintiff was no longer "being assigned . . . places to go" in "early May" of 2024).

property for the first and only time in November of 2022; he went into both the restaurant and the dispensary and made a purchase at each business.[7]

Plaintiff then entered into another representation agreement, this one dated July 26, 2023, with Molligan, Wade, and Sanderson. This new agreement was, other than adding Molligan's signature, identical to the first[8] and it authorized Molligan and her co-counsel to "file lawsuits in the U.S. District Court on [plaintiff's] behalf involving claims for discrimination . . . [under] Title III of the Americans with Disabilities Act."[9] The agreement also included what could be fairly described as a "blanket" power of attorney, giving the attorneys "full authority to prepare, sign, and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to commence, conduct, and conclude their representation" and specifically authorizing the attorneys to "act as a negotiator in any and all settlement negotiations."[10] Under this arrangement, as explained more fully below, Molligan exercised complete control over every aspect of plaintiff's case and believed she was authorized to settle it without plaintiff's express approval or even consulting him about the terms she had negotiated.[11]

---

[7] Sanctions Hearing Tr. 25:5–7, ECF 53.

[8] Molligan Obj. 8, ECF 80 (noting that the two representation agreements were identical apart from Molligan's signature).

[9] Def. Hearing Exhibits, Ex. 3 at 1–2, ECF 49-2 ("Representation Agreement"). The Representation Agreement has a signature line for "Wade Law, LLC." *See id.* at 4. Although the version of the agreement in the record does not have a signature on that line, Wade represented to plaintiff that he was "co-counsel" with the Wampler firm and seemed to be, at least from the evidence in the record, plaintiff's main point of contact regarding the ADA cases. Mehrens Decl., Text Message Ex., ECF 68 at 29, 31. It was Wade who initially communicated with plaintiff about joining the "project," explained how plaintiff would complete the "assignments," and verified the visits plaintiff made each month to facilitate plaintiff's payment. *Id.* at 31–39.

[10] Representation Agreement 3, ECF 49-2.

[11] Sanctions Hearing Tr. 14:21–22, ECF 53 (wherein Molligan stated she was "authorized to do settlements").

5 – OPINION AND ORDER

The text messages between plaintiff and Wade reflect that the administration of plaintiff's visits—such as identifying individual locations and verifying the number of sites plaintiff visited in a month—was initially completed over text and email.[12] Eventually, Wampler began to operate a so-called "portal" on which both Molligan and plaintiff relied heavily.[13] Molligan described the portal as a "case management system" to which documents and other materials, including settlement agreements, were "uploaded" and where she and plaintiff could "log in" and "see what stage [the case was] at."[14] It appears as though the properties, including defendant's here, were identified by an unnamed "ADA expert" or "inspector" who prepared an "initial inspection report" purporting to identify portions of the property that did not comply with the ADA.[15] After the "expert" identified the targeted properties, plaintiff was offered site visits through the "system" or email.[16] Plaintiff verified the locations that he visited by having his picture taken while he was somewhere on the property and making a purchase at the business, and then sending receipts via email or uploading them to the portal.[17] Wade would then verify with plaintiff the number of places he visited on a monthly basis and send plaintiff a check.[18] Plaintiff was paid a flat $200 for each location he visited.[19]

---

[12] Mehrens Decl., Text Messages Ex., ECF 68 at 32.

[13] Sanctions Hearing Tr. 41:19–42:19, ECF 53.

[14] *Id.*; *see also* Mehrens Decl., Text Message Ex., ECF 68 at 37 ("We've implemented something you will like. It's a way for you to easily upload your documents, rather than sending emails . . . Equally as important, our new system will allow us to email you new locations on the 9th of the month, giving you another week in order to visit.").

[15] Sanctions Hearing Tr. 20:13–22:2, ECF 53; *see also* Molligan Surreply 1, ECF 48 (describing receiving "expert information"); Molligan Resp. Order Show Cause 4, ECF 58 (wherein Molligan represented she "used" the "initial inspection report" to draft the complaint).

[16] Mehrens Decl., Text Message Ex., ECF 68 at 32–38.

[17] *See id.* at 35, 37.

[18] *See* Mehrens Decl., Text Messages Ex., ECF 68 at 35.

[19] Sanctions Hearing Tr. 37:20–39:23, ECF 53.

6 – OPINION AND ORDER

The visit, according to Molligan, would "start the process."[20] After plaintiff visited a property, the next step in "the process" was for Molligan to send a demand letter to the property owner listing repairs that allegedly needed to be made to bring the property into ADA compliance. In this case, Molligan wrote to defendant on August 29, 2023:

> Concerning repairs at the property, my client is requesting the following:
>
> 1.  The designated van accessible [parking space] is too narrow and needs to be widened to meet ADA guidelines.
> 2.  The designated accessible spaces present need to be dispersed evenly throughout the parking facility.
> 3.  The designated accessible handicap space needs to be made level to meet ADA guidelines.
> 4.  The accessible aisle needs to be made level to meet ADA guidelines.
> 5.  The curb ramp needs to be rebuilt to not be projecting into the access aisle.
> 6.  The curb ramp needs to not have flared sides that do not follow the ADA guidelines.[21]

Molligan also demanded that defendant pay "$13,000 in attorney fees and costs associated with this case."[22] About a month later, presumably after defendant had rejected plaintiff's initial settlement demands, Molligan filed this suit on plaintiff's behalf in September of 2023.[23] The original complaint mirrored the repairs requested in Molligan's demand letter, and also alleged that defendant had "a practice of failing to maintain the accessible features of the facility[.]"[24] Defendant offered to settle the case for $500 in early November and Molligan declined.[25]

---

[20] *Id.* 38:16–18; *see also* Molligan Surreply 3, ECF 48 (referring to "payments for 'starting the process'").
[21] Armstrong Decl., Ex. B at 1, ECF 60-2 ("Demand Letter").
[22] *Id.* at 1–2.
[23] *See* Compl., ECF 1 (filed September 26, 2023).
[24] *See id.* ¶¶ 27(a)–(i); Demand Letter 1–2, ECF 60-2.
[25] Molligan Supp. Decl., Ex. 3 at 1, ECF 80-4.

7 – OPINION AND ORDER

At the end of November 2023, defendant moved to dismiss the complaint for failure to state a claim.[26] Even at this early stage, there were irregularities in how Molligan drafted the complaint and attempted to explain the allegations, though of course it is only with the benefit of hindsight that the problems with the case and Molligan's conduct can now be understood with more certainty. Defendant noted that the complaint was "identical to that which [p]laintiff has used in at least three active ADA case in the District of Oregon," and characterized the complaint as essentially "boilerplate" without any significant factual allegations showing that defendant's property either violated the ADA or that any of the potential repairs were "readily achievable."[27] In response, Molligan filed an amended complaint on December 13, 2023, adding allegations that the "visible upright signage" in defendant's parking lot was "faded and unintelligible," the paint in the parking lot was not adequately maintained, and the curb ramp had "abrupt changes in level at the bottom transition," plus several essentially legal conclusions regarding plaintiff's rights under the ADA.[28]

At a hearing on defendant's motion to dismiss in January of 2024, Molligan withdrew the allegations regarding parking space distribution after defense counsel asserted that the parking lot had a total of four spots, one of which was an accessible spot "set off with clear markings."[29] Defense counsel also represented that the parking lot was painted and "there is a sign, and I believe that it's clear," and generally denied that any known ADA compliance issues existed and characterized the property as "well-maintained."[30] Defense counsel, however, recognized that at

---

[26] Mot. Dismiss 1, ECF 5.

[27] *Id.* at 4–6.

[28] *See* Am. Compl. ¶¶ 31(a)–(i); (g)–(i), ECF 8 (as written, where the subparagraph numbers for paragraph 31 mistakenly repeats subparagraphs (g)–(i)).

[29] Hearing (Jan. 24, 2024) Transcript ("Motion Hearing Tr.") 5:4–9, ECF 65.

[30] *Id.* at 6:1–5.

the motion to dismiss stage, evidence regarding the property's current condition was not typically going to carry the day.[31] Still, there were enough questions about the condition of the property as alleged in the complaint and its actual condition that the court reserved ruling on defendant's motion and instead ordered the parties to "confer further regarding plaintiff's allegations and . . . file a joint status report" in two-weeks' time.[32]

Molligan subsequently filed a Second Amended Complaint in early February of 2024 that omitted the allegations regarding the parking spot distribution but was in all other relevant aspects identical to the previous version.[33] Sometime around February 15, 2024, defense counsel again offered to settle the case for $500.[34] Molligan responded that she was "authorized to present a counter demand for $8000 in fees/costs; all other previous terms to remain the same unless additional time is needed for the repairs."[35] According to a Joint Status Report filed on February 23, 2024, defendant had already served discovery requests, and the responses were due that same day.[36] Molligan had not yet sought any discovery on plaintiff's behalf but suggested that such requests were forthcoming.[37] About two weeks later, defendant filed a motion for summary judgment.[38] In support of the motion, defendant filed several photographs appearing to show that the designated parking spot was adequately wide and level, the transition from the parking lot to the sidewalk was also level, and the parking lot's signage and marking paint were

---

[31] *Id.* at 15:4–16.
[32] Order (Jan. 24, 2024), ECF 12.
[33] *See* Second Am. Compl., ECF 13.
[34] Molligan Supp. Decl., Ex. 3 at 3, ECF 80-4.
[35] *Id.* at 2.
[36] Joint Status Report 2, ECF 15.
[37] *Id.*
[38] Mot. Summ. J., ECF 16.

clear and well-maintained.[39] Shortly thereafter, defendant again offered to settle the case for $500.[40]

After the motion for summary judgment was filed, Molligan requested a hearing during which she moved for an order allowing her to conduct a physical inspection of defendant's property under Federal Rule of Civil Procedure 34. At the hearing (hereafter "Inspection Hearing"), which occurred on April 2, 2024, Molligan sought to conduct an inspection of both the exterior and the interior of the property. Defense counsel objected to any inspection of the interior because the allegations in the complaint were solely directed to "the status of the exterior of the property, specifically the parking lot and whether . . . the parking spaces, and the access points from the parking lot to the property . . . were ADA compliant[.]"[41] Defense counsel also noted that, when plaintiff responded to defendant's interrogatories "asking for a specific description of the physical impediments and ADA violations that plaintiff actually experienced and what measurements, photos, [and] any evidence that they were there or how they affected him[,] . . . not a single one touched on the interior of the property."[42] Moreover, defendant had produced the first photographs of the property in the record, and they seemed to support defendant's representations that the parking lot was well-maintained and ADA compliant, thus potentially mooting the claims asserted in the complaint.[43]

Molligan countered that the complaint did not contain an "exhaustive list" of ADA violations, and that the list of violations alleged in the complaint "includes, but is not limited to .

---

[39] *See* Blumm Decl., Exs. A–F, ECF 17-1–17-6.
[40] Molligan Supp. Decl., Ex. 3 at 3, ECF 80-4.
[41] Hearing (Apr. 2, 2024) Transcript ("Inspection Hearing Tr.") 5:7–6:12, ECF 76
[42] *Id.* at 9:11–16.
[43] *See* Blumm Decl., Exs. A–F, ECF 17-1–17-6; Inspection Hearing Tr. 10:12–14, ECF 76

10 – OPINION AND ORDER

. . what my client was able to observe at the time."[44] She represented that other issues might exist inside in part because the "entrance to [the dispensary] is, like, two -- maybe two feet wide."[45] The dispensary space was for lease, and Molligan insisted that if defendant found "a new tenant and it goes right in and [defendant] doesn't change that entryway or anything about that, that's . . . an ADA violation."[46] She also acknowledged that the pictures showed defendant "did . . . quite a bit of work to that parking lot" but she "need[ed] to know if it was done, you know, after the complaint was filed."[47] When asked directly whether Molligan had any authority for her "proposition that the defendant cannot . . . moot a case by doing the repairs after the complaint is filed," Molligan had none and did not later provide any.[48] Notably, while Molligan was "reviewing the file" during the April 2, 2024 hearing, she discovered for the first time that plaintiff "did have three pictures of his visit" in November of 2022.[49] Molligan represented that the photos "really don't show a lot," but said she would gather the photos, and she produced them to defense counsel later that day.[50] As described in more detail below, the photos actually show a great deal, though their significance was not immediately apparent to the court and opposing counsel—who had not yet seen the photos—or, so it seems, to Molligan.

On May 7, 2024, relying on the allegations in the complaint and Molligan's representations at the Inspection Hearing, in particular those that suggested plaintiff had "personally encountered . . . the conditions of the parking lot and retail accessways" (i.e., the allegedly narrow entrance to the dispensary), the court granted in part plaintiff's motion and

---

[44] Inspection Hearing Tr. 6:22–7:3, ECF 76.
[45] *Id.* at 7:11–14.
[46] *Id.* at 8:7–10.
[47] *Id.* at 13:9–13.
[48] *Id.* at 14:3–9.
[49] *Id.* at 12:2–7.
[50] *Id.*; *see also* Molligan Supp. Exs. 6, ECF 69

11 – OPINION AND ORDER

authorized an inspection of "any barriers related to plaintiff's disability that plaintiff is reasonably likely to encounter as a patron," except for the vacant retail space and any employee-only restricted areas.[51] On May 15, 2024, Molligan emailed defense counsel that she had scheduled the inspection of defendant's property for June 4, 2024.[52]

On May 16, 2024, a local media outlet aired and published an online report headlined: "Portland businesses hit with ADA complaints, demands for thousands in attorney's fees."[53] Plaintiff "had seen the news and gotten very concerned about the allegations that [the reporter] was bringing,"[54] and on May 22, 2024, he emailed Wampler stating, "No thanks I quit."[55] By May 29, 2024, word had reached Wade that plaintiff wanted out, and Wade wrote to plaintiff that he "understood that you don't want to visit any new places."[56] Wade wanted to talk with plaintiff, though, about "one case in suit," which happened to be this one against defendant. Wade wrote that the property was "[h]orribly non compliant" and stated, "This is not a mom and

---

[51] Order (May 7, 2024) 4–5, 7, ECF 23.

[52] Molligan Supp. Decl., Ex. 4 at 1, ECF 80-5.

[53] Kyle Iboshi, *Portland Businesses Hit With ADA Complaints, Demands for Thousands in Attorney Fees*, KGW.COM (May 16, 2024, at 4:33 p.m.), https://www.kgw.com/article/news/investigations/portland-businesses-ada-demand-letter-violations-lawsuit/283-b597f6cd-b087-4e48-b0a9-e464d711f7fe. A series of other news articles and video reports from several different local outlets about the "uptick in ADA cases" and the legal developments in several of the cases pending in this district were reported in July and August of 2024. *See* Kyle Iboshi, *Asian-Owned Business Feel Targeted by Portland Lawyers Who Filed Dozens of ADA Lawsuits*, KGW.COM (July 3, 2024, at 1:59 p.m.), https://www.kgw.com/article/news/investigations/asian-owned-businesses-feel-targeted-portland-lawyers-ada-lawsuits/283-77e2c0a2-ebc7-437e-b5db-a75740333f10; Maxine Bernstein, *Lawyer Alleges Widespread Scheme to 'Extort' Money from Portland Businesses Over Disability Access*, THE OREGONIAN/OREGONLIVE (Aug. 2, 2024, at 8:29 a.m.), https://www.oregonlive.com/crime/2024/08/more-than-40-portland-area-businesses-got-demand-letters-to-make-ada-updates-pay-thousands-in-lawyers-fees-in-shakedown-like-scam.html.

[54] Sanctions Hearing Tr. 14:14–16, ECF 53.

[55] Molligan Supp. Exs. 9, ECF 69.

[56] Mehrens Decl., Text Message Ex., ECF 68 at 40; *see also* Sanctions Hearing Tr. 14:3–17, ECF 53 (wherein Molligan states what she later learned about plaintiff's desire to end his association with the lawyers and his cases).

12 – OPINION AND ORDER

pop operation. They bought the property for 1 million with $750k down and a 250k loan."[57]

Plaintiff's response was clear: "Sorry BJ but talking would be a waste of time. I want to make changes for accessibility in my community but I do not agree with the way that your firm handles this business and I do not want to be associated."[58] Wade replied:

> Conner, you are entitled to your opinions but you are not entitled to your "facts." Here are the facts. You have bought into a slanted news article that was generated by attorneys for property owners to deter people like you from pursuing cases. It's your prerogative to quit and we will certainly honor that. The facts are that we have pursued over 4000 of these cases across the country and in 90% of cases, we have been successful in requiring the property owners to get in compliance with the ADA, despite them being non-compliant for decades and hiring attorneys to fight us.[59]

Molligan, though, was nowhere to be found. She did not know anything about plaintiff's unequivocal statement to Wampler that he "quit" or to Wade that he no longer wanted to "be associated" with the lawyers or this case. Molligan Obj. 13, ECF 80. There is, according to Molligan, "no evidence that [plaintiff] communicated" his decision "that he did not want to be part of the ADA project any longer," nor any evidence "that he told her, or even agreed to communicate with her[] about what he wanted done with his pending lawsuits." *Id*. at 12. As explained more fully below, Molligan inexplicably only discovered plaintiff's intentions vis-à-vis this lawsuit after she agreed to settle with defendant for $1,000 in attorney fees without ever consulting plaintiff or securing his agreement to the settlement terms. Molligan attempted to execute the settlement by signing with power of attorney on plaintiff's behalf, and it was only after defendant rightly insisted that plaintiff himself sign the agreement and plaintiff subsequently refused Molligan's request to do so that she finally understood what plaintiff

---

[57] Mehrens Decl., Text Message Ex., ECF 68 at 40 (as written).
[58] *Id.*
[59] *Id.* at 40–41.

13 – OPINION AND ORDER

wanted to happen with the case and the attorney-client relationship.[60] This is just one example of many that shows Molligan rarely, if ever, communicated with plaintiff about his case or to clarify how he wished to proceed with it.

As for the photos of plaintiff's initial visit that had now come to light, defense counsel observed that the photos at least in part "appeared to directly contradict the allegations made in the complaint."[61] The first photo shows plaintiff in his wheelchair on the sidewalk in front of the now-shuttered dispensary, and the top of what appears to be a yellow access ramp extending into the parking lot.[62] In the second, a white vehicle is parked in the property's lot, next to painted markings seemingly designating an accessible aisle.[63] There is a blue accessible parking sign mounted on the exterior wall in front of the space, and though the photo is somewhat pixelated, the sign does not appear to be "faded and unintelligible" as Molligan alleged in the amended complaints.[64] On May 29, 2024, defense counsel served requests for admission asking plaintiff (and by extension, Molligan) to admit that the pictures show a clear and visible sign designating an accessible parking space, and show plaintiff was able to use the parking lot and curb ramp and thus was "able to access and assess all areas of the property which were open to the public when he visited the property" in November of 2022, contradicting what was alleged in the complaint.[65]

Despite having already scheduled the court-authorized inspection of defendant's property, Molligan suddenly became very eager to settle the case. Although it is not entirely clear from the record when the settlement discussions began to heat up, by about 6 p.m. on

---

[60] Sanctions Hearing Tr. 13:14–15:8, ECF 53.
[61] Second Mot. Sanctions 8, ECF 38.
[62] Def. Exhibits re Sanctions Hearing, Ex. 1, ECF 49-1.
[63] *Id.*, Ex. 2.
[64] *Id.*; Am. Compl. ¶ 31(i), ECF 8; Second Am. Compl. ¶ 31(h), ECF 13.
[65] Blumm Decl., Ex. C at 3–5, ECF 39-3; *see also* Def. Supp. Ex. 3 at 1, ECF 73.

Thursday, May 30, 2024 (just over 24 hours since the requests for admission were served), Molligan wrote to defense counsel that she "was really hoping to hear back from one of you by now" and asked for an estimate of when she could expect a response.[66] The lawyers scheduled a call for the next morning, on Friday, May 31, 2024, at which time defense counsel made an offer to settle for $1,000, and Molligan immediately accepted, without confirming with plaintiff that, for example, he wanted to abandon the inspection and end the case.[67] On Tuesday, June 4, 2024, defense counsel emailed Molligan and asked her to "send us [the] settlement offer" that the lawyers had discussed on Friday morning.[68] Molligan responded that her understanding was that they had "agreed to settle this matter for $1000 in attorney fees" and "[i]f you mean the Settlement Agreement, I should have that over to you today."[69] It is obvious from the evidence in the record that Molligan had not consulted with plaintiff or secured his consent to the terms, yet she unequivocally represented to opposing counsel (and later to the court) that in her mind, the matter was settled.[70]

Molligan sent the first written draft of the settlement agreement later that day, and defense counsel responded on June 12, 2024, with a revised agreement that was "more specific as to the obligations for [defendant]."[71] Molligan's only proposed revision thereafter was the removal of the language "as to form" that defense counsel had appended to Molligan's signature line.[72]

---

[66] Blumm Decl., Ex. A at 16, ECF 39-1.

[67] *Id.* ¶ 2, ECF 39 ("As soon as I said the dollar figure, plaintiff's counsel interrupted me and told me we could settle at that value.").

[68] *Id.*, Ex. A at 14, ECF 39-1.

[69] *Id.* at 13.

[70] *See* Sanctions Tr. 10:21–11:2, ECF 53 (representing that she did not respond to outstanding discovery requests because "we had already settled the case").

[71] Blumm Decl., Ex. A at 8, 10–11, ECF 39-1.

[72] *Id.* at 9.

Under the terms of the settlement, defendant would pay $1,000 to Molligan and plaintiff would dismiss the case and release all claims.[73] The agreement stated that the parties "agree that all of the ADA violations alleged in plaintiff's complaint related to the property or the premises addressed in this matter no longer exist as of June 12, 2024" and that "there are no other ADA . . . violations related to the property or the premises addressed in this matter."[74] The agreement did not contain any terms regarding the inspection that had been scheduled to take place on June 4, 2024, or mention any repairs to the interior of the property, in particular the allegedly narrow entrance to the dispensary, that Molligan had emphasized during the Inspection Hearing in April, 2024.

Defendant and Molligan dispute what some of these repair terms were meant to represent. Molligan points to the terms and asserts that defendant "made significant changes to the property because of the lawsuit." Molligan Obj. 15, ECF 80. In particular, Molligan notes that there are differences between the photos taken of the property during plaintiff's visit in November of 2022 and the pictures submitted at summary judgment, which show the parking lot lines are repainted, and the accessible parking space appears to have been re-located and is marked with a white sign (as compared to the blue sign in the November 2022 photos). Molligan Obj. 10, ECF 80.[75] Defendant asserts that the proposed settlement agreement "contained nothing related to the repairs requested" and, "[i]n reality, [d]efendant never gained sufficient clarity as to what repairs were necessary because [p]laintiff's complaint was so vague and [Molligan] never clarified, despite numerous requests, what [d]efendant[] could do to remedy the alleged violations." Def. Reply Sanctions 6, ECF 43 (emphasis in original). Defendant asserts that during settlement

---

[73] Settlement Agreement 1, ECF 44-1
[74] *Id.* at 3 (some formatting modified).
[75] *Compare* Blumm Decl., Exs. A–F, ECF 17-1–17-6.

discussions, "the only issue discussed with [Molligan] was the amount of money [d]efendant was prepared to offer for . . . attorney fees,"[76] and the email correspondence between counsel that is in the record similarly reflects that the amount of attorney fees was the only material term that Molligan mentioned.[77]

The dispute regarding the repair terms in the settlement agreement is briefly set aside at this point to be discussed in more detail below. It is undisputed, however, that despite having secured a court order allowing an inspection of the interior of defendant's property, and apparently having already scheduled it to occur in a few days' time, Molligan abruptly agreed (without consulting plaintiff) to settle the case for $1,000 in attorney fees. That is a substantial departure from her last settlement offer of $8,000 in February of 2024—a departure made more notable because it appears Molligan essentially walked away from the significant leverage she had gained by securing the right to inspect, and because her change in position followed closely on the heels of defendant's request for admission calling into serious question whether the lawsuit was based on a material misrepresentation of facts.

Still, there were more irregularities in Molligan's actions regarding the settlement agreement and in ultimately resolving the case. A final version of the settlement agreement was exchanged between Molligan and defense counsel on June 13, 2024.[78] Molligan returned the signature page to defense counsel on June 18, 2024, after signing the agreement in her own name as "Power of Attorney" for plaintiff.[79] Two days later, defense counsel wrote back requesting plaintiff's signature rather than Molligan's, and when Molligan did not respond, defense counsel

---

[76] Armstrong Decl. ¶ 5, ECF 60.
[77] Blumm Decl., Ex. A at 13, ECF 39-1.
[78] *Id*. at 8.
[79] *Id*. at 7–8; *see also* Armstrong Decl., Ex. A at 9, ECF 44-1 ("Settlement Agreement").

17 – OPINION AND ORDER

followed up about 10 days later, on July 1, 2024, asking again for plaintiff's signature on the agreement.[80] Molligan responded that they were instead "dismissing the case" and that she would "send over a Stipulated Dismissal shortly."[81] By July 3, 2024, defense counsel had signed the Stipulated Dismissal and given Molligan consent to file it.[82] Molligan, though, did not file the dismissal right away. Molligan still had not filed the Stipulated Dismissal on July 8, 2024, at 5:42 p.m., when defense counsel emailed Molligan: "We see from Pacer that that you have not yet filed the stipulated dismissal. Our client has had second thoughts and has withdrawn his permission to agree to stipulate to a dismissal at this time. Accordingly, please do not file the dismissal."[83] Molligan then filed the Stipulated Dismissal at 5:53 p.m., and at 5:54 p.m., emailed defense counsel stating, "I filed it today."[84] Based on the Stipulated Dismissal, the court directed the Clerk of the Court to close the case on July 10, 2024 (of course, without knowing any of preceding facts about how the settlement and dismissal came to be), and the matter seemed to be at an end.[85]

On August 1, 2024, at a hearing in another one of plaintiff's cases, *Slevin v. Baek Family Partnership LLC*, No. 3:23-cv-01487-HZ, in which Molligan was acting as his attorney, plaintiff represented he had learned "through the media" about how Molligan, and by extension the Wampler firm, had been handling his cases and he "want[ed] to be completely done with these attorneys."[86] He "[did] not agree with" the way Molligan and the other attorneys had represented

---

[80] Blumm Decl., Ex. A at 5–7, ECF 39-1.

[81] *Id.* at 5.

[82] *Id.* at 2.

[83] *Id.* at 1.

[84] *Id.*; *see also* Not. Voluntary Dismissal (July 8, 2024), ECF 24.

[85] Order (July 10, 2024), ECF 25; *see also* Def. Mot. Sanction 5, ECF 38 (stating there was "no subsequent communication between the parties" after the dismissal).

[86] *Slevin v. Baek Family Partnership LLC*, No. 3:23-cv-01487-HZ, Hearing (Aug. 1, 2024) Transcript 12:22–13:9, ECF 15.

him, and he "[did] not want to be associated with them any further."[87] Following that hearing, the court directed plaintiff to confirm "whether he wishes for Ms. Molligan to represent him in this case, and if he does not, Ms. Molligan shall file a withdrawal notice."[88] Molligan filed a motion to withdraw the next day, and plaintiff obtained new counsel.[89]

The photos of plaintiff's visit, which seem to directly contradict allegations made in the complaint, Molligan's attempt to sign the settlement on plaintiff's behalf and then sudden decision to dismiss the case, the suspicious sequence of events regarding the stipulated dismissal, and plaintiff's disapproval of how the attorneys were handling the *Baek Family* case, among other things, precipitated defendant's first motion for sanctions in August of 2024.[90] Although defendant voluntarily withdrew that motion because it did not comply with Rule 11's procedural requirements, the court under its inherent authority ordered Molligan to explain the circumstances surrounding the dismissal.[91] Defendant then re-filed its now-pending motion for sanctions against Molligan, and a sanctions hearing was held on November 12, 2024, at which Molligan appeared to explain her conduct and plaintiff appeared with new counsel.[92] After the hearing, defendant filed, at the court's request, the "photographs taken by plaintiff at defendant's property and plaintiff's fee agreement with Wampler, Carroll, Wilson & Sanderson, P.C."[93]

The court subsequently ordered Molligan to "show cause in writing by January 17, 2025, why based on the conduct alleged in defendant's motion for sanctions, she should not be sanctioned under the court's inherent authority," notwithstanding whether defendant could

---

[87] *Id.* at 13:9–11.
[88] Order (Aug. 14, 2014) 1, ECF 29.
[89] *See* Mot. Withdraw 1, ECF 32.
[90] First Mot. Sanctions, ECF 26.
[91] Order (Sept. 9, 2024), ECF 35.
[92] *See* Second Mot. Sanctions, ECF 38; Minutes of Proceedings (Nov. 12, 2024), ECF 50.
[93] Minutes of Proceedings (Nov. 12, 2024), ECF 50.

19 – OPINION AND ORDER

successfully seek sanctions under Rule 11.[94] Molligan responded to the court's order to show cause and also filed several other pieces of supplementary material in response to defendant's motion for sanctions.[95] The court further ordered the parties to provide the following supplementary materials: "[d]ocumentation showing the date on which Molligan produced to defense counsel the photographs contained in defendant's Exhibits re Hearing, ECF 52," "[d]ocumentation showing what date defendant served its Request for Admission (dated May 29, 2024) on Molligan," and "[t]ext messages and other communications between plaintiff and individuals from the Wampler, Carroll, Wilson & Sanderson firm in May and June of 2024 that are referenced in the Oregonian article dated August 7, 2024."[96] As mentioned above, the court issued an Opinion and Order in October of 2025 finding that Molligan acted in bad faith in bringing and maintaining this lawsuit, and ordered her to be sanctioned under the court's inherent authority for the amount of attorney fees that defendant spent defending against it. *See* ECF 77. Molligan subsequently filed objections and additional evidence, and the court construed her objections as a motion for reconsideration. *See* ECF 80, 81. Defendant responded to that motion and Molligan filed a reply. *See* ECF 82, 83. The matter—whether Molligan should be sanctioned under either Rule 11 or the court's inherent power—is ripe for decision, and the court

---

[94] Order (Dec. 19, 2024), ECF 56.

[95] *See* Supplement, ECF 57; Resp. Mot. Sanctions, ECF 58; Molligan Surreply, ECF 63.

[96] Order (Apr. 18, 2025) 1–2, ECF 67; *see also* Maxine Bernstein, *Lawyer Alleges Widespread Scheme to 'Extort' Money from Portland Businesses Over Disability Access*, THE OREGONIAN/OREGONLIVE (Aug. 2, 2024, at 8:29 a.m.), https://www.oregonlive.com/crime/2024/08/more-than-40-portland-area-businesses-got-demand-letters-to-make-ada-updates-pay-thousands-in-lawyers-fees-in-shakedown-like-scam.html.

20 – OPINION AND ORDER

considers the full record, including the new evidence and arguments that Molligan made in her objections to the court's initial Opinion and Order, in the following analysis.[97]

## II.    Defendant's Motion for Rule 11 Sanctions

As mentioned above, defendant's second motion for sanctions under Rule 11 suffers from an incurable procedural defect because of the case's posture and the timing of the motion. "Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.' " *Islamic Shura Council of S. California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393 (1990)). Rule 11 sanctions are not available, however, "unless there is strict compliance with [the Rule's] safe harbor provision." *Id.* "That provision provides that any motion for sanctions must be served on the offending party at least 21 days before the motion is filed with the court," and the "safe harbor provision further dictates that the motion may not be filed if the offending party timely 'withdraw[s] or appropriately correct[s]' the challenged contention during the safe harbor period." *Id.* at 872–73 (citing and quoting FED. R. CIV. P. 11(c)(2)).

A Rule 11 sanctions motion "cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing . . . because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy." *Islamic Shura Council*, 757 F.3d at 873; *see also United States ex rel. MC2 Sabtech Holdings, Inc. v. Get Eng'g Corp.*, No. 3:19-cv-01249-RSH-MSB, 2025 WL 1043547, at *2 (S.D. Cal. Apr. 8, 2025) (collecting cases and explaining "[o]ther circuits are in agreement"

---

[97] Defendant's Rule 11 motion seeks sanctions against "plaintiff and/or plaintiff's counsel." Second Mot. Sanctions 38, ECF 38. Rule 11 sanctions are not available against either plaintiff or Molligan for the reasons discussed below.

that "the service and filing of a motion for sanctions must occur prior to final judgment or judicial rejection of the offending motion") (quoting *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008)).

The analysis is straightforward here. The case was dismissed after Molligan filed the Stipulated Dismissal in July of 2024.[98] Molligan's dubious explanation of the circumstances surrounding the dismissal—that although five days had elapsed since defendant gave consent to file the stipulated dismissal, she *just happened* to be filing it at the precise moment she received (but claims not to have read) an email from defense counsel withdrawing consent[99]—and the other facts that have come to light about her conduct notwithstanding, defendant did not serve or file its motion for sanctions under Rule 11 until after the complaint had been dismissed. Plaintiff and Molligan therefore did not have the opportunity to use Rule 11's "safe harbor" and withdraw the allegedly offending complaint after being served with defendant's second motion. Accordingly, that motion, which sought sanctions against "plaintiff and/or" Molligan, necessarily fails. *See Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*, 339 F.3d 1146, 1150 (9th Cir. 2003) (explaining that a Rule 11 "motion served after the complaint had been dismissed does not give the offending party" the opportunity to "withdraw the offending pleading and thereby escape sanctions") (simplified). However, that does not end the inquiry with respect to Molligan's conduct.

## III.    Inherent Power to Sanction

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' "

---

[98] Not. Voluntary Dismissal (July 8, 2024), ECF 24; Order (July 10, 2024), ECF 25; *see* FED. R. CIV. P. 41(a)(1)(A)(ii).

[99] *See* Molligan Decl. ¶¶ 1–3, ECF 37.

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.' " *Id.* (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45 (1991)). The court may sanction "conduct before the court as well as actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021) (citing *Chambers*, 501 U.S. at 44). "The power of a court over members of its bar is at least as great as its authority over litigants." *Id.* (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980)) (simplified).

"Although it is preferable that courts use—and first consider—the range of federal rules and statutes dealing with misconduct and abuse of the judicial system, 'courts may rely upon their inherent powers to sanction bad-faith conduct even where such statutes and rules are in place.' " *Id.* (quoting *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136–37 (9th Cir. 2001)); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

"Because of their very potency, inherent powers must be exercised with restraint and discretion," and part of that discretion is "fashion[ing] an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. "A district court may, among other things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys' fees, or assess fines." *Am. Unites*, 985 F.3d at 1088. "When a court is considering using its

23 – OPINION AND ORDER

inherent authority to impose sanctions, the first step is to determine whether the potential sanctions that may be imposed are compensatory, punitive, or both" because the "procedural requirements and the substantive limitations that apply" vary depending on the type of sanction imposed. *Id.* at 1089.

Compensatory or remedial sanctions "may go no further than to redress the wronged party for losses sustained and may not impose any additional consequence as punishment for the sanctioned party's misbehavior." *Id.* at 1089 (simplified). The sanction must be "calibrated to the damages caused by the sanctionable conduct," and the misconduct must be a "but-for" cause of the harm. *Id.*; *see also Meyer v. Mittal*, No. 3:21-cv-00621-HZ, 2023 WL 3004761, at *22 (D. Or. Apr. 17, 2023). The "but-for" causation standard "generally demands that a district court assess and allocate specific litigation expenses—yet still allows it to exercise discretion and judgment," with the "essential goal" being "to do rough justice, not to achieve auditing perfection." *Goodyear*, 581 U.S. at 109 (simplified). In exceptional cases, for example where a plaintiff initiates a case in bad faith, the but-for standard "permits a trial court to shift all of a party's fees" or "make a blanket award." *Id.* at 110.

The sanctions sought here are compensatory because they are based on the attorney fees and costs defendant incurred in defending against this action, and therefore civil procedural rules apply. *See* Second Mot. Sanctions 3, ECF 38 ("[D]efendant seeks the costs and fees which defendant has incurred to defend from plaintiff's bad faith claims."); *see also RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 511 (C.D. Cal. 2022) (explaining that a "court must . . . provide adequate notice and an opportunity to be heard before imposing civil sanctions"); *Meyer*, 2023 WL 3004761 at *22 ("Civil procedures apply to sanctions that are remedial or compensatory, while criminal procedures apply to punitive sanctions.").

24 – OPINION AND ORDER

"When acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *Am. Unites*, 985 F.3d at 1090; *see also Lu v. United States*, 921 F.3d 850, 859 (9th Cir. 2019) (explaining that among the available sanctions under the court's inherent power is the "assessment of attorneys' fees against 'a party that has acted in bad faith' ") (quoting *Goodyear*, 581 U.S. at 107). Bad faith, the only relevant option here, includes "conduct done vexatiously, wantonly, or for oppressive reasons," and "requires proof of bad intent or improper purpose." *Id.* Recklessness alone is not sufficient to find bad faith; rather it must be combined with "an additional factor such as frivolousness, harassment, or an improper purpose" to warrant sanctions under the court's inherent power. *Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001); *see also Harris v. JFC Int'l Inc.*, No. 2:21-cv-01536-LK, 2023 WL 3818463, at *9 (W.D. Wash. June 5, 2023) (citing *Fink*, 739 F.3d at 993–94; *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002)). At the same time, a bad-faith finding "does not require that the legal and factual basis for the action prove totally frivolous," and sanctions can be "justified when a party acts for an improper purpose—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Fink*, 239 F.3d at 992 (emphasis omitted).

The decision to impose sanctions based on the court's inherent power must be based on "an explicit finding that the sanctioned party's conduct constituted or was tantamount to bad faith." *Am. Unites*, 985 F.3d at 1090 (simplified). The Ninth Circuit has not established a specific standard of proof for imposing sanctions under the court's inherent power, but it "it is clear that a bad faith finding supported by clear and convincing evidence will suffice." *Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670, 677 (W.D. Wash. 2014) (citing *Lahiri v. Universal Music & Video Distrib. Corp.,* 606 F.3d 1216, 1219 (9th Cir. 2010)) (additional citations omitted).

The record, which includes representations made by Molligan, plaintiff, and defense counsel in open court, establishes by clear and convincing evidence that Molligan acted in bad faith in bringing this suit and in the manner she litigated it. As explained more fully below, Molligan entered into a Representation Agreement with plaintiff whereby she was the only attorney of record responsible for filing a lawsuit grown from a questionable financial arrangement between lawyer and client. Empowered by the broad authority purportedly given to her via the Representation Agreement, Molligan essentially conducted the case and attempted to settle it without consulting or communicating with plaintiff and without obtaining his consent for the actions she was purportedly taking on his behalf. The demand letter and complaint contained allegations that were simply not true and were not based on plaintiff's actual experience at defendant's property. In fact, there is no evidence in the record that Molligan ever communicated with plaintiff about his visit.[100] When she was presented with photographs showing that defendant had modified the parking lot since plaintiff's visit in 2022, instead of conceding certain issues or negotiating with defense counsel in good faith, Molligan sought and secured a court-ordered inspection of defendant's property by making misleading representations to the court regarding what she knew about plaintiff's experience at the property. And when, after Molligan finally discovered the photos of plaintiff's initial visit and disclosed them, and defense counsel served requests for admission that would have forced Molligan to admit that allegations

---

[100] Notably, across numerous rounds of voluminous briefing, an Order to Show Cause, a hearing, and now on a motion for reconsideration of the court's previous order regarding Molligan's conduct—all of which clearly put Molligan's communications with her client at issue—Molligan never offered any explanation or evidence, whether to be submitted *in camera* or otherwise, about when, how often, and on what topics she communicated with her client. *See Roberts v. Legacy Meridian Park Hosp., Inc.*, 97 F. Supp. 3d 1245, 1253 (D. Or. 2015) (explaining that "the fact of the communication, the identity of the attorney, the subject discussed, and details of the meetings . . . are not protected by the [attorney-client] privilege").

26 – OPINION AND ORDER

in the complaint were not factually supported, Molligan immediately agreed to settle the case for $1,000 in attorney fees, without ever consulting with plaintiff about how he wanted to proceed. All of this indicates that Molligan brought this action for the improper purpose of extracting an attorney fee settlement. Molligan's initial demand for $13,000 in attorney fees grossly overestimated the amount of work she had done, or claimed she would do on the case "short of litigation,"[101] and it appears she requested the repairs without ever discussing with plaintiff what he experienced at the property or what changes he thought were needed. And when the factual foundation of the case began to crumble, so did the façade; Molligan abandoned any attempt to conduct the court-ordered inspection of the interior of defendant's property or secure additional repairs and instead did what she could to line her own pocket.

Although there are many facets of Molligan's conduct here that may warrant sanctions, any discussion must begin with one of this case's most fundamental aspects—the relationship between Molligan and plaintiff, her now-former client. As described above, the Representation Agreement gave Molligan advanced blanket authority to litigate and, most importantly, settle claims without consulting plaintiff. Such an agreement violates the Oregon Rules of Professional Conduct, including Rule 1.2(a), which requires that "a decision to settle must be made by the client, not the lawyer," and Rule 1.4, which obligates the attorney to "keep a client reasonably informed about the status of a matter" and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Oregon State Bar Formal Opinion No. 2019-195, though not binding,[102] is persuasive here in explaining why "[a]n

---

[101] Demand Letter, Ex. B, ECF 60-2.

[102] *See Evraz Inc., N.A. v. Cont'l Ins. Co.*, No. 3:08-cv-00447-AC, 2013 WL 6174839, at *4 (D. Or. Nov. 21, 2013) (explaining that Oregon legal ethics opinions are "advisory" and not controlling).

27 – OPINION AND ORDER

attorney may not ethically obtain from a client an advance blanket authorization over all settlement decisions," based on the requirements of Rules 1.2 and 1.4. OSB Formal Op. No. 2019-195 at 2. Such an arrangement runs afoul of both Rule 1.2 and 1.4 as it is "virtually impossible for a client to provide *informed* consent to [settle a case] at the outset of a representation" because "the facts and circumstances of a case are not fully developed, and the terms and conditions of a settlement will likely not have been fully explored or determined." *Id.* (emphasis in original). Other state bodies regulating the conduct of lawyers have reached essentially identical conclusions. *See* Ariz. Ethics. Op. 06-07 (2006) (concluding an attorney could not ethically use a fee agreement that gave the attorney "blanket authority to decide whether to settle the client's case and then execute – as the client's attorney in fact – any drafts or releases necessary to accomplish the settlement" because, among other things, a client's informed consent is necessary to settle a case); *Matter of Lewis*, 266 Ga. 61, 63 (1995) (finding an attorney "violated his duty to consult with his client prior to accepting the [defendant's] settlement offer," purportedly via a representation agreement that stated the attorney "shall have full power and authority to settle, compromise, or take such action as he might deem proper for the best interest of the client").

This case is a paradigm example of why Rules 1.2 and 1.4 exist and some of the problems these rules are designed to prevent. For one thing, with the broad authority purportedly provided by the power of attorney, Molligan seems to have litigated the case with little, if any, communication with her client. As the case developed, it became clear that the allegations in the complaint were not based on plaintiff's actual experience, and it appears that Molligan drafted and filed the complaint without ever consulting plaintiff about what he observed during his visit to defendant's property in November of 2022, or whether he ever intended to return there. The

28 – OPINION AND ORDER

initial complaint alleged that plaintiff tried but was "unable to access and assess all areas of the [defendant's] premises due to the architectural barriers encountered."[103] The complaint also alleged that plaintiff "intend[ed] on revisiting" the property within six months of filing the complaint or sooner, depending on when the alleged "barriers" were removed.[104] In the Second Amended Complaint filed in February of 2024, Molligan wrote that plaintiff "attempted to, and has to the extent possible, accessed the Subject Property in his capacity as a patron . . . but could not fully do so because of his disabilities resulting from the physical barriers to access, dangerous conditions and ADA violations."[105] Further, the Second Amended Complaint repeated the allegation, first raised by Molligan in the Amended Complaint filed in December of 2023, that the "visible upright signage (displaying the International Symbol of Accessibility) designating any parking space as accessible is faded and unintelligible[.]"[106]

Molligan failed to conduct a reasonable investigation into the facts and apparently never communicated with plaintiff about his visit to defendant's property before sending the demand letter and subsequently filing the complaint, and many of the allegations turned out to be false. In her briefing regarding defendant's second motion for sanctions, Molligan represented that she knew, or at the very least later found out, that plaintiff actually "did enter the property and make a purchase."[107] Also, photos taken during plaintiff's only visit to defendant's property in November of 2022 show a blue and white sign designating an accessible parking space that was

---

[103] Compl. ¶ 28, ECF 1.
[104] *Id.* ¶¶ 15–16.
[105] Second Am. Compl. ¶ 27, ECF 13.
[106] *Id.* ¶ 31(h); *see also* Am. Compl. ¶ 31(i), ECF 8.
[107] Molligan Surreply 3, ECF 48; Sanctions Hearing Tr. 24:2–25:12, ECF 53.

plainly legible and not, as the complaint alleged, "faded and unintelligible" on the day that plaintiff visited the property.[108]

As for plaintiff's "intent to return" to the property, Molligan stated she did not ask plaintiff about that, even though she understood that intent to return was a key part of the claim she was asserting on plaintiff's behalf.[109] Plaintiff said he did not understand that returning to the property was part of the arrangement.[110] Without the intent to return, plaintiff did not have standing to bring an ADA claim. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011) ("[A]n ADA plaintiff can establish standing to sue for injunctive relief either by demonstrating deterrence, or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding a plaintiff seeking injunctive relief must establish a "sufficient likelihood that he will again be wronged in a similar way").[111] Molligan posits that "it was reasonable to expect that [plaintiff] would return to the property if asked to as part of his role as an ADA tester" because he had "already visited numerous properties in the area and seemed fine doing so" and thus she "could not have possibly anticipated that [he] would suddenly stop serving as a tester[.]" Molligan Obj. 19, ECF 80. But the key facts for standing were whether plaintiff actually intended to revisit defendant's particular property and how concrete those plans were. *See Feezor v. Sears, Roebuck & Co.*, 608 F. App'x 476, 477 (9th Cir. 2015) (explaining that an ADA plaintiff's "profession of

---

[108] *See* Def. Hearing Exhibits, Ex. 2, ECF 49.

[109] Sanctions Hearing Tr. 33:8–17, ECF 53; *see also* Second Am. Compl. ¶ 15, ECF 13 (alleging plaintiff "intends on revisiting the Subject Property").

[110] *Id.* at 34:17–35:10.

[111] *See also Johnson v. DTBA, LLC*, 424 F. Supp. 3d 657, 666 (N.D. Cal. 2019) (holding the plaintiff did not establish standing because he did "not adequately alleg[e] that he is likely to return to the Bar or that [he] is deterred from doing so," including "(1) that he prefers this bar over others, (2) any specific instances of deterrence, or (3) that he often patronizes Bay Area bars and would patronize this one but-for the violations").

an intent to return to the places he had visited before is not sufficient to establish standing because such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that our cases require") (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564 (1992)) (simplified). Merely assuming that plaintiff would continue to visit properties in his role as a "tester" is irrelevant to plaintiff's standing for this particular lawsuit. And, more importantly, Molligan simply never asked plaintiff about his visit to defendant's property and thus had no factual basis whatsoever for alleging that plaintiff had "visited . . . [the property] on multiple prior occasions" or "intend[ed] on revisiting [the property] within six months" to become "a "regular patron" there.[112]

Molligan said that she relied on an "initial inspection report that was used in the drafting of the complaint" and her own visit to the property sometime before the complaint was filed in September of 2023.[113] The details about this "initial inspection" are sparse; Molligan represented that a so-called "ADA expert" was the "initial person looking at the property."[114] Molligan has not produced even the name of this "expert," much less the "inspection report" this expert allegedly prepared, and could not specifically identify the date on which this "initial inspection" of defendant's property occurred.[115] Molligan also represented that she visited defendant's property in August 2023 before the complaint was filed and observed there was "graffiti all over the sign."[116] Even if that is true, Molligan does not explain the discrepancy between the picture

---

[112] Sec. Am. Compl. ¶ 15, ECF 13; *see also* Sanctions Hearing Tr. 25:25–26:3, ECF 53 (in which plaintiff represented that he "did not have any intention to return" to the property or "to . . . become a regular" there).
[113] Molligan Resp. Order Show Cause 4, ECF 58.
[114] Sanctions Hearing Tr. 20:13–21, ECF 53.
[115] *Id.* at 21:24–22:2.
[116] *Id.* at 21:8–16.

31 – OPINION AND ORDER

of the signage during plaintiff's actual visit to the site in November of 2022 and the allegations in the complaint that are purportedly based on the "ADA violations . . . [p]laintiff experienced and/or observed[.]"[117] Molligan said that the photos, to her, meant that "somewhere between the time that the initial person looking at the property looked at it and the time of [plaintiff's] visit, [defendant] put up a new sign."[118] Whether Molligan was intentionally misleading in describing the timeline or hopelessly ill-informed about the allegations she was asserting in the amended complaints is not clear. It is clear, however, that Molligan did not corroborate the report's "findings" by asking plaintiff about what he saw and experienced at defendant's property in 2022, despite alleging in the complaint the purported "unlawful physical barriers, dangerous conditions and ADA violations [that] [p]laintiff experienced and/or observed" during the November 2022 visit.[119]

Not only that, but Molligan added the allegations about the sign to two amended complaints after the case had already begun, thereby indicating to the court and defendant that she had some new factual basis for adding the allegation about the sign. But the initial "inspection report" for the property had been completed long before Molligan *added* the allegation regarding the signage to the amended complaint filed in December of 2023,[120] and Molligan should have discovered and resolved any lingering confusion between the initial report and what plaintiff actually saw at the property in November of 2022 before expanding the allegations in the operative complaint. If not then, she surely should have verified the details of plaintiff's visit to the property after the hearing on defendant's motion to dismiss in January of

---

[117] Second Am. Compl. ¶ 31, ECF 13.
[118] Sanctions Hearing Tr. 20:13–16, ECF 53.
[119] Compl. ¶ 27, ECF 1.
[120] Am. Compl. ¶ 27(i), ECF 8.

32 – OPINION AND ORDER

2024. At that hearing, defense counsel asserted a number of specific facts that seemed to call into question the veracity of the allegations in the complaint—including that the property did not have a flared ramp, the parking lot was clearly marked, and a clear accessible parking sign was installed.[121] Molligan apparently did not contact plaintiff at any point to discuss these potential problems; had she done so, she could have discovered the photos earlier and confirmed with plaintiff what he actually saw at defendant's property. Instead, she continued to assert baseless, boilerplate allegations regarding defendant's signage and other aspects of the property while mispresenting to the court and opposing counsel the extent of her knowledge of the property and plaintiff's experience there.

In sum, Molligan filed a complaint that was purportedly based on what her client "was able to observe at the time"[122] of his visit to defendant's property in November of 2022, but she did not conduct a reasonable investigation into the facts before bringing suit and it appears that she never communicated with her client about what he saw and experienced during the visit. Prior to filing the complaint, Molligan did not know that photos of the visit existed and she did not ask plaintiff a key question that was needed to establish his standing to sue. She instead relied on an "expert" report and her own observations of the property, and many of the allegations in the demand letter and the complaint did not match what plaintiff experienced. Molligan used the blanket power of attorney to run the case without any input from, or seemingly any meaningful communication at all with, her client. Molligan appears to have regarded plaintiff as little more than a case generator for her—otherwise, Molligan would have made it a priority to understand what barriers he experienced and what changes to the property

---

[121] Motion Hearing Tr. 14:18–15:16, ECF 65.
[122] Inspection Hearing Tr. 6:23, ECF 76.

he thought might be needed to make it more accessible. But apart from visiting the site, plaintiff had essentially no connection with the case or apparently any idea what was going on with it.

The problems wrought by Molligan's failure to communicate with her client and her reliance on the purported power over plaintiff's case without his consent, not to mention her misrepresentations regarding what she knew about plaintiff's experience, affected not only this matter's beginning, but also its middle and end. The court relied on plaintiff's supposed standing to order an invasive inspection of defendant's property[123], which defense counsel stated was "a material factor in [d]efendant's decision to offer a nominal settlement amount in June 2024."[124] Molligan made further representations at the inspection hearing about plaintiff's visit to the property—including that the entryway to the dispensary was too narrow and that "someone else in a wheelchair would have the same exact problem [as plaintiff did] trying to get into that property, especially concerning the [dispensary]"—which gave the unmistakable impression that plaintiff had personally encountered a barrier there.[125] Yet, plaintiff later stated in open court that he was in fact able to access the dispensary and make a purchase, and could not remember any barriers at the property.[126] Molligan claimed to have visited the property herself at some unspecific point and viewed the entryway, but she has not offered any evidence that plaintiff personally experienced a barrier at the entryway to the dispensary. *See Vogel v. Tulaphorn, Inc.*, No. 2:13-cv-00464-PSG-PLA, 2013 WL 12166212, at *2, *6–*8 (C.D. Cal. Nov. 5, 2013), *aff'd,* 637 F. App'x 344 (9th Cir. 2016) (finding that counsel acted in bad faith after misrepresenting

---

[123] *See* Order (May 7, 2024) 2–5, ECF 23.
[124] Def. Reply 10, ECF 59.
[125] Inspection Hearing Tr. 15:22–25, ECF 76.
[126] Sanctions Hearing Tr. 25:5–12, ECF 53.

that the plaintiff had visited the defendant's property on a specific date, but in fact it was the plaintiff's counsel who had visited the premises and made a purchase).

Plaintiff was largely in the dark about his case until he first learned through the media in May of 2023 about how Molligan was running the cases. Shortly thereafter, as described above, plaintiff told Wampler on May 22, 2023, that he "quit," and on May 29, 2023, plaintiff specifically rejected Wade's request for assistance with defendant's property, stating that he "[did] not agree with the way that your firm handles this business" and "[did] not want to be associated" with it.[127] This all occurred at the same time Molligan was eagerly trying to settle the case with defendant on May 30, 2024, though Molligan did not know, or at the very least was unsure about, what plaintiff wanted to do, and her attempted explanations about what was happening in the attorney-client relationship as the case was ending are bizarre and contradictory. When Molligan was asked when she first had indications that plaintiff did not want to proceed with the case, she responded "it was in early May that . . . he wasn't being assigned places to go. He was – you know, okay, he's not doing this anymore[.]"[128] But because Molligan was not part of the conversations between plaintiff and Wampler or Wade,[129] and apparently was not herself in regular (if any) contact with plaintiff, she did not learn until "after the fact" that plaintiff "didn't want any new cases."[130] Even then, Molligan did not seem to understand what plaintiff wanted and, more importantly, she did not seek further clarification. Molligan stated she knew plaintiff "didn't want any new cases," but she "did not understand that

---

[127] Mehrens Decl., Text Message Ex., ECF 68 at 40.
[128] Sanctions Hearing Tr. 14:1–7, ECF 53.
[129] *Id.* at 13:14–15 (wherein Molligan describes that plaintiff "was having communications not with me but with B.J. Wade primarily, I think primarily").
[130] *Id.* at 15:3–7.

he was not agreeing to settlements" because that "was not made clear to [her]."[131] Again, empowered by the blanket power of attorney, Molligan forged ahead without bothering to consult with plaintiff and attempted to settle the case because she "was authorized to do settlements . . . and assumed that he would want to extricate himself as quickly and easily as possible," which to Molligan meant via settlement.[132]

Given plaintiff's overt and clear direction on May 29, 2024, that he no longer "wanted to be associated" with the lawyers and this specific case, there is an obvious question whether Molligan had authority to take any action on the case at all after that point, much less to settle it without plaintiff's consent on terms that, as discussed more fully below, solely benefitted herself, and then to voluntarily dismiss plaintiff's suit once the problem with plaintiff's signature arose (this latter step of course being significant because it affected both plaintiff's and defendant's legal rights, obligations, and potential remedies). Molligan said it only "became clear" to her that plaintiff wanted to end the representation when he "refus[ed] to sign" the Settlement Agreement after defense counsel's insistence, though the details of when and by whom plaintiff was actually shown the agreement and then asked to sign it before he refused are not clear.[133] To muddy the waters even further, Molligan produced a supplemental exhibit that appears to show that plaintiff *did in fact* sign the Settlement Agreement on July 2, 2024,[134] one day after Molligan had told defense counsel that plaintiff was "dismissing this case" and had begun working to secure the Stipulated Dismissal that defense counsel returned to Molligan on July 3, 2024.[135] Molligan

---

[131] *Id.* at 15:3–8.
[132] *Id.* at 14:21–23 (Molligan: "I didn't understand that what he meant was that he wouldn't sign it. In other words, because I was authorized to do settlements, I assumed that he would want to extricate himself as quickly and as easily as possible and -- Well, that's what I thought.").
[133] *Id.* at 13:13–19.
[134] Molligan Supp. Record 8, ECF 72.
[135] Blumm Decl., Ex. A at 5, ECF 39-1.

36 – OPINION AND ORDER

apparently never knew about the signed agreement until the court ordered her to produce supplementary materials in the sanctions phase of the case nearly a year later[136]; a phone call or an email to plaintiff might have revealed it, or at least provided clarity on plaintiff's wishes, sooner.

Coming to some conclusion about precisely when Molligan no longer had authority to act on plaintiff's behalf, or whether plaintiff actually signed the Settlement Agreement and what legal effect if any that may have in this case, is beside the point. The key observation to be made here is that the difficulty in answering those questions reflects Molligan's failure to communicate with plaintiff and illustrates the risks to clients, their legal adversaries, and the orderly administration of justice that result from representation agreements like the one that gave Molligan the purported authority to bring and eventually resolve cases without the client's informed consent and without keeping the client reasonably apprised about the case and how it was progressing.

All of these problems and questions about Molligan's relationship with plaintiff inform the analysis of Molligan's other conduct in the case and the determination that she acted in bad faith by bringing a contrived lawsuit that was designed, using plaintiff's visit to the property and the requested repairs as a pretext, to extract an attorney fee settlement from defendant, all to Molligan's benefit. *See* Second Mot. Sanctions 12, ECF 38 ("[P]laintiff's retention agreement in which he allegedly vested all settlement authority in plaintiff's counsel, and plaintiff's counsel's efforts to execute settlement agreements without plaintiff's signature, indicates a wider

---

[136] *See* Molligan Mot. Supp. 1, ECF 70 (wherein Molligan explains that "[i]n the course of responding to this Court's Order dated April 18, 2025," she learned that plaintiff "did in fact sign the Settlement Agreement between the parties in this matter on July 2, 2024").

37 – OPINION AND ORDER

sanctionable effort to use the ADA as a tool to engage in frivolous litigation" with a "focus on attorney fees.").

The repairs requested in Molligan's initial demand for $13,000 in attorney fees do not appear to be rooted in any discussion or consultation between Molligan and plaintiff about any barriers that he experienced at the property. Molligan admitted she did not know whether plaintiff ever intended to return to the property and did not discuss with plaintiff the actual barriers (if any) that he encountered during his November 2022 visit, meaning the repairs requested in the demand letter could not have been based on Molligan's sincere belief that they were actually needed or were meant for plaintiff's benefit. Some of the requested repairs were for issues not even present at the property—for example, the request in the demand letter that "designated accessible spaces . . . need[ed] to be dispersed evenly throughout the property" was not based on the reality of the parking lot. There are four spaces in total, including one accessible space.[137] Thus, the one accessible space could not be "dispersed evenly" in any sense of the phrase. Furthermore, ADA regulations only require one accessible space in a parking lot with between 1 and 25 spaces, so no additional accessible space was required at defendant's property. *See* 36 C.F.R. § Pt. 1191, App. B § 208.2. Including such a baseless request in the demand letter indicates that Molligan was motivated to exaggerate the alleged ADA violations at the property in an attempt to bolster her claim for attorney fees.

Additionally, Molligan's initial demand of $13,000 in attorney fees vastly outpaced the value of the work she appears to have put into the case, or reasonably could have been expected to perform "short of litigation."[138] Apart from parroting the "initial inspection report"

---

[137] *See* Demand Letter 1, ECF 60-2; Def. Reply Mot. Sanctions 4 n.3, ECF 43.
[138] *See* Demand Letter 2, ECF 60-2.

purportedly prepared by an unidentified "expert" and writing a demand letter, it appears that

Molligan did little else in developing the case to that point (or much after, for that matter) that

would justify her $13,000 demand for attorney fees at the outset. Moreover, because the

requested repairs were not based on the true condition of defendant's property, this calls into

question whether Molligan had a reasonable basis to request fees for the "monitoring" of

defendant's "remediat[ion of] the property" in the future.[139]

After filing the suit on the basis of uninvestigated allegations, several of which ultimately

proved to be untrue, Molligan then relied on false or at best misleading allegations and

statements to secure a court order allowing an inspection of the interior of defendant's property,

thereby strengthening her settlement leverage when it appeared that the suit was headed towards

early summary judgment in defendant's favor. During the hearing on her request for that

inspection, Molligan finally discovered the photos of plaintiff's initial visit to the property, and

despite the photos quite obviously calling into question at least some of the allegations in the

complaint, she continued the charade of seeking an inspection based on flimsy evidence and

seemingly without knowing much of anything about the true state of defendant's property.

Molligan's lack of knowledge was made further apparent at the sanctions hearing, where she

claimed that the "biggest issue with the access was the narrow entrance" of the former

dispensary.[140] However, when asked, Molligan could not identify which regulation was

purportedly violated, and none of the three complaints that she filed mentions a narrow

entryway.[141] Molligan also claimed the ramp was "problematic" and described a ramp "leading

up to the front door of the teriyaki restaurant," but could not clearly articulate what the problem

---

[139] *See id.*
[140] Sanctions Hearing Tr. 28:13–14, ECF 53.
[141] *Id.* at 30:9–18.

was.[142] In fact, there is no ramp to the teriyaki restaurant; one of the photos from plaintiff's visit in November of 2022 shows a ramp in front of the dispensary and other photos show no ramp leading up to the teriyaki restaurant.[143]

Molligan's conduct in attempting to settle and then subsequently dismissing the case further supports the conclusion that she was using this case as a vehicle to generate fees. After the pictures of plaintiff's initial site visit were produced in April of 2024 and the first media stories began to come out in May of 2024, defense counsel sent Molligan a request for admission that showed they had uncovered serious and troubling problems with the complaint.[144] Molligan immediately agreed to settle the case for $1,000 in attorney fees without consulting plaintiff, and without conducting the court-ordered inspection of the interior of defendant's property or attempting to ensure any repair of the entryway to the dispensary that she represented to the court (without, it seems, any reasonable investigation) was a barrier to anyone in a wheelchair. There is no evidence that Molligan ever informed plaintiff that she had secured the right to inspect the property, and she did not consult with plaintiff about giving up the right to inspect as part of the settlement agreement. The only material term Molligan discussed during negotiations with defense counsel was the amount of attorney fees she would be paid. When defendant's requests for admission came, and Molligan faced the prospect of admitting that several of the allegations in the complaint had no factual basis, Molligan abandoned the inspection—perhaps plaintiff's most powerful negotiating piece. More importantly, Molligan's retreat from the inspection and failure to even attempt to secure any concession from defendant about the purported accessibility

---

[142] *Id.* at 27:9–25.
[143] Def. Hearing Exhibits, Ex. 1, ECF 49; Mot. Summ. J. 5, ECF 16; Blumm Decl., Exs. A–F, ECF 17.
[144] Def. Supp. Ex. 3 at 1, ECF 73.

40 – OPINION AND ORDER

issues on the interior of the property, and in particular the entryway to the dispensary she represented could not accommodate a wheelchair, was directly contrary to plaintiff's reason for bringing the suit; plaintiff told the court that he "enter[ed] these cases . . . as an effort to make life more accessible for people with disabilities," and he told Wade the same thing.[145]

And though Molligan points out the settlement agreement states that "all of the ADA violations alleged in plaintiff's complaint related to the property or the premises addressed in this matter no longer exist as of June 12, 2024," that does not change the conclusion that Molligan attempted to settle the case without consulting plaintiff and on terms that solely benefitted herself. Molligan asserts that defendant "made significant changes to the parking lot because of [plaintiff's] lawsuit." Molligan Obj. 14–15, ECF 80. It is true that the photographs defendants submitted in support of its motion for summary judgment show that defendant repainted the parking lot markings and moved the accessible parking space sometime after plaintiff's visit in November of 2022. But Molligan did not send the demand letter to defendant until August of 2023, and defendant's photos are not dated. When Molligan filed the suit, she apparently knew next to nothing about the condition of defendant's property at the time plaintiff visited it in November of 2022, and defendant has denied from the beginning that the allegations in the complaint accurately reflected the condition of the property and raised those issues at the first opportunity. There is no evidence from which to conclude, as Molligan asserts, that defendant made changes to its parking lot because of this litigation.

---

[145] Mot. Withdraw Hearing Tr. 12:18–21, *Slevin v. Baek Family Partnership*, Case No. 3:23-cv-01487-HZ, ECF 15; *see also* Mehrens Decl., Text Message Ex., ECF 68 at 40 ("I want to make changes for accessibility in my community, but I do not agree with the way that your firm handles this business and I do not want to be associated.").

41 – OPINION AND ORDER

Similarly, Molligan's argument that her conduct is not sanctionable because defendant made some repairs to the property is inapposite. Molligan Obj. 2, ECF 80 (asserting that defendant "made significant alterations to the property because of Mr. Slevin's ADA lawsuit" and, thus, she "did not bring it in bad faith"). "For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides,* the assertion of a colorable claim will not bar the assessment of attorney's fees." *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995) (simplified). The fact that defendant repainted its parking lot or moved the location of its accessible parking space does not excuse Molligan's conduct in bringing a lawsuit without conducting a reasonable investigation, determining whether her client had standing, failing to communicate with her client, and misrepresenting her knowledge about the case and its underlying facts.

Molligan also disavows an improper purpose on the basis that the lack of terms regarding the inspection or future repairs in the Settlement Agreement was because the agreement arose "after it became known to [her] that [p]laintiff no longer wanted to pursue ADA claims and after [d]efendant had made some repairs and modifications." Molligan Surreply 4, ECF 63. This flatly contradicts other evidence in the record. As explained above, Molligan immediately accepted defendant's offer to settle the case for $1,000 in fees on June 1, 2023, and she delivered the first draft of the Settlement Agreement on June 4, 2024.[146] On June 18, 2024, Molligan delivered the

---

[146] Blumm Decl., Ex. A at 11, ECF 39-1; *see also* Sanctions Hearing Tr. 10:23–25, ECF 53 (wherein Molligan states she believed they "had already settled the case" sometime around May 29, 2024, when defendant served the Request for Admission regarding plaintiff's initial site visit).

42 – OPINION AND ORDER

signature page, which she had signed in her own name as "Power of Attorney" for plaintiff.[147]

Molligan later represented that "it really wasn't until the actual signature was requested . . . that

it became clear to me that [plaintiff] did not want anything to do with any of this,"[148] but that

could have happened only after defense counsel told Molligan on June 20, 2024, that they

needed plaintiff's signature for the agreement; the terms, including the lack of inspection and

future repairs, had long been set. Moreover, Molligan made no effort to confirm that the repairs

reflected in defendant's photographs addressed the barriers that plaintiff experienced during his

visit before purportedly agreeing to settle the case without plaintiff's consent. Instead, the

pressure of ending the lawsuit as quickly as possible seemed to be Molligan's primary, if not

sole, motivation. Molligan's post-hoc rationalizations regarding why the Settlement Agreement

and the brief negotiations that preceded it were totally silent as to the inspection or future repairs,

like many of her other representations in this case, ring hollow.

Molligan claims "that proceeding with the case and getting out of it to [her] were two

different things," and she did not "understand that what [plaintiff] meant was that he wouldn't

sign" the settlement agreement.[149] She explained, "In other words, because I was authorized to

do settlements, I assumed that he would want to extricate himself as quickly and as easily as

possible and -- Well, that's what I thought."[150] But Molligan's ill-informed and ultimately

incorrect assumption that her disabled client would want her to abandon the effort to inspect for

and fix any alleged accessibility problems at defendant's property and only wanted her to benefit

---

[147] Blumm Decl., Ex. A at 7, ECF 39-1.
[148] Sanctions Hearing Tr. 13:16–19, ECF 53.
[149] *Id.* at 14:3–24.
[150] *Id.*

from the settlement agreement underscores her failure to communicate with her client and determine how he actually wished to proceed.

Molligan's argument that the court may not consider whether she "violated Oregon's Rules of Professional Conduct" because those rules "may only be enforced by the Oregon Supreme Court and the disciplinary board appointed by that court" is baseless. Molligan Obj. 18, ECF 80. It is well-established that federal courts have the power to sanction an attorney for violating relevant rules of professional conduct. *See United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996) ("With respect to the court's inherent power, we note that an attorney admitted to a particular bar may be disciplined for conduct that violates that bar's local rules of professional conduct."). "Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised" and "[i]t is the *duty* of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar." *Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1324 (9th Cir. 1976) (emphasis added). And attorneys practicing before this court are bound by Local Rule 83-7 to "[b]e familiar and comply with the Oregon Rules of Professional Conduct and this Court's Statement of Professionalism."

Molligan's citation to Oregon statutes and case law regarding the "exclusive" jurisdiction of the Oregon Supreme Court over state bar disciplinary matters is similarly inapposite. *See* Molligan Obj. 18, ECF 80 (citing *Kidney Ass'n of Or., Inc. v. Ferguson*, 315 Or. 135, 141 (1992); O.R.S. 9.534). Those statutes create a specific procedure to be followed in proceedings to "disbar, suspend, or reprimand" a member of the Oregon State bar. O.R.S. 9.527. Such bar proceedings "are neither civil nor criminal in nature," and are "sui generis and within the inherent power of the [Oregon] Supreme Court to control." O.R.S. 9.529. Thus, the Oregon

44 – OPINION AND ORDER

Supreme Court has the power to enforce the applicable rules in the particular context of a "sui generis" bar proceeding to "disbar, suspend, or reprimand" a lawyer. The present case is not, obviously, such a disciplinary proceeding and thus those statutes and decisional law simply do not apply.

Finally, Molligan denies paying plaintiff directly and asserts the court's conclusion that she was "complicit" in the arrangement whereby plaintiff received a flat $200 as a "reimbursement" for each site he visited is erroneous. Molligan Obj. 12–13, ECF 80. For one thing, the payment was clearly not a reimbursement, or a "repayment for an expense or loss incurred,"[151] because plaintiff "never spent . . . close to $200 at any location [he] visited."[152] Molligan is (or at least was, until plaintiff terminated her representation) the sole lawyer responsible for this case. She knew plaintiff was being paid an "agreed upon" amount and believed it "would make him, on average, whole in terms of transportation, gas, expenses, and additional care services if necessary" for visiting properties, and she claims to have "reasonably and in good faith relied upon Oregon Rule of Professional Conduct 1.8(e)(1) which states that an attorney may advance costs and expenses of litigation for a client." Molligan Resp. Order Show Cause 5, ECF 58 (some formatting modified). The fact that the payments came from Molligan's co-counsel and not directly from herself is a distinction without a difference for the present purpose. Whatever the appropriate term to assign to Molligan's involvement in the payment scheme, the fact that Molligan's representation of plaintiff was contaminated with what looks to be an unethical payment arrangement is just one more tile in the mosaic of Molligan's bad faith and ill-informed conduct in this case.

---

[151] https://www.dictionary.com/browse/reimbursement.
[152] Sanctions Hearing Tr. 38:1–2, ECF 53.

45 – OPINION AND ORDER

In sum, Molligan brought this case without any meaningful investigation into the facts, using an unethical representation arrangement that was designed to allow her to use plaintiff and his visit to the property as a vehicle to facilitate obtaining attorney fees. She misled the court to obtain an order allowing an inspection of defendant's property, and then, when the case appeared doomed, she attempted to settle the case without her client's informed consent and on terms that served only her interests. She later dismissed the case, again without talking to her client, and did so under extraordinarily suspicious circumstances after defendant had apparently withdrawn its consent to dismissal. Molligan's misconduct and bad faith infected this case from its inception, and thus "every cost of defense is attributable only to sanctioned behavior." *Goodyear*, 581 U.S. at 110. A blanket award based on the total amount of fees that defendant has incurred in defending against Molligan's "sordid scheme" is justified. *Id.*

## ORDER

Defendant's Rule 11 Motion for Sanctions (ECF 38) is denied; however, attorney Jessica Molligan is sanctioned under the court's inherent power for bringing and litigating this case in bad faith, and because this conduct permeated the entire case from the beginning, defendant is awarded the entire amount of reasonable fees incurred in defending it.

DATED March 31, 2026.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge
